FILED
CLERK
4/8/2016
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA :

14-CR-208 (ADS)

-against- :

United States Courthouse
Central Islip, New York

WILLIAM SCULLY,

October 13, 2015

Defendant. : 9:25 a.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ARTHUR D. SPATT
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government: KELLY T. CURRIE
Acting United States Attorney
100 Federal Plaza
Central Islip, New York 11722
BY: CHARLES P. KELLY
KENNETH M. ABELL
Assistant United States Attorneys

For the Defendant: KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022
BY: SCOTT A. RESNIK, ESQ.
MICHAEL ROSENSAFT, ESQ.

Court Reporter: Perry Auerbach
100 Federal Plaza
Central Islip, New York 11722
(631) 712-6103

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

(The following ensued in the absence of the jury at 9:25 am.)

THE COURT: I received a telephone call from the employer for Juror No. 5 whose name is Byron Chou, and he said that their policy is to pay the jurors for the first week but not after that. And he said that is a binding policy and it is not going to be changed. So I am going to have to excuse Juror No. 5 after today. He gave me all kind of reasons how it would be a hardship for him to continue, he wouldn't be able to pay his bills and he would be in real financial trouble, so I think we have to left him go.

Any objection to that?

MR. RESNICK: No objection from the defense, your Honor.

MR. KELLY: No, your Honor.

THE COURT: Also, I am going to tell the jurors that their going to be off on November 2. You know that now, right?

MR. KELLY: Yes, your Honor.

THE COURT: I think that about covers the announcements.

(There was a pause in the proceedings.)

(The following ensued with Juror No. 5 outside the courtroom.)

THE COURT: I got a call from David Bressen, actually yesterday when I wasn't here but I called him this morning. He told me that they had a very firm policy that they would not be able to pay you past the first weeks. I spoke to him to see if I remember could persuade him otherwise but I couldn't. So you are going to sit today, and after today you are going to be excused.

Don't talk to the other jurors. Don't tell them anything. All right?

JUROR NO. 5: All right.

THE COURT: Okay.

JUROR NO. 5: What happens with like pass? Do I give it to you at the end of the day?

THE COURTROOM DEPUTY: I will give you a certificate for the days you were here, the jury selection so at the end of the take when Judge Spatt recesses, at 4:45 just buzz me and then when the jurors leave I will talk to you in the hallway. I will give you that and then you will give me back your ID.

JUROR NO. 5: He gave me a letter to give you but I imagine it says the same thing he already told you.

Thank you, your Honor.

(Discussion with Juror No. 5 was concluded.)

(The following ensued in court in the absence of the jury.)

THE COURT: I am beginning to wonder about the jury selection.

I received a phone call from Juror No. 5's employer, and I had a telephone conversation with him and he said that they could not pay Juror No. 5 beyond the first week. So I'm going to have to excuse Juror No. 5.

I spoke to Juror No. 5 this morning. He is going to stay the rest of the day and then leave at the end of the day. He will not discuss this with the other jurors. However, we have another problem.

Alternate Juror No. 1 has a similar problem. She said that she told this to the Judge in the selection of the jury but no one paid any attention to her. So I'm going to have to speak to her and see what her problem is. We will do that later today and I will let you know. So we have this other potential problem.

I received a communication from the employer of Juror No. 5, which I am going to put in the record, of course not to be seen by the other jurors, which explains that they can't pay him after the first week.

You know, I think, already, or if you don't I'm telling you now, that there will be no trial on November 2nd. A juror has a problem on November 2nd that I have to take care of. So there will be no trial on November 2nd.

That is all I think I have to tell you now. But it looks like we may lose another juror. I have will have to speak to that juror later today.

Are we all set to go?

THE COURTROOM DEPUTY: The jury is ready.

THE COURT: Bring the jury in.

We concluded the testimony of the previous witness. Is that right, Mr. Kelly?

MR. KELLY: Yes, your Honor.

THE COURT: Incidentally, I also received a letter from Juror No. 5's employer to the same effect of what I discussed.

This letter from Juror No. 5's employer says: *"Unfortunately, we are not able to deviate from our firm's written policy. He has been an employee for seven years and this is the only employee at his level. He is working on many sensitive matters."*

(The following ensued in the presence of the jury at 9:50 am.)

THE COURT: Good morning, members of the jury. Have a seat. You all look very well rested and ready to go. You should be well rested; you had all that time off.

You may proceed with the government's case, Mr. Kelly.

MR. KELLY: Thank you, your Honor. The

government calls Cynthia Debrosse.

**CYNTHIA DEBROSSE**

called by the Government, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT: You may proceed, Mr. Kelly.

MR. KELLY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. KELLY:

Q. Good morning, Cynthia. Would you please tell the jury where you are employed.

A. I work in Akron, Ohio.

THE COURT: Would you get closer to the microphone and speak up as loud as you can.

THE WITNESS: I have a good strong voice. I just need to get closer.

I work for Drs. Mubashir, Marquinez, and Rehman in Akron, Ohio.

Q. That is a medical office. Is that correct?

A. Yes.

Q. What does that office specialize in?

A. Oncology and hematology.

Q. What is your position there?

A. I've been with the doctors for 29 years as an oncology nurse. I do chemotherapy. I also do the ordering of our drugs and supplies.

Q. Where is this office located?

A. Akron, Ohio. We have a secondary office in Ravenna, Ohio.

Q. And what diseases does the office treat?

A. Cancer-related things that would be treated with chemotherapy. So it is oncology. And hematoma would be blood problems, such as anemia or any other things, that would be related to blood.

Q. And approximately how many patients do the offices see each week?

A. We see hundreds between the two offices.

Q. Between the Akron and the Ravenna office?

A. Right. In a given day, anywhere from 20 to 50 patients at a given office. And there are two offices.

Q. Could you tell the jury your educational background and training, please.

A. I first graduated as a three-year diploma nurse at a hospital, Riverside School of Nursing, in Toledo, Ohio.

I went on from there to a three-year Bible college. I have a diploma in Bible admission.

And then from there I finished my bachelor's degree through New York State University in a Regents

external degree where you are tested after courses. But I have a bachelor's degree through New York State.

Q. After getting your three-year degree in Bible studies, did you work abroad for a while?

A. I was, for a short time, in the Philippines as a missionary nurse. And then I traveled for a while with the mission, speaking on missionary nursing, about a year and a half.

Q. And what were your duties and responsibilities at the mission hospital?

A. Mostly, assisting the doctor in surgery and then in the clinic area with shots and things and examining patients. They came from the hills and the mountains and the tribal areas.

Q. The hills and the mountains and tribal areas of the Philippines?

A. Of the Philippines. Correct.

Q. Returning to Ohio. Would you tell the jury what your duties and responsibilities are, your day-to-day duties and responsibilities, in your position as oncology nurse at the medical office.

A. The majority of the time I'm actually doing the treatments, teaching, working with our patients, helping them to deal both with giving the chemotherapy as well as dealing with the side effects and those types of things.

But because I'm the senior nurse, between those times, as I have time, I'm ordering whatever the office needs as far as chemotherapy and supplies. So I'm just doing that as needed. And I do most of it by phone.

Q. That includes prescription drugs?

A. All of the drugs we would be giving IV, yes. Not prescription drugs like pain medications and that, but those things that we would be giving IV that would be prescription. Sure.

Q. The chemotherapy drugs?

A. Correct. The chemotherapy drugs.

Q. And explain to the jury how the chemotherapy drugs are given to the cancer patients.

A. In IV. There are oral chemos, which we don't dispense, we would work through a pharmacy, but the IV drugs we would be giving IV. Or it could be in an injection.

Q. In the first few years prior to 2010, who were your suppliers for prescription drugs?

A. Oncology Supply and Florida Illusion, which is now called Cure Script. And then on occasion we would order directly through the supplier. Like I might order Lupron through the manufacturer, a few drugs if I could get it for a better price through the manufacturer. Or sometimes it is a shortage and that is the way you need to get it.

Q. And approximately how much were the office's prescription drug orders per week on average by the time you get to 2009?

A. Anywhere from $80,000 to $100,000.

Q. A week?

A. In a week.

Q. Did there come a time when you learned of a company named Medical Device King?

A. Yes. We would get faxes sometimes. And I'm always looking for better prices. I usually stay within the ones that I had contact with directly, the ones I mentioned, but the prices looked good and so I called.

Q. And this was on a blast fax or something else?

A. Correct. Yes. I don't have a computer in my office area so everything would come that way, by fax.

Q. Have you heard of a company called Quantum Solutions or Apex?

A. Yes.

Q. How did you learn of them?

A. Same way. Then I called to check on pricing.

Q. You called Quantum?

A. I'm getting my names confused now.

Q. Take your time.

A. But that was the one, the first one that I contacted was out of Canada. And they gave me prices, but I said

we're not interested in ordering out of the country. And then they said they had a subsidiary in the United States, and that is when they made contact with me through a salesperson.

Q. And the contact came from Pharmalogical or Medical Device King?

A. Correct. Correct.

Q. And that is what you understood was the New York company?

A. Yes. And they gave me a way to look it up on the computer. And I don't have a computer in my office area and so I looked it up on my computer at home.

Q. You went to, what, a website?

A. To the website. I didn't order but just to see if it was legitimate.

Q. And what did you --

A. Nowadays I should be smarter than that, to know everything on the computer is not, but at that time I did. I got on, it looked like a good company, good business.

Q. And what did you observe on the website of Pharmalogical or Medical Device King?

A. That the drugs and everything looked like I was ordering the drugs that were by the names that I knew, and it looked like a legitimate site that would be approved by the FDA and was here in the United States and the pricing

looked definitely competitive.

Q. And did you look at pictures of those drugs?

A. Yes.

Q. And what language was the labeling in on the website?

A. It was all English. It appeared to be out of America.

Q. And these appeared to be FDA-approved drugs that were pictured on the website?

A. Yes, sir.

Q. Did you eventually place orders with Pharmalogical?

A. Yes, I did.

Q. And approximately when was that that you placed orders?

A. The date, you mean?

Q. The approximate time period that you first placed an order there.

A. I don't remember. I'm assuming it was in 2007, but I don't remember now.

I know I had between five and six orders that I ordered through them, and I don't remember, but I don't remember the time spans.

MR. KELLY: The government offers Exhibit 56 into evidence.

A. Where am I looking?

MR. KELLY: Soon.

THE COURT: You say you are offering 56?

MR. KELLY: Yes, your Honor.

THE COURT: Any objection?

MR. ROSENSAFT: No objection, your Honor.

THE COURT: Government Exhibit 56 in evidence.

(Government Exhibit 56 in evidence.)

BY MR. KELLY:

Q. Turning to page 1316 of Exhibit 56 in evidence. Do you recognize that document?

A. Yes.

Q. What is that?

A. This is one of the orders that we had. And it was in towards the end of the year, at which time we always order in large quantities going into the end of the year.

Q. And was this, you see the date at the top there?

A. Yes.

Q. What is the date?

A. 2010.

'10 goes by fast when you are 65.

Q. I know that.

And in terms of this, is this approximately when you were ordering drugs?

A. Yes. I'm sure it was, yes.

Q. The end of 2010?

A. Yes.

THE COURT: Where do you get that date of 2010?

MR. KELLY: In the upper right-hand corner of the exhibit I'm putting on the machine.

THE COURT: I see June 1, 2011.

MR. KELLY: That is the first page, your Honor, I had asked the witness to turn to page 1317 of that exhibit.

THE COURT: Okay. Page 1317? I see. That date is December 15, 2010?

THE WITNESS: Yes, sir.

MR. KELLY: Yes. That is 1316. 1-3-1-6.

BY MR. KELLY:

Q. If you will, look at 1316. You can look at the original in front of you.

If you look at that 1316, you see the address at the top of the page?

A. Yes.

Q. That says Pharmalogical Northern Boulevard in Great Neck, New York. Correct?

A. Correct.

Q. And is that who you believed you were purchasing drugs from when you made this order?

A. Correct.

Q. And did you believe you were purchasing FDA-approved drugs when you made this order?

A. Absolutely.

Q. And this order totaled, at the bottom, $251,525?

A. Correct. But, again, it was in December, which is when we always order in large quantities.

Q. In December?

A. Correct. The end of November, beginning of December.

I have been with the doctor 29 years, and every year about that time we purchase towards the end of the year, partly because of the end-of-the-year purchasing, but also in January reimbursement is low, and so we like to have the drugs in place. Plus there is always a price increase on drugs after the first of the year.

So we always make a big purchase at this time of year. So this wasn't unusual.

Q. And in terms of these drugs that are listed on this invoice, could you just go through them and tell the jury what these drugs are used for.

A. Well, they are all used in chemotherapy. Some are used a little differently. But you have you Alimta. Avastin, which actually destroys the blood vessels that are feeding the tumor, it works a little different, but it's used in chemo.

Eloxatin. Zometa to strengthen the bones that are affected by cancer. Herceptin is used in mostly breast cancer. It works with the body fighting against

positive cells.

Neupogen is used off the white cells. Given in injection for people whose counts are low due to chemo.

Rituxan works in your lymphomas and chronic leukemia to, again, destroy cells through the immune system.

Taxotere, both another chemo.

As you can see, all very expensive.

Q. Yes.

How did you place orders?

A. Because I'm an oncology nurse and in the chemo unit doing chemo, I'm not out on the computer somewhere in an office doing this order, so I do all of my ordering by telephone.

Q. And how were the drugs received?

A. I don't know if it was FedEx or UPS but one of those.

Q. And did there come a time you ordered, as Exhibit 56 shows, you ordered from Pharmalogical a number of times. Is that correct?

A. Correct.

Q. Did there come a time when something occurred that made you pause in ordering from them?

A. We received, the last order we received, there were some drugs that were either not, did not appear to be FDA approved here in the States because; like Rituxan was

Rituximab and we always received it. Rituxan is still in the same family, the same drug, but the generic wasn't approved at the time.

And some of the inserts were in another language, or at least half and half, and when I opened that up and saw that, I assumed that either those things came shipped probably through Canada or something. But we were quite upset. I went to the doctor and he said we will not be ordering from them again.

Q. And what was it you observed on the product? Did you say an insert?

A. Yes. The insert, themselves, was not in English or was not completely in English, which in the United States obviously they're all written in English.

Q. And so did you stop ordering at that time?

A. Absolutely. I went to the doctor first. I would have still stopped ordering, but I went to him immediately and he said we will not be ordering from them again. And I said I, of course, agree. And we didn't.

Q. Did you subsequently hear from someone at Pharmalogical?

A. Yes. After a period of time I hadn't ordered, they called. And I told them at that time we would not be ordering again. Emphatically.

Q. Was this a male?

A. Yes. I always talked to a man. I don't remember names at this time, but it was always a male salesperson, I assumed it was a salesperson I was talking to.

Q. What did the person from Pharmalogical tell you on the phone?

A. Of course they wanted me to order. And they said that everything was legal and legit, and they didn't understand why I wasn't ordering.

And I said well, my doctor feels that anything you do that could even send a red flag up is not something you ever want to do.

Q. What did you say to them in that phone call?

A. I said that we were quite upset, that I had made it clear that we were only ordering through a legitimate service in the United States, and I did not say, did not feel that things should come appearing any different than what it should no matter who I was ordering from. And we were very unhappy and we would not be ordering again.

Q. And if you knew that the drugs you were purchasing from Pharmalogical, that you believed you were purchasing from Pharmalogical, were nonapproved FDA drugs, would you still have purchased them?

A. No, would not have. I wouldn't do anything to jeopardize either my boss or my patients.

Q. Now, is there a medical reason why you want to buy

FDA-approved drugs for your practice?

A. Because I know that they are approved and thus safe for the patients and there would be no risk.

Q. What risk? You mention risk. What risks are occasioned by administering nonapproved FDA drugs to your cancer patients?

MR. ROSENSAFT: Objection, your Honor.

THE COURT: Well, how would this witness know that, Mr. Kelly?

MR. KELLY: In her view, as the chief oncology nurse at the medical practice, what risks does she believe are occasioned by administering nonapproved FDA drugs to her cancer patients?

MR. ROSENSAFT: Same objection, your Honor.

THE COURT: I'm going to allow it. Overruled.

A. I will put it this way. If something came and it wasn't refrigerated properly, or I thought in any way the package was damaged, as an RN I would have a red flag that that drug was not safe for my patient.

So as a nurse, I would be expected to know, like in this case something came that was not what appeared to me to be FDA approved. The first thing I did is go to the boss with the box, and I said I'm concerned about this. I don't understand why this insert is written in other than English.

And so there are certain alarms that you have. And I would wonder about things like refrigeration, would it have been transported properly, those types of things.

Q. You mean how it got there?

A. Exactly.

Q. Would you be concerned about where it might be from?

A. Sure. Sure.

Q. And other than this matter, as a result of all this, what kind of drugs does your practice buy?

A. That was the last time I looked at those inserts that came through faxes other than those that came from the companies I order from. I wasn't going to take any further chances.

I do check on pricing still, and I do order from more than one place. I try to do best by our office that is going to help our patients as well as the doctor, but I don't order from anyplace that is not one of the mainstream oncology suppliers: Cardinal, Cure Script or the manufacturers, themselves.

Q. Did you believe, when you were ordering from Pharmalogical, that you were going to receive FDA-approved drugs?

A. Absolutely.

Q. And do you believe that you were misled into purchasing drugs that were not FDA approved?

A. Absolutely.

MR. RESNICK: Objection, judge.

THE COURT: Sustained as to form. Strike out the answer.

BY MR. KELLY:

Q. Do you believe you got what you ordered from Pharmalogical?

A. No. Again, I wouldn't order anything that can hurt my patient or the practice.

MR. KELLY: Thank you, judge.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. ROSENSAFT:

Q. Good morning, Ms. Debrosse.

How long have you worked for Dr. Mubashir, again?

A. 29 years.

Q. And you have been the senior nurse for Dr. Mubashir during that time?

A. Yes, sir.

Q. During the time you have been in charge of ordering the drugs that are administered to the patients?

A. Yes, sir.

Q. So presumably you have a very good knowledge of the

different drugs, what they look like. Correct?
A. Sure.
Q. And when you first ordered from Pharmalogical, you said you were responding to a fax blast. Correct?
A. Correct.
Q. But that wasn't the first blast you received?
A. That wasn't from Pharmalogical. It was actually from the place in Canada. But we refused to order from them, and then they said they had a subsidiary in the United States and that is how it became connected.
So, no, this company I didn't get through a fax.
Q. So you first got a fax from a Canadian company --
A. Correct.
Q. -- and you called them up. Correct?
A. Correct.
Q. And you called up that Canadian company to inquire about their prices?
A. Sure. But I didn't know it was Canadian. But yes. I mean, it was simply an advertisement.
Q. Let me finish my question. I know you are anxious.
A. All right.
Q. You called up the Canadian company to ask about their prices. Correct?
A. Sure.
Q. And you talked to them on the phone?

A. Sure.

THE COURT: You have to answer.

THE WITNESS: I'm sorry, sir, I did say sure.

I'm not staying close to the mic. I'm sorry.

BY MR. ROSENSAFT:

Q. You said you had decided you didn't want to order from a Canadian company. Correct?

A. Correct.

Q. Now, you were interviewed back in 2013 for the first time. Is that correct? By the FDA.

A. I would assume so.

Q. Is that --

A. Sounds about right.

Q. And you spoke to someone from the FDA named Brian Balman. Does that sound about right?

A. Yes, sir.

Q. Was that interview in person or on the phone?

A. I believe from the first time it was at the office. I don't think there was one on the phone first.

Q. And during that time you spoke to him in person, presumably you wanted to tell him everything that had happened in this case?

A. He asked the questions and I answered honestly.

Q. And you wanted to be truthful with him?

A. Sure.

Q. You were trying to be helpful to him?
A. Um-hmm.
Q. Do you remember saying anything about the Canadian company when you first spoke to the FDA?
A. I would assume so. It was certainly not anything I was hiding.
If he asked me how I first found out about it, that is what I would have said. So I assume I did say that. That wasn't anything that was in hiding.
Q. Let me pass you what has been marked 3500 CB1. I will direct your attention to the second paragraph there.
If you could, read through that quickly and let me know when you are done.
A. Read it to myself?
Q. Yes. Not out loud.
A. I would have never said --
Q. Wait one second please.
Are you done reading?
A. I read it. But that couldn't have been what I said, because it is not the truth.
Q. You saw the agent taking down notes during the time you were speaking to him?
A. I'm sure he was but --
Q. And do you still believe you talked all about the Canadian company, after reading that?

MR. KELLY: Objection.

THE COURT: Overruled.

A. You know, I'm telling you I told the truth. So if he asked the question, then yes, I did tell him because I would have never explored the internet and that would have been a lie on my part. And I guarantee to you that I answered his questions as honestly as I could.

Can I quote you what he said? Can quote what I said? No. But absolutely I did not say I found it on the internet. I'm 65 and I don't explore the internet. That's not how I ever find things, so that would not have happened.

So whatever happened in that conversation, I don't know.

Q. The conversation was a while ago. Correct?

A. Sure.

Q. And you said before you get confused on the names because it happened a while ago, sometimes.

A. Names. What does that have to do with this? I'm sorry.

Q. Didn't you say, when you were speaking about this with Mr. Kelley, that sometimes you get confused with the names because it happened so long ago?

A. When I was nervous here and he asked Apex versus Pharmalogical? Sure. Yes, I had to take a minute to

think about it.

But I don't have any problem with what I know was said as fair as truth or lie or whatever. So that doesn't get confused.

Q. Take whatever time you need.

A. No problem.

Q. The first time you spoke about the Canadian company Quantum was a few weeks ago with Mr. Kelly. Correct?

A. I'm sure that is not true. Because I'm sure it has come up before that.

Q. Do you remember being interviewed by Mr. Kelly and Agent Naisatka on August 24, 2015, or thereabouts?

A. Sure.

Q. And do you remember anyone taking notes during that time?

A. There is always notes being taken.

Q. Let me pass you what has been marked as 3500 CD2, and I will ask you to read that third paragraph, if you can.

Could just read the whole paragraph and let me know when you are done, please.

A. Okay.

Q. So it was the prosecutor and/or Special Agent that first mentioned Quantum to you on that day. Is that correct?

MR. KELLY: Objection.

A. No. I've heard the word before.

THE COURT: Overruled.

THE WITNESS: I'm sorry.

MR. ROSENSAFT: I'm sorry. Was it overruled, your Honor?

THE COURT: Yes.

BY MR. ROSENSAFT:

Q. So excuse me. It was the prosecutor and/or Special Agent that first mentioned Quantum to you that day. Is that correct?

A. I don't know that that's correct, no.

You know, you are trying to get me to recall a conversation that happened so many years ago. What is truth I know I didn't lie, so I know what truth is. But when the word was first mentioned? When the name was first mentioned?

I've heard the word Quantum, I'm familiar with it, so I don't have a problem with that. But no, I'm not going to say that I heard the word for the first time, because I'm sure that is not true.

Q. So you don't remember exactly what was said and who said it in a conversation that was a few weeks ago?

A. Absolutely.

MR. KELLY: Objection.

THE COURT: Overruled.

A. I'm not sure why we are saying do I remember the exact words because no. And I doubt that few people could recall exact words in a conversation.

Q. The exact words are important, Miss Debrosse. I'm asking you now --

MR. KELLY: Objection as to the statement prior to the question.

THE COURT: Well, you interrupted the question so I didn't hear the question.

What is the question?

BY MR. ROSENSAFT:

Q. Let me refer Miss Debrosse to Government Exhibit 56.

Do you still have that in front of you, Miss Debrosse?

A. Which one was 56?

THE COURT: You have to keep your voice up and speak into the microphone.

MR. ROSENSAFT: Absolutely, your Honor.

BY MR. ROSENSAFT:

Q. Could you look at Government Exhibit 56.

A. I'm looking.

Q. Do you see on the top left corner where it says *Pharmalogical*?

A. Um-hmm.

Q. It was Pharmalogical that you ordered from?

A. Absolutely.

Q. Now, the prosecutor asked you if you had ordered from Pharmalogical or Medical Device King. Did you order from Medical Device King?

A. I ordered from this right here, whoever the salesperson was on the phone who represented this company, so yes.

Q. Do you remember the name of that person?

A. No.

MR. KELLY: Your Honor, may the record show that when the witness said *this company*, she indicated the document in front of her.

THE WITNESS: Oh, I apologize, yes.

BY MR. ROSENSAFT:

Q. So you are not sure who you spoke to at whatever company?

A. It was a gentlemen but that -- see, I never thought anything was a problem for me to keep track of until after we stopped ordering. So, no, I wasn't memorizing the name of the salesperson I talked to on the phone.

THE COURT: Miss Debrosse, on cross-examination you are going to be asked a lot of questions that are going to call for a yes-or-no answer.

THE WITNESS: Yes, sir.

THE COURT: Please try to confine your answers

to yes or no. If you don't know, say *I don't know*.

THE WITNESS: Okay.

THE COURT: But don't make answers that give material not asked for.

THE WITNESS: Yes, sir.

THE COURT: Do you understand?

THE WITNESS: Yes, sir.

BY MR. ROSENSAFT:

Q. Do you remember telling the FDA agent that you actually spoke to two different people at the company you were ordering from?

A. No, I don't remember that.

Q. I'm going to refer you again to Government Exhibit 3500 CD2 and ask you to look at the last sentences on that page.

Please let me know when you are done.

A. Okay.

Q. Now, I want to reference again a meeting you had with Mr. Kelly, Special Agent Naisatka on August 24. We talked about that meeting before. Correct?

A. Um-hmm.

Q. Do you remember telling them during that meeting that you dealt with two gentlemen at the company?

A. No.

Q. Do you remember the name Billy or Tarn? Do those

names ring a bell to you?

A. No.

Q. Now, you testified that you called the Canadian company and they told you they had a subsidiary in the US. Correct?

A. Yes, sir.

Q. So it was your understanding that the company in the US you were talking to was owned by the Canadian company you first spoke to.

A. Or associated in some way.

Q. And you placed a number of orders, didn't you, Miss Debrosse?

A. Yes, sir.

Q. You can look at Exhibit 56 that is in front of you.

A. That's this one, still?

Q. Yes. It says Government Exhibit 56 on the bottom.

A. Okay. I see it, yes.

Q. On or about June 2011, can you tell me what you ordered?

A. Is that on another page?

Q. It should be on the first page.

A. *June 1, 2011,* it says at the top?

Q. Yes.

A. Yes. It says Avastin, Eloxatin, and Neupogen.

Q. How many of each did you order?

THE COURT: Did you order Avastin?

A. Avastin, 12 quantity. Eloxatin, 20. And Neupogen, three.

Q. What happened when you received these items? What was your normal course?

A. You want to check the package insert that you got what you ordered, and you put it on the shelf or in the refrigerator, wherever it belongs.

Q. So you unpacked 12 Avastins, 20 Eloxatins, and three Neupogens.

A. Yes, sir.

Q. Checked each of the boxes. Put them where they belonged. Correct?

A. Correct.

Q. And there were no problems whatsoever.

A. No.

Q. And you are saying you didn't see any foreign writings on any of those bottles.

A. No, sir.

Q. And then if you turn to page, it's about six pages in, on the bottom of the page it says 1302. An order on March 15, 2011. I will put it up on the ELMO as well.

A. Yes, sir.

Q. Could you tell me what you ordered on that date.

A. 12 Herceptin. Four Neupogen. 12 Rituxan. 20

Eloxatin. And 12 Rituxan.

Q. And as such, you took all this medicine, you are saying you checked each one to make sure it was what you ordered, and you put in on the shelf. Correct?

A. They were checked. And I'm not always the one at that office. There are two offices. But yes, they were checked. And then I would deal with it within the next day or two when I was at that office.

They're checked as they come out of the box, not always by me.

Q. Who else checks them?

A. One of the nursers. We have two office sites, and we go, all of us go, back and forth between both office sites.

Q. If you could now turn to the invoice at the bottom of the page 1311. It is an invoice on February 8, 2011.

A. Yes, sir. Read it again?

Q. If you could.

A. 30 Taxotere 20. 20 Taxotere 80 milligrams. Six Alimta. 10 Avastin. And then it says shippings costs.

Q. And you received all of those items, Miss Debrosse?

A. I'm sure we did because they would have been checked.

Q. And you or the other nurse placed them on the shelf where they go?

A. Or refrigerator. Correct.

Q. What is Taxotere, Miss Debrosse?
A. One of the chemo drugs.
Q. Now, you said eventually you noticed the Taxotere was not in English. Correct?
A. Yes.
Q. I'm going to pass you what has been marked as defense Exhibit DH. If you could, please look at that and let me know when you are done.
A. Okay.

(Continued on the following page.)

Q. Does that look like the Taxotere that you eventually unpacked?

A. I'll say the truth, I know that I had an alarm as I looked at the insert. To say that this is exactly what one looked like in 2010 or 11 I wouldn't be able to tell you that.

Q. So you don't know exactly what you actually looked at?

A. I do know there was a red flag, there was a package, and when I looked at it I was concerned. I went to my boss. He said is that exactly what the box looked like, I know when I looked at it I saw another language on the package insert and/or the box. I was concerned, I went straight to my boss and said I'm concerned, I don't understand, because our FDA drugs we ordered to every place else does not have another country's language on it. That was my alarm. He said is this the one? I said I can't tell you because it's not the English language. I just knew it wasn't English.

Q. Ms. Debrosse, the Taxotere had Turkish all over the box; is that correct?

A. I don't know that, I have no idea what Turkish looked like.

Q. It had another alphabet on it?

A. It had another language.

Q. It was prominently displayed on the box?
A. I don't know if it was on the box or the package insert. I thought that I remembered it being on the insert in the box.
Q. So you don't even have the specific memory sitting here today?
A. No, because I didn't think anything was wrong or illegal. When I showed the doctor, we were concerned and we stopped buying. I don't look for something to be dishonest. I apologize.
THE COURT: Listen to the question.
THE WITNESS: Yes.
THE COURT: Answer just what the attorney is asking you. If it calls for a yes or no answer, if you can answer yes or no.
THE WITNESS: Yes.
THE COURT: But don't make explanation when question doesn't call for it.
Do you understand.
THE WITNESS: Yes, sir.
THE COURT: Okay.
Q. The question, Ms. Debrosse, you don't remember sitting here today, you don't have a clear recollection of what was on the box; is that right?
A. Absolutely not.

Q. And you don't have a clear recollection of what was on the packages?

A. Um-um.

Q. You just remember that it was something that you brought to the doctor's attention; is that correct?

A. Another languages yes.

Q. And that was on February 8, 2011 that was no quantities of Taxotere and no quantities of Taxotere 80; is that correct?

A. What paper is that? That's all I remember what he had me read.

Q. Does that seem about right, that that was the quantity of Taxotere?

A. Yes, it says 30.

Q. And then I want to bring your attention now to page 1316 of Government Exhibit 56. It's invoice dated December 15, 2010.

A. Um-hmm.

Q. If you can turn to that.

THE COURT: I don't see any invoice on that page. I see a check on that page.

MR. ROSENSAFT: Your Honor, the bottom of the invoice reads DD 351316. I can publish it on the overhead.

Q. Did you find that, Ms. Debrosse?

A. Yes.

MR. ROSENSAFT: Were you able to find that, your Honor?

THE COURT: No. 1315 is a check here.

MR. ROSENSAFT: 1316.

MR. KELLY: 1316.

THE COURT: I'm sorry, okay. I see it.

Q. So this is another order that you placed, correct?

A. Yes, sir.

Q. And in this order -- I won't make you read the whole thing -- but there was an order of 4 Taxotere 80 and 6 Taxotere 20 milligrams, correct?

A. Um-hmm.

Q. So did you also see foreign writing on this order of Taxotere?

A. This was the order that brought alarm to me.

Q. So this was the order that brought the alarm. Let me turn back to page 1311, I'll actually put them side-by-side on the Elmo. I want to be absolutely clear about this. There seems to be some confusion.

Let me zoom out so you can see both of them. So on December 15, 2010, you purchased four quantities Taxotere 80 and six quantities of Taxotere, correct?

A. Yes, sir.

Q. And that was the one you said that you saw the

foreign writing on?

A. It was the final one. This one right here. This last one.

Q. Which one was that, Ms. Debrosse?

A. The one that, 1316 ordered in December, the last order that was purchased, 15th. Was that the last? Whatever the last purchase was, I don't know how these are ordered or date but the last purchase was the one that set off the alarm.

Q. Ms. Debrosse, let me be simple. There were two orders of Taxotere, correct?

A. Um-hmm.

Q. One order of 50 Taxotere and one order of seven Taxotere, correct?

A. (Witness nods.)

Q. And one order was placed December 2010 and one order was place February of 2011, correct, and sitting here today, you don't actually remember what the box looks like, correct?

A. Correct.

Q. You don't remember what the insert looks like?

A. Correct.

Q. But you do remember the package had some kind of foreign language on it?

A. Correct.

Q. So when you placed the order for Taxotere and you saw it had a foreign language did you bring that to the doctor's attention?

A. I do not recall it being that way at this time.

Q. You're saying you got two different boxes of Taxotere; is that correct?

A. Correct.

Q. But you don't actually remember the boxes; is that correct?

A. I don't know how the letters were written, but the last order was when the alarm came to me.

Q. Ms. Debrosse, you ordered for -- from Medical Device King, Pharmalogical, whoever you were ordering from, for a long period of time correct?

A. Five or six times maybe.

Q. You ordered a lot of medicine from them, correct?

A. Not in the big scheme of things, not. But yes.

Q. This is a lot of quantity of medicine, it may not be the for the packages shipped?

A. For the practice no, but yes, it's a lot of medicine.

Q. You're saying all of the orders up to the very last one all had English languages and there were no problems with it, right?

A. Yes.

Q. And on the last order there was one Taxotere that

happened to be in a foreign language and that was a problem. Is that what you're saying?

A. I don't believe it was one bottle, but sure.

Q. But you don't actually remember what that looks like, correct?

A. Yes.

Q. You've been with Dr. Mubashir for 29 years, right?

A. Yes, sir.

Q. And you understand that the prosecutor has charged Mr. Scully with a number of criminal acts, correct?

A. I would assume that. I would assume that's true.

Q. And you understand that one of the things that he's been charged with is selling drugs that are unapproved, correct?

A. From about what I'm being questioned, I'd say yes.

Q. And you understand that one of the allegations is that one of the reasons they were unapproved is because they had foreign language, correct?

MR. KELLY: Objection.

A. I haven't seen --

THE COURT: Sustained. Strike out the answer.

Q. There were no issues with the other drugs, to your memory, correct? No other problems?

MR. KELLY: Objection.

THE COURT: Overruled.

A. I -- that last order we were concerned. The details of how many drugs or what or which ones, I don't know, but when we became alarmed we stopped ordering, and I do not recall exactly. So...

Q. The question is, and I'll be more specific, you don't remember any problems with patients?

A. Absolutely.

Q. And you don't remember problems with them coming in a different temperature, correct?

A. Correct.

Q. And you spoke about if there were damages you would be alarmed?

A. Correct.

Q. You don't remember any problems in the end with the drugs?

A. Absolutely not, you're correct.

Q. You testified that you would be concerned if the drugs were not safe, that they were damaged or they weren't refrigerated, correct? None of those issues were present, correct?

A. No.

Q. You also talked about having drug shortages at times?

A. Correct.

Q. What would you do during a drug shortage?

A. I'd call the manufacturer, see that there was a

shortage and I got it directly from Baxter.

Q. Was there ever times that you got trouble even getting drugs from the manufacturer?

A. At some point I always found it even with, be it magnesium or whichever drug I was trying to find, and the manufacture at some point I could get it.

Q. Then you tried to reach out through other avenues to try to find those drugs, correct?

A. After this experience, and only this experience, I went to the manufacturer, one of the main line companies.

Q. Understood. But before this experience you would reach out to other sorts to try to find it?

MR. KELLY: Objection.

A. I was not --

THE COURT: Sustained. Strike out the answer. The jury is instructed to disregard it.

MR. ROSENSAFT: I have no further questions, your Honor.

THE COURT: Anything else?

MR. KELLY: The government offers defense exhibit DH into evidence.

MR. ROSENSAFT: No objection, your Honor.

THE COURT: What's the letters again, Mr. Kelly.

MR. KELLY: D as in David, H as in Harry. DH.

THE COURT: Any objection?

MR. ROSENSAFT: No, your Honor, I would just ask to publish that to the jury then.

THE COURT: Defendant's Exhibit DH in evidence.

MR. KELLY: Your Honor, I'll take care of the exhibit. May I publish this to the jury, your Honor.

THE COURT: Yes. Defendant's Exhibit EH, easy how in evidence. What is it?

MR. KELLY: It's a four page document that has photos of the exterior of T-A-X-O-T-E-R-E, Taxotere.

MR. ABELL: Your Honor, for the record it's DH, D as in David, H as in Howard. DH.

MR. KELLY: The exhibit in evidence is D as in David, H as in Howard.

THE COURT: D as in David, H.

MR. KELLY: Yes.

THE COURT: Okay, members of the jury, D as in dog and H as in Harry in evidence.

(Defendant's Exhibit DH in evidence.)

THE COURT: Anything is, Mr. Kelly.

MR. KELLY: No, your Honor.

THE COURT: You may step down. Please call your next witness.

MR. KELLY: The government calls Dr. Jorge Perez, J-O-R-G-E, P-E-R-E-Z.

**JORGE PEREZ, M.D.,**

called as a witness, having been first duly sworn, was examined and testified as follows:

THE COURT: Please speak into the microphone and speak loudly. What is your full name?

THE WITNESS: Jorge Perez Cardona.

THE COURT: How do you spell it.

THE WITNESS: J-O-R-G-E, P-E-R-E-Z, C-A-R-D-O-N-A.

THE COURT: You may proceed.

MR. KELLY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. KELLY:

Q. Good morning, Doctor.

A. Good morning.

Q. Where do you work, Doctor?

A. I work in Carson City, Nevada. My office name is Sierra Nevada Cancer Center.

Q. And how long have you had your own practice known as Sierra Nevada Cancer Center?

A. 13 years.

Q. And what diseases does your office treat?

A. Cancer and blood disorders, including breast cancers.

Q. Does that include multiple myeloma?
A. Yes.
Q. Approximately how many cancer patients do you see each week?
A. About 150 patients per week.
THE COURT: Excuse me, why. You're too close to the microphone. We're having trouble hearing you.
A. About 150 patients per week.
Q. Would you please tell the jury your educational and training background, doctor?
A. I went to medical school in Colombia. I graduated age 32. Then I went to England, the United Kingdom. I did training in internal medicine.
Q. Internal medicine.
A. Chemical pathology and then I did a Ph.D. in cellular biochemistry in Cambridge.
Q. After you completed your Ph.D. in cellular biochemistry at Cambridge, what did you do next?
A. Then I immediately came to the United States, came over to Pennsylvania, did internal medicine training for three years, then I went to Houston, where I did training in oncology.
Q. Was that training part of a medical oncology and hematology fellowship?
A. Yes, it was, this was combined training at the

Indiana Cancer Center and Baylor College of Medicine.

Q. And after you completed the fellowship at Baylor and MD Anderson Cancer Center in Houston, Texas, what did you do next?

A. I stayed in Houston for one year where I worked in private practice. After that we went to Nevada in Carson City where I opened my private practice as a sole practitioner. Over the years I opened three other practices, satellite offices and the third have -- one main office and 3 satellite offices.

Q. Where is your main office?

A. My main office is in Carson City, in Nevada.

Q. And where are your satellite offices?

A. The current satellite offices are in Fallon, F-A-L-L-O-N Nevada, Garnerville and in Salt Lake.

Q. And what are your duties and responsibilities at the Sierra Nevada Cancer Center?

A. I have the oncologists, they are the practice, I see all the patients with cancer and blood disorders, I make a determination, the diagnosis, the treatment and I supervise their treatments.

Q. And approximately how many people are on your staff?

A. Currently there are about 10, 3 registered nurses, 2 additional registered nurses on part-time basis, 2 medical assistants, one nurse practitioner, 2 pharmacy techs and 3

office personnel.

Q. And during 2011 and 2012, who in the office was, had ordering prescription drugs as part of their duties?

A. My pharmacy technician at the time was Elizabeth Tallent.

Q. Elizabeth Tallent?

A. Correct.

Q. And prior to 2011, who were your suppliers for prescription drugs?

A. The main supplier was Oncology Supplies. We also purchased medication from BDI.

THE COURT: Doctor, we're having trouble hearing you. I'm having trouble hearing you. I think you have to get a little bit further away. You, unlike other witnesses, you can't get too close. Stay away. Okay.

A. BDI.

THE COURT: You have to be a sound technician besides everything else. I didn't take any courses on that. Go ahead.

Q. The other companies besides Oncology Supplies?

A. Those were BDI and Pharma.

Q. BDI, Pharma and McCutchen?

A. Correct.

Q. What types of prescription drugs were you ordering from these companies?

A. They were all chemotherapy drugs, all support drugs, and these included medications like Rituxan, Avastin, Herceptin and Oxaliplatin, O-X-A-L-I-P-L-A-T-I-N.
Q. Did there come a time when you expand your and moved into new building?
A. Yes.
Q. When was that?
A. This was in 2009.
Q. And what was the procedure in regard, did your office receive from time to time blast faxes?
A. Yes. Frequently, we received fax vendors offering to sell medications of favorite blasts. Most of them went directly to the trash can. Some of them that could appear credible we would look further.
Q. And did there come a time in 2011 when you saw some that were -- that appeared credible?
A. Yes.
Q. And what did you do with the ones that looked credible?
A. I passed them off to my pharmacy technician to look at them further.
Q. Who was that at the time?
A. This was Elizabeth Tallent.
Q. Did there come a time when you asked Liz Tallent do research on MDK, a company that you had gotten a blast fax

from?

A. Yes.

Q. And did you also ask her to look at, to look into this company and evaluate it?

A. Yes. I ask her to find out about the company and find out as much as she could about the company to see how legitimate they were so that we could consider purchasing from them.

Q. And did Liz Tallent get back to you on MDK?

A. Yes.

Q. And what did she tell you?

MR. RESNIK: Objection.

THE COURT: Sustained.

Q. After she spoke to you and told what you she had found --

MR. RESNIK: Objection.

THE COURT: Don't interrupt the question.

MR. RESNIK: Apologize.

THE COURT: Go ahead.

Q. Did you then go and look at the website of MDK?

A. I did look at the website.

Q. And this was prior to ordering from MDK?

A. Yes.

Q. And would you tell the jury what you saw on the website?

A. The website appeared to be a legitimate place. It mentioned that they were noted, fully accredited company to sell these products. There were pictures of the products that they were selling with the names and the prices.

Q. There was a reference to whether or not they were licensed?

A. Yes.

Q. And what was that reference, what did it say?

A. They said they were fully licensed and insured.

Q. And in terms of these drugs, did you see pictures of drugs on the website?

A. Yes.

Q. And what was the language on the labels of the drugs on the website?

A. They were pictures of the products and there was Rituxama, another one was Herceptin those are the ones that I remember the most.

Q. And did you see picture of Rituxan?

A. Yes, I did.

Q. What's language on the label of Rituxan?

A. It said Rituxan and then Rituxama.

Q. Was in English?

A. Yes.

Q. And did it appear to be FDA approved to you?

A. Yes, it did.

Q. And after you reviewed the website, and after speaking with Liz Tallent, did you make a decision as to whether or not to order from Medical -- from MDK, Medical Device King?

A. Yes. Basically from information I would have received from the company, did investigation from Liz Tallent and the information on the website we concluded that this was a legitimate company selling legitimate products and we then decided whether to include a contract with them to purchase the products.

MR. KELLY: The government offers Exhibit 12 into evidence, your Honor.

THE COURT: Any objection?

MR. RESNIK: One moment? I just want to see it, your Honor. No objection, your Honor.

THE COURT: Government Exhibit 12 in evidence.

(Government's Exhibit 12 in evidence.)

Q. Placing Exhibit 12 in evidence on the overhead and placing a copy of exhibit 12 in evidence before you. Do you recognize that document? (Handing.)

A. Yes, I do.

Q. What is it?

A. It is an agreement to buy medications from MDK.

Q. And who's agreeing to buy medications from MDK?

A. I agreed to buy medications from MDK, or my company, Syria Nevada Cancer Center.

Q. Does this document contain your signature?

A. Yes, it does.

Q. And where is your signature on this document? You can just looking at the copy in front of you. What is it next to?

A. It's just above where it says to be removed from this list call this number.

Q. And then there's your signature, correct?

A. That is correct.

Q. Right where my finger is?

A. Yes.

THE COURT: Is there a date on this document?

Q. Do you see a date at the top, Doctor, a fax date?

A. The fax date is 6/3/2011.

Q. And what's date next to the signature below of Mercedes Davidson?

A. 6/3/2011.

Q. And who is Mercedes Davidson?

A. She is one of my administrative assistants.

Q. Now, at some point --

THE COURT: We'll take break at this time, Mr. Kelly.

MR. KELLY: Yes, your Honor.

THE COURT: Members of the jury, we're going to take a 15 minute recess. Do you want to pick up that exhibit, please.

MR. KELLY: Yes, your Honor.

THE COURT: Thank you, juror number seven, you're taking good care of the exhibits. We're going to take 15 minute recess. Please don't discuss the case, keep an open mind. We'll see you in 15 minutes. Please recess yourselves.

(Whereupon, the jury retired from the courtroom.)

(Recess taken at this point.)

(After recess.)

THE COURT: We have another problem with the jury. Alternate juror number one has a similar problem to juror number five. When questioned about why she didn't bring this up when the jury selection was taking place she said she did, but it was not paid any attention to.

Do you want to tell the lawyers?

THE CLERK: She also told me that her employer because nobody has been out of work for a two-month period of time, she's the first, her employer said she's only being paid for two weeks but if she can provide the proof of the two weeks payment. She said I do have bills that I have to pay, mortgage that I have to pay, and children I

 have to take care of. So the $40 day isn't going to help her pay her bills.

THE COURT: So on the same situation I'm going to have to excuse alternate juror number one who would now have been juror number five to replace juror number five. But now alternate juror number two will replace juror number five tomorrow morning.

Any objection to discharging alternate juror number one?

MR. KELLY: No, your Honor.

MR. RESNIK: None from the defense, your Honor.

THE COURT: I'm going to speak to her later. Okay. Let's bring them in.

Dr. Perez, we're having some trouble hearing what you say, and you want us to hear everything, right? So you'd better slow down and speak up.

THE WITNESS: Yes, sir.

THE COURT: Don't get too close to the microphone. Okay?

THE WITNESS: Yes, sir.

THE COURT: Speak up, you see how the lawyers speak up? Mr. Kelly speaks up very well. You never have any trouble hearing him. And I don't think you have any trouble hearing me.

THE WITNESS: That's correct.

THE COURT: So speak up so the jury will hear everything. Understand?

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you.

THE CLERK: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: Please be seated, members of the jury. Okay, Mr. Kelly.

MR. KELLY: Thank you, your Honor.

BY MR. KELLY:

Q. Doctor, at some point was it brought to your attention that there was foreign language on the labels of some of these drugs that you were purchasing from Medical Device King?

A. Yes.

Q. And what did you say about that?

A. We asked or I asked Liz Tallent to call MDK to discuss with them this aspect of the drugs being in foreign language. They assured us that there was not a problem and they offered to give us translations, translate the instructions in language.

Q. And after that, what did you do?

A. Because of the reassurance, I trusted that they were a legitimate company. We decided that it would be appropriate to continue using these products.

Q. You decided that would be appropriate?

A. Correct.

Q. And did you continue to order from Medical Device King after that?

A. Yes, we did.

Q. And did you believe at that time that you were receiving FDA approved drugs?

A. Yes, I did.

MR. KELLY: The government offers exhibit 184 into evidence.

THE COURT: 184?

MR. KELLY: Yes, your Honor.

MR. RESNIK: No objection, your Honor.

THE COURT: Government Exhibit 184 in evidence.

(Government's Exhibit 184 in evidence.)

THE COURT: What is 184?

MR. KELLY: A series of invoices from 28 pages of invoices from Medical Device King to Sierra Nevada Cancer Center from USAO-12 to USAO-40, those are the Bates numbers at the bottom of the pages, 12 to 40.

Q. Dr. Perez, place the first page of Government Exhibit 184 in evidence on the overhead, Bates number USAO-12. Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. This is an invoice for required payment for a delivery of products from MDK to Sierra Nevada Cancer Center.

Q. And was this at the beginning of the time that you were ordering from them?

A. Yes.

Q. And what's the date on this invoice? Is it 6/6/2011?

A. That is correct.

Q. And in terms of what is ordered on this invoice, there's a drug called Gemzar, G-E-M-Z-A-R. Will you tell the jury what Gemzar is?

A. Gemzar is chemotherapy drug that is used in the treatment of pancreatic cancer.

Q. There's another drug on this order, first page of exhibit 184 in evidence, and that's Eloxatin, E-L-O-X-A-T-I-N.

Do you see that in front of you?

A. Yes.

Q. What is Eloxatin?

A. Eloxatin is a trade name that was sold to us, the main unit being Oxaliplatin, O-X-A-L-I-P-L-A-T-I-N, it's also a chemotherapy drugs mainly for the treatment of colon cancer.

Q. And if you look at the center of the document that's on the screen, do you recognize the handwriting that is on

there?

A. Those are my initials.

Q. JP?

A. JP.

Q. And what's the procedure -- why were you initialing it?

A. Once the shipment of medication reached the office, this is taken over to the pharmacy where the druggist verifies that they received, the medications were received. Once I approved that the shipment is correct, they give me the invoice and I authorize this invoice for payment. Any initials on the paper is authorizing for payment.

Q. And placing on the screen page 22, USA0-22 from Government Exhibit 184 in evidence, an invoice dated 9/26/2011. Do you see that?

A. Yes, that's correct.

Q. And in terms of that document, whose initials are near the top?

A. This is the person at the front desk who receives the box, the shipment box.

Q. And do we again see at the bottom of that document initials that you recognize?

A. Those are my initials authorizing payment of this.

Q. And that's on USA0-22 of exhibit 184 in evidence.

And this order is for a variety of chemotherapy drugs, correct?

A. Yes.

Q. And what is Altuzan?

A. Altuzan is the trade name for medication called Avastin, used for the treatment of colon cancer, lung cancer, breast cancer, ovarian cancer.

Q. And there's a drug called Mabthera listed on this document?

THE COURT: How to you spell it.

MR. KELLY: M-A-B-T-H-E-R-A.

Q. Did you see it listed there?

A. Yes.

Q. What is Mabthera?

A. Mabthera is the trade name for the medication that contains the documents according to the information received from MDK.

Q. And in terms of the Mabthera, was your office paying, according to the invoice $2,550 per each 500 milligram Mabthera?

A. Yes, sir.

Q. And place on the screen page 22 of exhibit 184 in evidence, an invoice dated 10/13 of 2011, do you see that?

A. Yes, I do.

Q. What is that?

A. This is an invoice for Mabthera and for Aloxi.

Q. And this is for October 13, 2011; is that correct?

A. Yes, sir.

Q. And at this time did you believe that you were receiving, at this time on October 13th, 2011, did you believe that the drugs that you were receiving were FDA approved drugs?

A. Yes, sir.

Q. Placing on the screen page 29 from exhibit 184 in evidence.

THE COURT: Exhibit 184?

MR. KELLY: Yes. It's page 29 from exhibit 184 in evidence. When I say 29, I mean Bates number 29.

Q. Do you see that, Doctor?

A. Yes I do.

Q. And what is it?

A. This is an invoice for chemotherapy drugs.

Q. Is it dated November 28, 2011?

A. Yes, sir.

Q. And what drugs are being received under this order?

A. These includes Altuzan and in brackets referred to as Avastin, Herceptin and Avastin in brackets, in parenthesis.

Q. And how are these being shipped, via what?

A. Via regular UPS service.

Q. Placing on the overhead USAO-39 being an invoice dated 2/23/12?

THE COURT: What page is this?

MR. KELLY: This is page Bates number 39 of exhibit 184 in evidence.

Q. Terms of this document, Doctor, what is this page?

A. This is an invoice for chemotherapy drugs received on 2/23/2012.

Q. Is this for chemotherapy drugs from Medical Device King being shipped to Sierra Nevada Cancer Center?

A. That is correct. It includes Mabthera Herceptin and Aloxi.

(Continued on next page.)

CONTINUED DIRECT EXAMINATION

BY MR. KELLY:

Q What is Aloxi?

A Aloxi is a medication used to prevent chemotherapy nausea and vomiting.

Q At this point in time, February 23, 2012, did you believe you were receiving FDA approved drugs from Medical Device King?

A Yes.

Q Was there a time when you told Liz Tallent that you thought foreign language was okay on drugs --

MR. RESNIK: Objection, Your Honor.

THE COURT: Sustained.

Q Was there a time when you discussed with Liz Tallent the different languages used on drugs?

A Yes. After discussions with MDK where they assured us that they were only using FDA approved drugs, we discussed they were correct.

Q What is Rituxan used to treat?

A Mainly for lymphoma, which is a cancer of the lymph nodes.

Q Did there come a time when you entered into an agreement with the federal government at the end of 2013?

A Yes.

Q I am placing in front of you Government Exhibit 183 for

identification. Do you recognize that?

A Yes, I do.

Q What is that, Doctor?

A This is an agreement to pay to the Medicare -- Department of Medicare the total sum of $273,000 that we received from Medicare in payment for drugs purchased from MDK.

Q In terms of that document --

MR. KELLY: The government offers 183 into evidence.

THE COURT: Any objection?

MR. RESNIK: No objection, Your Honor.

THE COURT: Government Exhibit 183 in evidence.

(So marked as Government Exhibit 183 in evidence.)

Q Now, this document is entitled "Agreement for Pretrial Diversion." Is that correct?

A Yes, sir.

Q It says in the beginning of the second paragraph, "Upon accepting responsibility for your behavior." Is that correct?

A Yes, sir.

Q Tell the jury what your understanding of that reference is, "upon accepting responsibility for your behavior"?

A That we recognize that the drugs purchased from MDK were not approved drugs and that, therefore, we would not be -- it would not be appropriate to charge Medicare for those drugs.

Q Your recognition that these drugs were unapproved, did that come after you had finished ordering from MDK?

A Yes, sir.
Q In terms of that understanding, did you then enter into the agreement for pretrial diversion?
A Yes, sir.
Q Under that, did you have to repay $273,000 to Medicare?
A Yes, sir.
Q If you knew that the drugs that you were purchasing from MDK were not approved FDA drugs would you still have purchased them?
A No, sir.
Q Was any patient harmed by these unapproved drugs?
A I don't know.
Q Why don't you know?
A Because cancer is such a terrible disease, even with the best treatment, some patients are not going to do well. So if any of these patients did not do well, there is no way of knowing whether it was from a natural progression of the cancer or was it because of the medication that they received.
Q Doctor, do the approved versions -- does the approved version of Avastin contain a black box warning?
A Yes. All the FDA approved drugs do have a black box warning.
Q What is the black box warning on Avastin for?
A There is a risk for anaphylactic reaction. These are severe reactions that can be life threatening. There is a

risk for bleeding of the bowel and perforation of the bowel.

Q Does Rituxan, in the FDA approved version, have a warning, a black box warning on it?

A Yes, it does.

Q What's that a warning for?

A Again, severe medical reactions, life threatening reactions, in addition to immune suppression.

Q Doctor, what is anaphylactic shock, A-N-A-P-H-Y-L-A-C-T-I-C?

A It is a severe allergic reaction that occurs upon administration of the medication that results in severe lowering of the blood pressure, closing of the airways. And if untreated, possibly will result in death.

Q Now, you said that you understood that the prescription drugs you were purchasing from MDK were FDA approved, is that correct?

A Yes, it is.

Q Is there a medical reason why you want to buy FDA approved drugs for your practice?

A According to the guarantee that the medication that is given is -- the medication that is said to be sold by the manufacturer, that it is kept in the proper manner so there is no deterioration of the product and that they monitor the distribution of the medication. So that giving the medication or giving a product that you're not sure is correct may be --

or may result in the patient receiving no treatment or a compromised treatment.

Q What risks do you believe arise by administering non-approved FDA products to your cancer patients at your medical center?

A The first question would be are they receiving the treatment at all, there is a reason they are not receiving any treatment at all. Are there any harmful products in the treatment that is being administered. Does it contain a very good product so that the patient treatment is appropriate.

MR. KELLY: Nothing further, Your Honor. Thank you.

THE COURT: Cross-examination.

MR. RESNIK: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. RESNIK:

Q Good morning, Doctor.

A Good morning.

Q My name is Scott Resnik. I am an attorney for Mr. Scully. We haven't met before, have we, sir?

A No, we have not.

Q We haven't spoken before, have we?

A No, we have not.

Q Sir, you indicated that you graduated medical school in Colombia, is that correct?

A That is correct.

Q And that you trained in the United Kingdom, correct?
A That is correct.
Q Before moving here to the United States, correct?
A Correct.
Q In fact, you're actually a citizen, aren't you, of the United States, Colombia, and Great Britain? Is that true?
A That is correct.
Q You began the Sierra Nevada Cancer Center practice in February of 2002, correct?
A That is correct.
Q You testified that your involvement in ordering the cancer drugs would be that you would approve payment after the drugs had been received, correct?
A Say that again, please.
Q Sure. With regards to your involvement in ordering cancer drugs for the Sierra Nevada Cancer Center, you testified that you would approve payments for the drugs after they were received, correct?
A Correct.
Q In fact, you reviewed with the prosecutor a number of invoices that you actually looked at and you actually initialed, correct?
A Correct.
Q You testified that you used to purchase your oncology drugs from a company called Oncology Supply, correct?

A Yes, sir.

Q The prices for Oncology Supply, though, were fairly high. Fair to say?

A They are higher than MDK, yes, sir.

Q The reason you asked Ms. Tallent to inquire about certain alternatives to Oncology Supply and some of the other suppliers, was because you were looking for a cheaper source of drugs for your center, correct?

A Correct.

Q You were looking for a cheaper source of drugs in order to increase the profitability of your practice, correct?

A Yes, sir.

Q In June of 2011 you made the first purchase from MDK, correct?

A Yes, sir.

Q As a matter of fact, sir, when you received your initial purchases of oncology drugs from MDK, your staff noticed that there were -- there was foreign language on some of the box labels, correct?

A Yes, sir.

Q This was actually a subject that you were questioned about by the FDA back in 2012. Do you remember that, sir?

A I don't remember the detail, no.

Q Do you remember that before this case, you were visited back in your office by an FDA agent?

A Yes, sir.

Q In fact, you were under investigation, yourself, sir, for purchasing non-approved drugs, correct?

A Right.

Q You had told the FDA agent during that meeting that you thought it was perfectly fine for drugs to have foreign languages on the boxes, correct?

A Yes, sir.

Q Because, in your experience, it is oftentimes that drugs are imported into this country from other places and they're sold throughout the United States; and sometimes in commerce they will have foreign languages on the boxes?

A No, sir.

Q You didn't say that?

A Well --

Q Did you say something close to that, sir?

A Probably.

Q In fact, when you were questioned about it, you even told the FDA agent that you had seen a product in Walmart, over-the-counter drugs that were being sold at Walmart that had foreign languages on them, and you thought that was okay.

A Yes, I was saying that.

Q I'm just asking if that's what you said, sir.

A Yes, sir.

Q In addition, you indicated to the FDA agent when he asked

you about purchasing foreign drugs, you told him in the state of Nevada where you practice, the state of Nevada allows citizens to order drugs from Canada, correct?

A That is correct.

Q As a result, you told your staff they shouldn't be concerned about purchasing drugs that had foreign languages on the labels, correct?

A I told my staff after we weren't sure about MDK, that this wasn't appropriate.

Q That's very interesting, sir. When you were interviewed back in 2012 by the FDA agent, you didn't say a word about calling MDK and asking them for a translation, did you?

MR. KELLY: Objection.

THE COURT: Overruled.

A I don't recall that.

Q Because the reality is, when you were being investigated by the FDA in 2012 it wasn't for purchasing drugs from MDK. It was for purchasing drugs from the Canadian source called QSP, isn't that true?

A I don't know why I was being investigated.

Q You were being asked questions about purchasing products from a Canadian company called Quality Specialty Products, is that correct, sir?

A Doesn't -- those products were included in this, yes.

Q Right. So you were being asked questions about

purchasing drugs from a Canadian company called QSP at that time?

A Yes.

Q In addition, you told the FDA agent that it was common practice in the medical profession to refer to drugs by the actual ingredient names rather than brand names, correct?

A That is correct.

Q So for you, the importance was getting for your clients the actual drug regardless of what the brand name was, correct?

A Yes.

Q So, for example, as you testified, Altuzan is a trade name, correct?

A Yes.

Q And Avastin is a trade name, correct?

A Yes.

Q So they both refer to the exact same drug, which is bevacizumab, correct?

A They do refer to the same name, yes.

Q Similarly, Rituxan is a trade name?

A Yes.

Q And MabThera is a trade name?

A Yes.

Q And they both refer to the same drug Rituximab, correct?

A Correct.

Q I'd like to show you what has been marked by the government as Exhibit 184. Do you have 184 in front of you, the list of the invoices?

A I don't have it in front of me.

Q Okay. Let me hand it to you.

Doctor, Exhibit 184 I put in front of you is a stack of invoices, correct?

A That is correct.

Q You testified about the invoices on your direct examination, correct?

A Yes, sir.

Q The first invoice on the first page, which is Bates No. 12, the date on that is June 6, correct?

A Correct.

Q If you look to the final page in that exhibit, which is No. 40, the date on that is March 8, 2012, correct?

A Correct.

Q So you purchased drugs from MDK from June 6, 2011, all the way through to March 8, 2012, correct?

A Correct.

Q Looking at these invoices, there is -- I'll represent to you that there are approximately 29 separate orders. Do you want to take a moment to confirm that?

A Mm-hmm.

Q Does that sound about right?

A Yes, sir.

Q Looking at the page that is Bates number No. 20, this is an invoice from September 12, 2011, correct?

A Yes, sir.

Q On this invoice you're purchasing six MabThera in the 100 milligram size, correct?

A Yes, sir.

Q On this page you -- you initialed this document? Is that your signature?

A Yes, sir.

Q So when you received this invoice you knew that you were receiving MabThera. Fair enough?

A Yes, sir.

Q You continued to order MabThera from MDK, but you received more on September 26th, two weeks later, if you look at Exhibit -- or page No. 22 of that same exhibit?

A Yes, sir.

Q Can you just point out -- you see where it says MabThera, and you're purchasing it both in the 500 milligram and the 100 milligram size?

A Yes, sir.

Q On the same invoice, it also says Altuzan. But you're ordering Altuzan both in the 400 milligram size and the 100 milligram size. But those seem to be cut off by the printout.

A Yes, sir.

Q So it was clear to you that you were buying and receiving Altuzan, correct?

A Correct.

Q Altuzan is the European trade name for bevacizumab, correct?

A I didn't know that.

Q You testified before that it was a trade name.

A It's a trade name, but I don't know whether it's European or not.

Q So it's a trade name. But it's a trade name for bevacizumab, correct?

A Correct.

Q And MabThera, as well, is a trade name, correct?

A Correct.

Q And this invoice accurately reflects what it was that was shipped to you from MDK?

A Yes.

Q You continued to order from MDK. And on October 13, 2011, page No. 24, you receive more MabThera in the 500 milligram size, correct? Right here (indicating).

A Yes, sir.

Q You also initialed this page as well, correct?

A Correct.

Q On October 17, 2011, you received more Altuzan from MDK,

correct?

A What page?

Q That's Page 25, sir.

A Yes, sir.

Q You have signed this page as well, correct?

A Yes.

Q Just going through a few more examples, I don't want to belabor the point. But on Page No. 29, which the government showed you, you received Altuzan in two different sizes here as well, correct?

A Yes, sir.

Q The following order, on November 29, which is Page No. 30, you received MabThera again, correct?

A Yes, sir.

Q Just skipping to Page No. 39, which, by way of example, Page 39, the date is February 2012 now. You have ordered MabThera as well as Herceptin and Aloxi in this invoice, correct.

A Yes, sir.

Q You initialed this invoice as well, right down here (indicating), correct?

A Yes.

Q Sir, is the reason you kept ordering from MDK was that they would deliver you the drugs that you needed at a better price than you were receiving before?

A The reason we ordered from MDK is because -- well, because they were FDA approved drugs. We would not have ordered them if we felt otherwise.

Q That's interesting, sir. Because you stopped ordering from MDK and started ordering from QSP, correct?

A I think it was around the same time. About the same time.

Q Dr. Perez, I'm showing you an exhibit that we marked as Exhibit D, as in David, U, as in umbrella.

A Yes.

Q Can you take a look through those, and tell me when you've had a chance to look through them.

(Handing.)

(Witness reviews the documents.)

Q Dr. Perez, do you recognize these documents?

A Yes.

Q You recognize your initials on both of them?

A Yes, sir.

Q Can you tell us what these documents are?

A Those are invoices for purchases from QSP.

MR. RESNIK: Your Honor, the defense would move Defendant Exhibit D, as in David, U, as in umbrella, into evidence at this time.

THE COURT: What are they?

MR. RESNIK: These are invoices from QSP.

THE COURT: From?

MR. RESNIK: QSP.

THE COURT: USP; Uncle, Sugar, Peter?

MR. RESNIK: QSP; Queen, Sugar, Peter.

THE COURT: Any objection?

MR. KELLY: No, Your Honor.

THE COURT: Defendant's Exhibit DU, dog, uncle, in evidence.

(So marked as Defendant's Exhibit DU in evidence.)

Q Dr. Perez, I'm going to put up on the screen the first page of Defendant's Exhibit DU. Can you read just the date of this order?

A January 17, 2012.

Q That marks your first purchase from QSP?

A Yes, sir.

Q Looking towards --

THE COURT: What date was that?

MR. RESNIK: Your Honor, that was January 17, 2012.

Q Just to go back, the first order from MDK was June 6, 2011?

A Correct.

Q So this is six months after your first purchase from MDK, correct?

A Yes, sir.

Q Your final purchase from QSP is on February 14, 2012,

correct?

A Right.

Q It is true, sir, that you ordered from QSP understanding that QSP is a Canadian company, not an American company, correct?

A It is a Canadian company with distribution rights in the United States. That's what we were led to believe by the company.

Q Sure. But the company is based where, sir, QSP?

A I believe it is based in Canada.

Q Right. Sir, you indicated during your direct examination that when you looked at MDK's website, MDK indicated that it was both licensed and insured in the United States?

A Yes.

Q You have no reason to believe that that's not completely true?

A No.

Q But QSP never provided you with an American license, did they?

A They did.

Q No. They provided you, sir, with an English license, isn't that correct?

A That is correct.

Q So they never provided you with an American license?

A No, sir.

Q They provided you with a foreign license, correct?
A Correct.
Q You started purchasing drugs from them as well, correct?
A Correct.
Q So they weren't licensed in the United States and they weren't insured in the United States, to your knowledge?
A No.
Q That didn't stop you from ordering from them, did it?
A Correct.
Q As a matter of fact, you purchased from QSP Herceptin, correct?
A Yes, sir.
Q You purchased Neulastin from them, correct?

THE COURT: How do you spell that?

MR. RESNIK: N-E-U-L-A-S-T-I-N.

A I have to see the invoices. I don't have them in front of me.
Q Sure. I'm going to be showing you the invoice. The top invoice from January 17, 2012, that you just testified to.

THE COURT: What does QSP stand for.

MR. RESNIK: It stands for, Your Honor, Quality Specialty Products.

Q Is that correct, sir?
A I believe so. Yes.

MR. RESNIK: Can I stay up here and flip the pages,

Your Honor? Can I stay up here and flip the pages for the witness?

THE COURT: Yes.

Q Can you just read the products ordered?

A Zometa, Z-O-M-E-T-A. Aloxi, A-L-O-X-I. Velcade, V-E-L-C-A-D-E, Altuzan. There are six amounts.

Q Just to be clear, looking at the invoice January 17, 2012, you order Altuzan in two different sizes, 100 milligrams and 400 milligrams, correct, sir?

A That is correct.

Vidaza, V-I-D-A-Z-A.

Q There were repeat drug names I'm going to ask you to just skip over.

A Alimta, A-L-I-M-T-A. Eloxatin, E-L-O-X-A-T-I-N, Herceptin, H-E-R-C-E-P-T-I-N. Neupogen, N-E-U-P-O-G-E-N.

Q So, Doctor, you didn't believe that purchasing drugs that had foreign languages on the box made them non-FDA approved, correct?

A That was what was stated by MDK.

Q What was stated to you by QSP?

A The same, similar. My pharmacy tech called QSP and asked them the same question, and they said it was appropriate.

Q Yet, when you spoke to the FDA in 2012, you didn't mention about asking either them, about calling up QSP or MDK about the foreign language used?

A The conversations with QSP and MDK were done by my pharmacy technician. I didn't have a conversation with the FDA about it.

Q So when the FDA came to question you about selling foreign language items, you didn't think it was worthwhile to mention to them back in 2012, right?

A Right.

Q You thought it was more important to tell them about seeing the foreign language boxes at Walmart, correct?

A I mentioned that, by the way.

Q The fact that the state of Nevada allows citizens to purchase drugs from Canada, correct?

A Right.

Q And your view is that drugs are frequently imported to the United States and sold with foreign languages on the box, correct?

MR. KELLY: Objection.

THE COURT: Overruled.

A When I mention foreign language drugs in the Walmart, for example, as places, I was probably mistaken believing that. Because I no longer see when I'm buying product, they don't have foreign language. But seeing in the sort of typical drugs that I buy from Walmart, they do say made in a foreign language.

Q You actually told the FDA, didn't you, that you told

Ms. Tallent that drugs sometimes have a foreign language on the label and there's nothing to worry about?

A Correct. I was mistaken.

Q That was being mistaken after being in practice for over 40 years, sir?

A Yes, sir.

Q Treating how many thousands of patients?

A I couldn't say how many thousands.

Q Sir, the FDA took certain drugs from your practice back in 2012, didn't they?

A Yes, they did.

Q Amongst the drugs that were taken from your practice was MabThera, correct?

A Yes, sir.

Q When the FDA took the drug MabThera from you, you didn't believe they had a basis to do so, isn't that right?

A That's right.

Q You actually had your attorney try to contact the FDA to try to get the MabThera back, correct?

A Right.

Q Because you disagreed with the FDA, you felt that MabThera was FDA approved, correct?

A Correct.

Q You actually provided your attorney with certain documentation to give to the FDA to show them why you believe

MabThera was FDA approved, correct?

A Correct.

Q Sir, I'd like to show you what has been marked as Government Exhibit -- I'm sorry. I have to remember what side I'm on -- Defense Exhibit DT.

THE COURT: What exhibit?

MR. RESNIK: D, as in David, T, as in Thomas.

Q Can you take a moment to look through that exhibit, sir.

A Yes.

Q Do you recognize this exhibit?

A Yes, I do.

Q Can you state what this exhibit is?

A This is a media release saying that --

Q Just generally speaking, what is it? Without reading it.

A Basically saying that MabThera --

Q Do you recognize that to be a media release, sir?

A Yes.

Q Do you recognize it as a document that you gave to your lawyer to give to the FDA?

A I think so.

MR. RESNIK: Your Honor, the defense would like to offer Defense Exhibit DT at this time.

THE COURT: Any objection?

MR. KELLY: May we have one moment, Your Honor?

THE COURT: Surely.

MR. KELLY: Objection, Your Honor.

THE COURT: May I see it?

MR. RESNIK: Certainly, Your Honor.

(Handing to the Court.)

THE COURT: The objection is sustained.

MR. RESNIK: Your Honor. We are offering it merely for a state of mind, not for the truth of what it is purporting to say.

THE COURT: Sustained.

Q Dr. Perez, did you share with your lawyers a document that you think supported your position that MabThera was approved by the FDA in the United States?

MR. KELLY: Objection.

THE COURT: Overruled.

A The document that I previously read?

Q That document is not put into evidence. I'm just speaking in general.

A Yes, I did.

Q Based on that document, it was your belief, as a medical doctor of 41 years, that MabThera was actually approved by the FDA for sale in the United States?

A It was approved -- say that again. Excuse me. Could you repeat it?

Q Sure. I'll rephrase. The reason you provided information to your attorney was to try and convince the FDA

in your belief that MabThera was, in fact, approved for sale in the United States because you wanted to get back the confiscated drugs, correct?

A Yes, sir.

Q Sir, you had a number of your patients which -- who were -- whose medical costs were paid by Medicare, correct?

A Yes, sir.

Q You submitted reimbursement to Medicare for the drugs that you administered on them, including the drugs that you purchased from QSP and MDK, correct?

A Correct.

Q You did not inform Medicare that you, in fact, had gotten a discount on those drugs, did you?

A There is no requirement to do that.

Q Sir, the question is, did you inform them?

A No.

Q Subsequently, in 2012, you were involved in an investigation being conducted by the U.S. Attorney's Office out in Nevada, correct?

A Correct.

Q You and your lawyer negotiated a resolution to that case, correct?

A Correct.

Q The document that the government showed you was a document called the pretrial diversion agreement, correct?

A Correct.

MR. RESNIK: I'm just going to get a copy of that.

Q I'm just going to put it up on the screen, sir.

Okay. This is an agreement for a pretrial diversion. The document is entitled "United States of America versus Dr. Jorge Perez and the Sierra Nevada Cancer Center." Do you recognize that document, sir?

THE COURT: Government Exhibit 183, correct?

MR. RESNIK: Correct. Government Exhibit 183, Your Honor.

Q As part of this agreement for pretrial diversion, you acknowledge that you knowingly received misbranded drugs in interstate commerce?

MR. KELLY: Objection, Your Honor.

THE COURT: Overruled.

Q Is that correct?

A Yes, sir.

Q So what "knowingly" means is that you knew what you were doing and you did it intentionally, correct?

A It means at the time that document was drafted, I knew about it. It doesn't mean I knew about it at the time we were purchasing it.

Q So even though you signed this document, at the time, accepting responsibility for your behavior, you are now retracting that you had knowledge that what you were doing was

considered by the government to be wrong until the time that you signed this agreement?

MR. KELLY: Objection.

THE COURT: Overruled.

A So, as I said, at the time that the document was signed, I became aware that this was unapproved drugs. At that time, I accepted that. In retrospect, I did not know that they were non-approved drugs.

Q So in retrospect, in other words, you're representing here that when you signed this agreement saying that you're accepting responsibility for what you did, and that you knowingly received misbranded drugs, you're saying at the time you did it you did not know they were misbranded drugs; and only when you signed this agreement did you realize it, correct?

A Correct. Due to the circumstance after the discussions with the FDA, then I became aware that this was correct about these drugs not being approved.

Q So the government allowed you to enter a pretrial diversion program without acknowledging that you knew what you were doing was wrong, correct?

MR. KELLY: Objection.

THE COURT: Overruled.

A I guess the document speaks for itself. I can't -- I don't really have anything to say there.

Q So you entered a pretrial diversion agreement; and this is an agreement that you will not be charged with a felony, correct?

A Correct.

Q You will not be charged with a misdemeanor, accordingly, correct?

A I understand that.

Q So even though you had billed Medicare for over $400,000 and received over $200,000, you are not charged with a felony for doing that, correct?

A That will be the case provided I return the money to Medicare.

Q So you had to pay back 270-something thousand dollars to Medicare and you wouldn't get charged with a felony, correct?

A Yes.

Q You had to do ten hours of community service under this agreement, correct?

A That is correct.

Q So even though you had purchased drugs, which the government was claiming were misbranded, from MDK and QSP, you were not charged with any crime, correct?

MR. KELLY: Objection.

THE COURT: Overruled.

A That is correct.

Q You bought over $400,000 worth of products from MDK,

correct?

A I believe so.

Q You purchased well over $100,000 worth of products from QSP as well?

A About that, yes.

Q You used these products on patients, correct?

A Most of them, yes.

Q Knowing that they came from foreign language boxes, correct?

A Yes.

Q You weren't charged with a single crime for doing that?

A Correct.

MR. RESNIK: No further questions, Your Honor.

MR. KELLY: May I inquire, Judge.

THE COURT: For a short while. Because I have a feeling we're going to go to lunch pretty soon.

MR. KELLY: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. KELLY:

Q Sir, turning to this agreement for pretrial diversion that is on the screen, did you ever admit that you had knowingly bought misbranded drugs from MDK and knew that at the time you bought them?

A I admitted that after the FDA visit I became aware that they were not approved medications. I didn't know at the time

I bought them.

Q On cross-examination you established that you were buying from QSP from January 12 to February 14 of 2012, correct?

A Right.

Q Isn't it a fact that that was during the time that you said that you were buying from MDK?

A There was a period of overlap from January, thereabouts.

Q Isn't it a fact that you began buying from MDK on June 6, 2011?

A Yes, sir.

Q You continued to purchase from them until March of 2012?

A Yes, sir.

Q So you were purchasing from them before you purchased from QSP and after you purchased from QSP, correct?

A Yes, sir.

Q Now, in terms of the 184 in evidence, I'm showing you Page 22 of 184 in evidence. I'm putting that on the overhead. Do you see that?

A Yes, sir.

Q Do you see where it says Altuzan, A-L-T-U-Z-A-N, and in parens, Avastin, A-V-A-S-T-I-N, close parens.

A Yes, sir.

Q Are those drugs both approved by the FDA?

A Avastin is approved. Altuzan is not.

THE COURT: Is this a good time to take a break,

Mr. Kelly?

MR. KELLY: Yes, Your Honor. Thank you.

THE COURT: Members of the jury, we will recess for lunch until 1:30 sharp. Everybody be back by 1:30. We want to start on time. I am big on time.

In the meantime, please don't discuss this case amongst yourselves or with anyone else. Keep an open mind. Come to no conclusions. You are not to come to any conclusions until you are in that jury room deliberating. Until then, keep an open mind and don't talk about the case.

We'll recess until 1:30. Have a nice lunch.

(Whereupon the jury leaves the courtroom.)

THE COURT: You have to be back prior to 1:30 to go back on the stand, Dr. Perez.

THE WITNESS: Yes, sir.

MR. ROSENSAFT: Your Honor, may I address one matter quickly?

THE COURT: Yes.

MR. ROSENSAFT: I have noticed both last week and now this week, too, that Mr. Envo seems to be sleeping. He appears to be sleeping during part of the testimony.

THE COURT: Who?

MR. ROSENSAFT: Mr. Envo, E-N-V-O. He's on the front row.

THE COURT: Which juror is that?

MR. ROSENSAFT: I believe it's No. 3, Your Honor.

THE COURT: Juror No. 3 seems to be sleeping?

MR. ROSENSAFT: Yes, Your Honor. It's happened both last week and this week. Perhaps a reminder to the jury. I'm not sure what more can be done.

THE COURT: Well, do you want me to talk to him?

MR. ROSENSAFT: That might be appropriate, Your Honor, as well.

THE COURT: Any objection?

MR. KELLY: No, Your Honor.

THE COURT: Okay. I'll talk to him before we start at 1:30.

MR. ROSENSAFT: Thank you, Your Honor.

THE COURT: Wait before you leave so you don't leave at the same time as the jurors. 1:30.

(Whereupon a luncheon recess was taken at 12:30 p.m.)

(Matter continued on the next page.)

A F T E R N O O N  S E S S I O N

1:30 PM

(The following ensued with Juror No.3 outside the courtroom.)

THE COURT: It appears that you sometimes have your eyes closed. When a juror has his or her eyes closed, it gives us the feeling that sometimes they may be sleeping.

I'm sure that you aren't sleeping. But you are going to have to keep your eyes open because it appears, when you close your eyes, that you are sleeping, which I know you are not. So I would appreciate that.

JUROR NO. 3: Okay. Yes, sir.

THE COURT: Thank you very much.

Please don't talk to the other jurors about this at all.

(The following ensued in the courtroom in the absence of the jury.)

THE COURT: Let the record indicate that I spoke to Juror No. 3, he is the juror who apparently had his eyes closed, and I told him that I'm sure he wasn't sleeping, but if he has his eyes closed, it looks that way. I told him to keep his eyes open. Of course, he agreed to do so.

Let's bring in the jury.

(The following ensued in the presence of the jury at 1:40 pm.)

**JORGE PEREZ**

called by the Government, having been previously duly sworn/affirmed, continued testifying as follows:

THE COURT: Please be seated, members of the jury. You may proceed, Mr. Kelly.

MR. KELLY: Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. KELLY:

Q Doctor, on cross-examination you were asked about your agreement to repay $273,000 to Medicare. Correct?

A Correct.

Q And have you paid that money to Medicare?

A Yes, I have.

Q And have you completed the performance of this agreement?

A Yes, I have.

Q And did you complete it without any problem?

A That is correct.

Q And in terms of this money that you are paying back to Medicare. Had you billed Medicare as if the products you received from MDK were approved products?

A Yes, I have.
Q And were you then paid by Medicare as if you had received approved products?
A Yes.
Q And you then had to pay back Medicare under this agreement. Correct?
A Yes, sir.
Q Does the billing and payment for prescription drugs have anything to do with your patients' finances?
A Essentially, Medicare has a fixed fee for each one of the products within Medicare, and they pay that fixed fee regardless of how much you bill them.
Q Do your patients save money through your purchase -- if you were to purchase unapproved drugs, do your patients save money for that?

MR. RESNICK: Objection, your Honor.

THE COURT: Overruled.

A No, they don't.
BY MR. KELLY:
Q Are your patients affected financially in any way by your purchase of unapproved drugs?
A No, they are not.
Q The only impact on them is that they are getting unapproved drugs. Correct?
A That is correct.

MR. RESNICK: Objection, your Honor.

THE COURT: Overruled.

MR. KELLY: Nothing further. Thank you, your Honor.

THE COURT: Mr. Resnick?

MR. RESNICK: Nothing further for this witness, your Honor.

THE COURT: Very well.

You may step down, Mr. Perez.

(The witness was excused.)

THE COURT: Please call your next witness.

MR. ABELL: The government calls Douglas Liptak to the stand.

**DOUGLAS LIPTAK**

called by the Government, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT: You may proceed.

MR. ABELL: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ABELL:

Q Good afternoon, Mr. Liptak.

A Good afternoon.

Q Mr. Liptak, where do you work?

A I work for Sanofi.
Q What is the business of Sanofi?
A Sanofi is a pharmaceutical manufacturer.
Q What is your position in the company, sir?
A I am the senior manager of brands protection and investigations.
Q For how long have you held that position?
A 15 years.
Q Can you explain for the jury your day-to-day responsibilities in that job.
A Day-to-day responsibilities include the oversight of our anticounterfeiting protection. So I would be looking for counterfeit products, diverted products, overseas supply chains, security issues related to cargo theft, anticounterfeiting technologies, things that we place on products, as well as online monitoring of pharmacies that sell our products.
Q Mr. Liptak, is one of the products manufactured by Sanofi known as Taxotere?
A Yes.
Q Mr. Liptak, can you describe the medical conditions for which Taxotere is prescribed.
A Taxotere is an oncology medication. It is used to treat patients who have breast cancer, gastric adenocarcinomas or gastric esophogeal cancers, head and neck cancers, as well as

prostate cancer.

Q During the period of 2009 to 2013, where did Sanofi manufacture Taxotere?

A Taxotere was manufactured exclusively in Dagenham in the United Kingdom.

Q Mr. Liptak, is there Taxotere that is approved by the FDA?

A Yes.

Q And is there also Taxotere that is not approved by the FDA?

A Yes.

Q How can you, in your job at Sanofi, tell whether a particular package of Taxotere is FDA approved?

A Just by looking at exterior cartons of the product, we are able to identify differences in that packaging to determine whether it is an FDA-approved product for the United States distribution or for markets outside of the United States.

Q Does Sanofi, for example, use different labels for FDA-approved Taxotere than Taxotere intended for foreign markets?

A Yes.

Q How are those labels different?

A Primarily, product that is destined for the US markets will be labeled as *RX Only*.

They will have NDC numbers, which stands for National Drug Code.

There will be English print or English writing on those packages. And you will have several other identification numbers on those packages, as well as having storage issues or storage temperatures for that product.

Q Mr. Liptak, does Taxotere have, in terms of maintenance, to be kept within certain temperature parameters?

A Yes.

Q If the product is not maintained within those parameters, what are the risks?

A The product basically would lose its efficacy, which would mean the patient would be injecting themselves with a product that just would not work.

Q By *efficacy*, does that also mean potency?

A Yes.

MR. RESNICK: Objection, your Honor.

BY MR. ABELL:

Q Are you familiar with the term *black box warning*?

A Yes.

Q Does Taxotere have a black box warning?

A Yes.

Q And can you explain for the jury what a black box warning is.

A Black box warning is basically an indication that the FDA

requires manufacturers when there are certain adverse events that a patient could encounter by taking that product.

For instance, the first black box warning was issued on Taxotere in November of 2008 that indicated certain patient groups who would be taking Taxotere could potentially suffer adverse reactions to that product. So there was a black box warning that was placed with the product.

Q Was there also another black box warning on Taxotere?

A There was a second black box warning, that was issued in May of 2010, and that black box warning basically indicated that it could cause toxic death, hypersensitivities, fluid retention. And that created the second black box warning.

Q Are those black box warnings featured prominently on the package insert?

A Yes.

Q Is that an FDA-required warning that goes along with the product?

A Yes.

Q And those warnings are in English, I take it?

A Yes.

Q Mr. Liptak, I'm going to ask you to look at the exhibit in front of you marked Exhibit DH.

This has already been admitted into evidence, judge.

Mr. Liptak, I'm also going to ask you to look at what is in front of you as Government Exhibit 187.

With respect to 187, do you recognize that?
A Yes.
Q What is it?
A That is the FDA-approved carton for Taxotere for the United States.
Q Is this something you have occasion to look at regularly in the course of your job responsibilities?
A Yes.
MR. ABELL: Your Honor, the government would move Government Exhibit 187 into evidence at this time.
THE COURT: Any objection?
MR. RESNIK: No objection, your Honor.
THE COURT: Government Exhibit 187 in evidence.
(Government Exhibit 197 in evidence.)
BY MR. ABELL:
Q With respect to Defendant's Exhibit DH, sir, can you take a look at that, please.
A Yes.
Q Do you recognize that?
A I do.
Q What is this, sir?
A That is the Taxotere packaging for the Turkish market.
Q Is the product reflected in Defendant's Exhibit DH FDA approved?
A No.

Q How do you know that, sir?
A First and foremost, it is not written in English.
There is no RX Only labeling on the front of the carton that would indicate that the product requires a prescription.
There is no NDC number, which is a National Drug Code number. That is not listed on the product.
And there is no indication that the dosage, the US packaging indicates that an 80 milligram per 2 milliliter dosage is the strength of that packaging. That is not indicated on the front of this carton, either.
Q So what I'm going to do is I'm going to put the -- this is Government Exhibit 187, also admitted into evidence.
And this, sir, is the FDA-approved label. Is that correct?
A Yes.
Q Now, with respect to the strength or the dosage, is that reflected right here, where it says 80 milligrams per 2 milliliters?
A Yes.
Q The RX Only you mentioned, is that reflected right there on the front of the package?
A Yes.
Q With respect to the lot number. Would that be found typically on the bottom of the package, right here?

A Yes. Lot number and expiration date are on the bottom of the carton.

Q The directions you mentioned about storage, where can those be found?

A On the FDA-approved packaging, that would be towards the bottom of the back side of the carton.

You have the Sanofi-Aventis information at the very bottom, and then the storage temperature range is right above that.

Q And this product is sensitive to light. Is that correct?

A Yes.

Q If it is exposed to light, what are the risks?

A It becomes subpotent.

Q The box in the middle, can you explain to the jury what that is.

A The red box in the middle that indicates a caution, basically just advises the patient basically how to dilute the product that is inside.

Q Going back to the unapproved version. This is the front of the box?

A Yes.

Q Page No. 2, is that the back of the box?

A Yes.

Q Do you recognize that language to be Turkish?

A Yes.

Q On the front of the box, I think you indicated the FDA-approved items have 80 milligrams over 2 milliliters?
A Yes.
Q Is that different on the unapproved products?
A Yes, it is different.
Q Page No. 3 of Defendant's Exhibit ^ DH, can you state for the jury what that is?
A That is the top of the Taxotere carton that indicates a serialization number that is put on by the Turkish Ministry of Health for their rebate programs within their country.
Q Would you ever see this SKU on an FDA-approved product?
A No.
Q On page 4 of Defendant's DH, is this where, on the FDA-approved product, it would state the lot number?
A Yes, that lot number and expiration date.
Q Does it say *lot number* anywhere on the bottom of this package?
A In Turkish it may.
Q But that is, what appears to be DOD105, that would be the lot number?
A That would be a lot number. Yes.
Q Speaking of lot numbers, Mr. Liptak, can you explain to the jury what that is?
A The lot number is basically an identifier of that product that indicates when it was manufactured and its distribution,

its intended markets, through a unique numbering system.

So, for instance, as we just saw with the Taxotere lot number, since it is manufactured in Dagenham, the lot numbers always begin with a D.

The second character, or the second digit, is numeric, and that indicates the year that that product was manufactured. So if it is a zero, it indicates it was manufactured in 2010.

The third digit is an alpha digit that is assigned through the unique process, the inventory process.

And the last three digits are numeric, and it is a numeric sequencing that is done internally by Sanofi that indicates where the product is destined to be shipped.

Q What is a recall, sir? Just so everyone knows and understands what that term means.

A *Recall* would be, if patients had experienced adverse reaction to a product there would be a recall issued on that product to have that product taken out of the market so that no other patients encounter any danger or suffer any adverse events.

Q In the event of a recall of foreign-market Taxotere, say in Turkey, for example, would Sanofi be looking for that product here?

A No.

Q Why not?

A The lot numbering law does not pertain to the US markets. So if a foreign-source market came into the US marketplace, we would not be able to initiate a recall through the United States.
Q For the Turkish product that came into the United States.
A For the Turkish product.
Q Has approved Taxotere been the subject of recalls?
A Yes.
Q Mr. Liptak, is there a list of authorized distributors for Taxotere from, say, 2009 to 2013 in the United States?
A Yes.
Q Was Pharmalogical, Inc, ever an authorized distributor of Taxotere?
A No.
Q Medical Device King?
A No.
Q Taranis Medical?
A No.
Q Atlantic Pharmaceuticals?
A No.
Q Medicare Solutions?
A No.
Q World Medical Group?
A No.
Q Ozay Pharmaceuticals?

A No.
Q Quantum Solutions?
A No.
Q Mr. Liptak, did there come a time when Sanofi learned that a company called Pharmalogical or Medical Device King was selling Taxotere intended for foreign markets in this country?
A Yes. We were notified by the FDA.
Q What steps, if any, did you take after being so notified by the FDA?
A Since we were notified by the FDA and it was an active investigation with the agencies, we did not take any steps for fear of compromising any efforts that may have been done by the FDA.
Q Let's switch to a different Sanofi product now, Mr. Liptak.

Are you familiar with the product known as Eloxatin?
A Yes.
Q Can you describe, sir, the medical conditions for which Eloxatin is prescribed.
A Eloxatin is another oncology medication, and it is used to treat patients who have advanced colon cancer.
Q From 2009 to 2013 where did Sanofi manufacture Eloxatin?
A They manufactured Eloxatin in two locations. One, Dagenham in the United Kingdom. And another called Benvenutos Laboratory in France.

Q Is there Eloxatin that is approved by the FDA?

A Yes.

Q Is there Eloxatin that is not approved by the FDA?

A Yes.

Q Again, how can you, in your position with Sanofi, tell whether a particular package of Eloxatin is FDA approved?

A Again, first and foremost would be the writing, the language that the information is written on the cartons. As well as looking at the RX Only, the prescription-only indicator, the NDC number, again that's on the cartons, as well as any of the storage and handling information that's on those labels as well.

(Continued on the following page.)

BY MR. ABELL:

Q. There are different labels for FDA-approved Eloxatin than for Eloxatin that has not been approved by the FDA.

Does Eloxatin have to be kept within certain temperature parameters?

A. Yes.

Q. If the product is not maintained within those parameters, again, what are the risks?

A. Again, it becomes a subpotent medication.

Q. I'm going to you ask to look at Government Exhibit 177 in front of you, and particularly the last three or four pages.

A. I do not have that.

Q. I have a copy, I apologize. (Handing.)

In particular the last, I think, five pages.

I'm going to direct your attention to the page that starts 00031 on the bottom.

A. Okay.

Q. You have it, sir?

A. Yes.

Q. What is that?

A. The front packaging for Eloxatin.

MR. ABELL: Your Honor, we move Government Exhibit 177 into evidence.

THE COURT: Any objection?

MR. RESNIK: Your Honor, we'd only ask just to see it. We don't seem to have a separate copy.

THE COURT: Government Exhibit 177 in evidence.

MR. RESNIK: No objection, your Honor.

(Government's Exhibit 177 in evidence.)

Q. Mr. Liptak, tell the jurors what is reflected on the first page of 177.

A. The front or exterior carton of Eloxatin.

MR. ABELL: Judge, we're also going to move Government Exhibit 186 into evidence.

THE COURT: Any objection?

MR. RESNIK: No objection, your Honor.

THE COURT: Government Exhibit 186 in evidence.

What is 186?

MR. ABELL: It's a picture of the FDA-approved label for Eloxatin.

(Government's Exhibit 186 in evidence.)

MR. RESNIK: We do object to that description of the exhibit, your Honor.

Q. Well, what is 186, sir?

A. It would actually be the carton, the exterior carton, for Eloxatin.

Q. As reflected right there on 186?

A. Yes.

Q. This is a carton for the FDA-approved Eloxatin?

A. Yes.
Q. Is this -- Mr. Liptak, can you tell us what this is, the front of the box where my pen is?
A. Yes, sir.
Q. This is the back of the box?
A. Yes.
Q. Are these the sides?
A. Yes.
Q. With respect to the front of the box, what are the characteristics that are unique to the FDA-approved carton?
A. The product is designated as RS only. It indicates on the packaging that it is a single -- for single use vial only. It has the NDC number on it, and then the information about looking at the package insert.
Q. Do you see any of these same characteristics on the front of the unapproved carton?
A. No.
Q. Not a great picture, I apologize, but is there anything on the back of the box that leads you to conclude that this is not the FDA-approved carton?
A. Again, it's missing the prescription only indicator, the NDC indicator number up top, as well as the information about looking at the internal leaflet.
Q. Now, this product, although not FDA approved, it's in

English, correct?
A. Yes.
Q. Did that change your opinion whether it's approved by the FDA?
A. No.
THE COURT: I'm having trouble hearing you. Please keep your voice up and slow down.
MR. ABELL: Yes, your Honor.
Q. In the event of a recall of foreign-market Eloxatin, same question with respect to safety efforts, would Sanofi be looking for that product here?
A. No. .
Q. Why is that?
A. We would not -- Sanofi would not be looking for a foreign source product that would be coming into the country because there would be really no way for Sanofi in the United States to address the customers and consumers outside of the country.
Q. With respect to the list of entities that I went through earlier, are any of those authorized distributors of Eloxatin in the United States?
A. No.
Q. And did there come a time when Sanofi learned that a company called Pharmalogical was selling unapproved Eloxatin in the United States?

A. Yes.
Q. Did Sanofi undertake or -- strike that.
How did Sanofi find out about that?
A. Through the FDA.
Q. And did Sanofi undertake or not undertake the same steps it undertook respective to that?
A. There were no steps taken. Again, that was an investigation that was being handled by the FDA.
MR. ABELL: No further questions, your Honor.
THE COURT: Cross-examination.
MR. RESNIK: Thank you, your Honor.

CROSS-EXAMINATION
BY MR. RESNIK:
Q. Good afternoon, Mr. Liptak.
A. Good afternoon.
Q. My name is Scott Resnik. I'm the attorney for Mr. Scully in this case.
You and I haven't met before, have we?
A. No.
Q. We haven't spoken before, have we?
A. No.
Q. Sir, how long have you worked for Sanofi?
A. 15 years.
Q. Sanofi is a popular French drug company, correct?

A. Yes.
Q. Annual sales somewhere around 40, $50 billion, would that be accurate?
A. Yes.
Q. As you testified, Sanofi makes Taxotere?
A. Taxotere, yes.
Q. Taxotere. Thank you.
And it also makes Eloxatin, correct?
A. Yes.
Q. And --
THE COURT: What? Makes what?
MR. RESNIK: Eloxatin, your Honor.
THE COURT: How do you spell it?
MR. RESNIK: E-L-O-X-A-T-I-N.
Q. And Mr. Liptak, you indicated during your direct examination that all Taxotere is made in the same location in the United Kingdom, correct?
A. Yes.
Q. I believe you said that location is in Dagenham?
A. Dagenham, United Kingdom, D-A-G-E-N-H-A-M.
Q. So all -- and, again, let me -- the pronunciation is Taxotere?
A. Taxotere.
Q. Taxotere.
So all Taxotere is made from the same facility

in the United Kingdom, correct?

A. Yes.

Q. So whether that Taxotere is sold in the United States or sold in Turkey or in France or in Germany, it's all coming out of that same factory, correct?

A. Yes.

Q. As an employee of Sanofi, is it your view that Sanofi would stand behind the quality of the product that it sells no matter where in the world it sells it, correct?

A. Yes.

Q. It's not your view that Sanofi is selling a substandard Taxotere in Turkey or France or Germany or anywhere else, correct?

A. Yes.

Q. The factory in Dagenham, United Kingdom is, in fact, FDA approved for the manufacture of Taxotere, correct?

A. Yes. For clarification, and so the jury understands, they're FDA inspected. The FDA does not approve manufacturing facilities. They only inspect facilities. They approve drugs.

Q. So they inspect -- the FDA has inspected the Dagenham facility?

A. Yes.

Q. And has given it a satisfactory rating to produce the product Taxotere?

A. Yes.
Q. And Sanofi sells Taxotere far cheaper in Europe than it does here in the United States, correct?
A. Yes. I'm not familiar with pricing structures.
THE COURT: Just hold it a minute, please.
MR. RESNIK: Sure.
THE COURT: I have to go into my chambers for a few minutes. Everybody sit tight.
(Pause in proceedings.)
THE COURT: You may proceed.
MR. RESNIK: Thank you, your Honor.
Q. So, Mr. Liptak, I believe you just responded that it's your belief that Sanofi sells Taxotere at a lower price in Europe than it does here in the United States.
A. Yes.
Q. And the reason that Taxotere sells it cheaper in Europe than it does here in the United States is because European countries impose price controls over prescription drugs; is that correct?
A. That would be accurate.
Q. And there are no such price controls here in the United States, correct?
A. No.
Q. So, therefore, Sanofi sells the drug -- the same drug that is produced in Dagenham, United Kingdom plant has a

hire price in the United States than it does in Europe?

A. Yes.

Q. Even though the product being sold is the same, and Sanofi would stand behind the quality of that product anywhere in the world it's sold?

MR. ABELL: Objection.

THE COURT: Overruled.

A. Yes.

Q. You had indicated, sir, that in case of a recall here -- I'm sorry -- strike that.

You testified that Taxotere -- FDA-approved Taxotere has been recalled at some point in time here in the United States?

A. Yes.

Q. So FDA-approved products can be recalled, correct?

A. Yes.

Q. Because sometimes there can be problems with the manufacture even of FDA-approved drugs, correct?

A. Yes.

Q. And I'd like to turn your attention to Government Exhibit 177.

Do you still have a copy of that in front of you, sir?

A. Yes.

Q. You had testified during your direct examination that

one of the issues that you had with Government Exhibit 177, which I'll put on the screen, was that the formulation of the drug, the 80 milligrams per 2 milliliters was not on the packaging; is that what you testified to?

A. Yes.

Q. And you also looked at the second page of this exhibit, do you recognize that, sir, second page?

A. Yes.

Q. And up here in the top is "80 milligrams for 2 milliliters," sir?

A. What's your question?

Q. I believe you testified that this packaging did not indicate the 80 milligrams per 2 milliliters, and that was one of the reasons that you viewed it as being non-approved.

What I'm pointing out to you is that 80 milliliters for 2 milliliters is printed on the set pack.

Do you see that?

A. I see that.

Q. But that is not FDA approved. The FDA approved has that printed on the front of the of the letter.

A. Your suggesting you sort of recognize it for the two milliliters.

Q. I'm just asking you: Do you recognize the 80 milligrams per 2 milliliters?
A. I do.
Q. Keeping your attention on the same exhibit, I'm going to turn to what's marked in your packet as Number 34 in the bottom right-hand corner.
Here we're shifting to the product Eloxatin, correct?
A. Yes.
Q. And this is a panel of a box of Eloxatin, correct?
A. Yes.
Q. And on this document you had indicated in your view that there was no "RX Only" on this product, correct?
A. Correct.
Q. Pointing your attention to this notation over here, "POM," are you familiar with what that means?
A. No.
Q. Do you have -- so do you not know that that stands for Physician Only Medication, which is European the equivalent of RX Only?
MR. ABELL: Objection, your Honor.
THE COURT: Overruled.
A. No, sir.
Q. In the course of your testimony testifying as to whether this box has RX Only or not, you never took into

consideration the fact that it says POM on it?

A. Yes.

Q. Yes, you did not consider it?

A. Did not consider it.

Q. Sir, you also indicated that the boxes that you were looking at for both Eloxatin and Taxotere were not FDA approved because they lacked the NDC number, correct?

A. Yes.

Q. Well, is it not a fact, sir, that the FDA does not require an NDC number to be on a label or a box of a product sold in the United States?

A. Not required, but it is for -- it is put on packages for the United States distribution.

Q. But it's not required by the FDA?

A. Correct.

Q. So you cannot say something is not FDA approved because it does not have an NDC number?

A. Correct, big difference.

Q. You also testified, sir, that Taxotere and Eloxatin were -- I'm sorry, that Taxotere -- that there is non-approved Taxotere. But what you're talking about is the same drug product be made in the same factory.

So when you testified, you are testifying to the difference in the labeling or the actual product?

A. Testifying to the labeling. It's the same product.

Q. Thank you. Same goes for Eloxatin, as well?
A. Correct.
Q. It's the same product inside the box.
You're talking about just different boxes?
A. Yes.
Q. You also testified, sir, with regards to authorized distributors of Sanofi products, correct?
A. Yes.
Q. And when asked by the government, you indicated that Pharmalogical and Medical Device King, amongst other MDs were not authorized distributors of the same products that we're talking about today, correct?
A. Correct.
Q. But when you sell a product to an authorized distributor, you being Sanofi, those authorized distributors or licensed distributors can sell those products to other licensed distributors; isn't that a fact?
A. They can, but that's not the scenario for oncology medication.
Q. But they can do it, correct?
A. They can.
MR. RESNIK: Nothing further, your Honor.
THE COURT: Anything else?
MR. ABELL: Briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ABELL:

Q. Just a couple of follow-up questions, Mr. Liptak.

Counsel asked about the 80-milligram, 2-milliliter notation, do you remember that?

A. Yes.

Q. Directing your attention to this page, correct?

A. Yes.

Q. Page two of the Taxotere.

Do you have any way of knowing what it says before 2 milliliters, sir?

A. I do not.

Q. Do you have any way of knowing anything that is said on this page?

A. No.

Q. Counsel also directed your attention to a notation stating "EOM" on the Eloxatin package, do you recall that?

A. Yes.

Q. And you stated you didn't know what that referred to?

A. Correct.

Q. Is the notation "RX Only" required by the FDA?

A. Yes.

Q. And is that a term that's commonly known in the industry for FDA-approved products?

A. Yes.

Q. And lastly, sir, counsel asked you some questions about just the labeling being different in the products, and the product is essentially the same; is that correct?

A. Yes.

Q. If a product goes outside of the normal distribution channels, in other words, product is headed to the Turkish market and it's sold in the United States, does Sanofi have any way of knowing where that product has been before it arrives in this country?

A. No, they do not.

Q. Does Sanofi have any way of knowing if that product has been maintained within temperature parameters?

A. No, they do not.

Q. Does Sanofi have any way of knowing if the product has been exposed to light?

A. No.

Q. Does Sanofi have any way of knowing if the product has been compromised in any way?

A. No.

Q. Can Sanofi say with certainty that the product that arrived in this country that's not supposed to be here is the same product as the FDA-approved product?

A. No.

MR. ABELL: Thank you. No further questions.

MR. RESNIK: Very briefly, your Honor.

THE COURT: Yes.

RECROSS-EXAMINATION

BY MR. RESNIK:

Q. Mr. Liptak, you have no -- you had no way to know once a product is sold by Sanofi to any authorized distributor the exact conditions by way they maintain it, do you?

A. Meaning, shipping or storage or --

Q. Meaning all of that. Once it leaves Sanofi's hands, it would be Sanofi's position that it's no longer responsible for that, correct?

A. Correct.

Q. You have absolutely no reason to know how Pharmalogical and Medical Device King stored their product, correct?

A. Correct.

Q. So you wouldn't be in a position to say that it did not abide by all temperature storage for compliance with your drugs, correct?

A. Correct.

MR. RESNIK: Nothing further, your Honor.

THE COURT: Anything else?

MR. ABELL: No, your Honor.

THE COURT: All right. You may step down. Please call your next witness.

MR. ABELL: Your Honor, the government calls Special Agent Michael Baxter to the stand.

**MICHAEL BAXTER**,

called as a witness, having been first duly sworn, was examined and testified as follows:

THE COURT: Please state your full name, and spell your last name slowly for the record.

THE WITNESS: Michael Baxter, B-A-X-T-E-R.

THE COURT: You may proceed.

MR. ABELL: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ABELL:

Q. Good afternoon, Special Agent Baxter.

A. Hello.

Q. Where are you currently employed?

A. With the Food and Drug Administration, Office of Criminal Investigations in Los Angeles, California.

Q. What's your actual title with the FDA?

A. I'm the assistant specialist in charge of the Los Angeles field office.

Q. How long have you held that position, sir?

A. Just short of two years.

Q. Can you give the jury, please, some brief overview of your day-to-day responsibilities?

A. I accept incoming cases that are being either sent out by our headquarters office and assign them. I review paperwork done by the other agents in the office. I review evidence that comes into the office that's being processed by agents. I have administrative duties, including financial and budget duties.

Q. In or around February of 2012, did you have occasion to visit the Sierra Nevada Cancer Center?

A. I did.

Q. That was part of your duty as a special agent with the FDA?

A. That's correct. That was when I was assigned to the office in Oakland, California. I visited Sierra Nevada Cancer Center.

Q. What was the purpose of your visit there?

A. We had received information from our headquarters office that they had -- that Sierra Nevada Cancer Center had received product that was foreign and approved from a company that had previously distributed counterfeit product.

Q. With whom did you meet when you visited the Cancer

Center?

A. When I originally visited the Cancer Center in February, late February of 2012, I met with Elizabeth Tallent who was an employee at the center.

THE COURT: Met with who?

THE WITNESS: Met with Elizabeth Tallent. I believe it's spelled T-A-L-L-E-N-T.

Q. Did the Sierra Nevada Cancer Center surrender products to you at that time?

A. Yes, they did.

Q. What was the context of that surrendering of products?

A. The products were identified as being foreign and approved drugs. Primarily oncology drugs.

Q. What drugs did you seize at that time?

A. There were a variety of drugs. I know there was a product called Altuzan. I believe it's spelled A-L-T-U-Z-A-N. It's the foreign equivalent of the drug called Avastin in the United States. And Avastin is, I believe, A-V-A-S-T-I-N.

(Document handed to the witness.)

Q. Agent Baxter, I've placed in front you what's been marked as Government Exhibit 181.

Do you recognize that exhibit, sir?

A. I do. This is the Office of Criminal Investigation's

Certified Inventory of Evidence or CIE.

Q. When was it created?

A. This document was created on February 29, 2012.

Q. Is your signature on that document?

A. It is.

Q. Did you create this document as part of your job duties with the FDA?

A. I did.

Q. Is this a record that is kept in the course of FDA's regularly conducted business?

A. Yes, it is.

Q. Is it the regularly practice of FDA to create this form?

A. At the time it was, yes, but it has subsequently changed.

Q. At the time, though, is that how the FDA intended it?

A. Yes.

MR. ABELL: Your Honor, we move Exhibit 181 into evidence.

THE COURT: Any objection?

MR. RESNIK: Your Honor, can we voir dire briefly on this document?

THE COURT: Surely.

VOIR DIRE EXAMINATION

BY MR. RESNIK:

Q. Special Agent Baxter, I believe you know me. My name is Scott Resnik. I'm counsel for the defendant. Good afternoon, sir.

A. Good afternoon.

Q. A few questions about this document.

During the time of your investigation of the Sierra Nevada Cancer Center, your primary or your initial focus was on the Sierra Nevada Cancer Center purchasing drugs from a Canadian company, called QSP?

A. I don't know that it was a Canadian company. I know it was QSP.

Q. The drugs listed on this document, all of these drugs were purchased by Sierra Nevada from QSP correct?

MR. ABELL: Objection.

THE COURT: Overruled.

A. At this point -- later on I found out and I don' know for certain that these drugs were purchased strictly from QSP.

Q. At the same token, you don't know that these drugs were purchased from MDK either, correct?

A. Correct. I know that they purchased drugs from MDK, and they purchased drugs from QSP. I don't have all the invoices in front of me right now, but I know in some

cases we couldn't tell which drugs were purchased from which suppliers.

Q. So that the drugs that are listed here as being seized, you would not be able to testify as to which of either QSP or MDK it came from; fair enough?

A. Are we talking about this particular document?

Q. This particular document.

A. As I sit here today, that's correct.

MR. RESNIK: Your Honor, we object to the introduction of this document. Lack of foundation. And the drugs that are on here, the witness cannot relate to MDK.

MR. ABELL: Your Honor, this exhibit will be linked up with a further witness who will testify later. It will establish that some of these products were purchased directly from MDK. This is just a seizure notice of products that were seized on that day, your Honor, nothing more.

THE COURT: Well, this is a document made in the regular course of business; is that right?

MR. ABELL: Yes, your Honor.

THE COURT: And it was the business of this witness to make this document?

MR. ABELL: Yes, your Honor.

THE COURT: Overruled. I'll allow it.

Government Exhibit 181 in evidence.

(Government's Exhibit 181 in evidence.)

DIRECT EXAMINATION (Continued.)

BY MR. ABELL:

Q. Can you tell the jury what you seized from Sierra Nevada Cancer Center on that day?

A. Well, it's listed on this document or others. But there's a product called Velcade, V-E-L-C-A-D-E; a product called Alimta, A-L-I-M-T-A; a product called Aloxi, A-L-O-X-I; a product called Zometa, Z-O-M-E-T-A; another produce called Alimta with a different milligram strength, again Alimta, A-L-I-M-T-A; a product called Eloxatin, E-L-O-X-A-T-I-N; and Vidaza, V-I-D-A-Z-A.

Q. Is that your signature right here, sir?

A. In the section where it says SAIC, that's my signature.

Q. I'm also going to ask to you look at what's in front you as Government Exhibit 182.

A. I'm sorry, I don't have it.

Q. Do you recognize this exhibit, sir?

A. I do.

Q. What is it?

A. It's either CIE or Certified Inventory of Evidence.

Q. Is your signature on this document, sir?

A. It is.

Q. Was it created on or about the date next to your name?

A. Yes.

Q. Same question: Did you create this document as part of your job duties at the FDA?

A. I did.

Q. Is it a record kept in the course of FDA's regularly conducted business activity?

A. It is.

Q. Is it the regular practice of the FDA to create this report?

A. At the time it was created it was a regular practice of the FDA.

MR. ABELL: Your Honor, the government moves Exhibit 182 into evidence.

THE COURT: Any objection?

MR. RESNIK: I'm just going to renew my objection, the same objection to this document as the prior one.

THE COURT: Objection overruled.

Exhibit 182 in evidence.

(Government's Exhibit 182 in evidence.)

Q. Walk the jury through what you seized then.

Was this a seizure that took place on the same

day as Government Exhibit 181?

A. That's correct, it did.

Q. In other words, you create two seizure reports, but it was a seizure for drugs on the same day?

A. Right. The -- both documents list that the products were received on February 28, 2012.

Q. And if you can just walk the jury through the drugs that were seized consistent with this Certificate of Evidence.

A. Yes, sir. First was seven boxes of a product called Altuzan, A-L-T-U-Z-A-N, in 400-milligram strength.

Box -- two boxes of Herceptin in 440-milligram strength. One box labeled Neupogen; 10 boxes of Altuzan in the 100-milligram strength, and 8 boxes of a product called Neulasta in 6-milligram strength.

Q. Special Agent Baxter, if I can ask you to look at this, it's been marked as Government Exhibit 27-A.

Are you done with that package, sir?

A. I did.

Q. Can you take a look at the Certificate of Evidence in the manila envelope, please.

Is that the same certificate -- Certified Inventory of Evidence or CIE as Exhibit 182?

A. Correct. It's one of the original carbon copies. I don't know if original covers it, but it's the same serial

number for the CIE Number 185- -- or I'm sorry. Yeah, 185158.

Q. And is the product within the envelope in front you, the product you seized, consistent with this Certified Inventory of Evidence?

A. This is one of the 400-milligram Altuzan boxes.

Q. This is a product that you received on the date of this CIE?

A. On the date that it was received, on the February 28th date, from Sierra Nevada, yes.

MR. ABELL: Your Honor, the government moves Exhibit 27-A into evidence.

THE COURT: What is 27-A?

MR. ABELL: That is a product that he seized on February 28th of 2012, as indicated on the Certified Inventory of Evidence.

THE COURT: Is the product in that envelope that's in front of him?

MR. ABELL: There's one product of Altuzan, Judge, that was received --

THE COURT: Where is that?

MR. KELLY: In the envelope.

THE COURT: Let's see it.

Q. Can you take it out, Special Agent Baxter?

A. I will.

Can we have a pair of scissors that I can use, your Honor? Strike that. It's open. I apologize.

Do you want me to open up the internal?

THE COURT: You're offering a product, which we haven't seen, right?

MR. ABELL: Yes.

THE COURT: We need to see it.

MR. ABELL: Okay.

A. This is the original box. These are my initials on the box, dated 3/1/12 from the date of the inventory of the evidence.

I don't see the actual vial in here right now that was contained inside of it. It looks like there's the work from the lab, also.

Q. The box is the product that you seized on March 1st of 2012?

A. That's correct.

THE COURT: So the product isn't there?

THE WITNESS: I don't see the vial, the original vial.

THE COURT: How can you put in evidence of a product that isn't there?

MR. ABELL: Your Honor, we're putting into evidence the box. The Certificate of Evidence shows that this box was subsequently tested.

But I just want this 27-A established. This was the box that was seized on March 12, 2012, as indicated on the box.

THE COURT: It's one thing to offer the contents, but it's another thing to offer a box that isn't there.

MR. ABELL: Well, the box is there, and is evidence in and of itself, your Honor.

THE COURT: But the medicine isn't there.

MR. ABELL: It was sent out for testing, and apparently the vial itself --

MR. RESNIK: Your Honor, could we do this at sidebar? This is an awful lot of testimony --

THE COURT: It doesn't have to be at sidebar. I'm going to sustain the objection.

MR. RESNIK: Thank you, your Honor.

Q. Did you have occasion to return to the Sierra Nevada Cancer Center in or around April of 2012?

A. I did.

Q. Was that as part of your duties as Special Agent with the FDA?

A. That's correct, yes.

Q. What was the purpose of your second visit there?

A. To speak with Dr. Perez, who is the administrator of the Sierra Nevada Cancer Center.

Q. Did the Cancer Center surrender additional products to you at that time?

A. They did.

Q. Why did they surrender additional products at that time?

A. The products --

MR. RESNIK: Objection, your Honor, calls for speculation, and hearsay.

THE COURT: Overruled.

A. The products were labeled as foreign and approved drugs, that the product was not there.

(Document handed to the witness.)

Q. I'd like to you ask to take a look at what's been marked as Government Exhibit 13 in front of you?

THE COURT: What exhibit is it?

MR. ABELL: 13, 13.

Q. Do you recognize that document, sir?

A. I recognize the invoice. It appears to be similar to the one that was given to me, and it is the receipt for personal property was the one that I created for the -- showing that I actually took the product from Sierra Nevada Cancer Center.

THE COURT: What is the product? What is that paper?

THE WITNESS: I apologize. It is an invoice

listing various drugs, page one, including Mabthera, M-A-B-T-H-E-R-A; Herceptin,H-E-R-C-E-P-T-I-N, at 440 milligrams; Herceptin at 150 milligrams, and a product called Aloxi --

THE COURT: No. I want to know what it is. It is a machine gun? Is it a Fiat automobile?

THE WITNESS: They're drugs.

THE COURT: Is it a New York Mets ticket? What is it?

THE WITNESS: They're drugs, sir.

THE COURT: What?

THE WITNESS: They're drugs, your Honor.

THE COURT: It's an invoice.

THE WITNESS: It's an invoice for drugs. The products that are on the invoice are drugs.

Q. On the second page, Special Agent Baxter, of Government Exhibit 13, what's that?

A. This is a document created by me. It's a receipt for personal property. It shows the receipt of nine boxes of Mabthera in 100-milligram strength.

Q. When did you create this document, sir?

A. I don't have the exact date in front of me. It was in April of 2012.

Q. Your signature is in the middle of the page?

A. That's correct.

Q. And did you create this document as part of your job duties with the FDA?

A. Yes, I did.

Q. Is that a record that's kept in the regular course of business activity?

A. Yes.

Q. And is it a regular practice of yours and the FDA to create this report when product is taken and no other form of receipt is available?

A. Yes.

MR. ABELL: Your Honor, we move Government Exhibit 13 into evidence.

THE COURT: Any objection?

MR. RESNIK: Brief voir dire on this document, your Honor?

THE COURT: Yes.

MR. RESNIK: Thank you.

VOIR DIRE EXAMINATION

BY MR. RESNIK:

Q. Special Agent Baxter.

A. Yes, sir.

Q. Sir, on the Government Exhibit 13, there is a -- handwritten words on the document, do you see that, sir?

A. I do.

Q. That's not your handwriting, is it, sir?
A. It is not.
Q. Do you know whose handwriting that is?
A. I do not.
Q. In addition, the second page of this document, these two documents were not created together, were they, sir?
A. No.
Q. So these are actually two separate documents that were not created together at the same time?
A. The second document was created by me. The first document was a business document that I received a similar copy from Sierra Nevada Cancer Center, yes.
Q. So you're saying that the first document is a business record, despite the fact that you don't know whose handwriting that's running through the whole front.
A. The invoices and business documents is a business document similar to the one that I received from Sierra Nevada Cancer Center.
Q. Correct. But the handwriting you do not recognize?
A. I do not.
Q. Special Agent Baxter, is the reason that you say it's similar to the one that you received is because this one has handwriting on it that you don't recognize?
A. That's correct.

MR. RESNIK: Your Honor, we would object as

hearsay, this document, because it contains handwriting that the Special Agent does not know whose it is.

THE COURT: Where is the handwriting? On the top or the middle?

MR. RESNIK: It's a different document, your Honor. May I approach the bench?

THE COURT: I'm looking at it.

MR. RESNIK: No. That's not the document.

THE COURT: Let me see it.

(Document handed to the Court.)

THE COURT: Agent, whose handwriting is this?

THE WITNESS: I don't know, your Honor.

THE COURT: Sustained.

MR. ABELL: Your Honor, since the objection is exclusively to the first page of this exhibit --

THE COURT: I looked at the first page.

MR. ABELL: -- I don't think there's any objection to the second page.

THE COURT: Show it to counsel.

MR. ABELL: He has it.

MR. RESNIK: Your Honor, our objection to the second page is that these documents were not created together, therefore, their introduction as a composite exhibit would be our objection to the second page.

THE COURT: You say they were created together?

MR. RESNIK: No, they were not created together.

THE COURT: Well, then each one can be separately identified, correct?

MR. RESNIK: Correct. We don't have an objection to the second page of that, just the first page.

MR. ABELL: Judge, we'll mark the second page as 13-A, and we'll admit it that way.

THE COURT: What are you going to call it?

MR. KELLY: 13-A.

THE COURT: 13-A?

MR. KELLY: Yes.

THE COURT: Okay. Government Exhibit 13-A in evidence.

(Government's Exhibit 13-A in evidence.)

MR. KELLY: Thank you, Judge.

DIRECT EXAMINATION

BY MR. ABELL:

Q. Special Agent Baxter, I'm putting on the screen what's been admitted as 13-A.

Explain for the jury what this is.

A. This is a receipt for personal property. I believe it was given to Dr. Perez's assistant in April and it's for the nine vials of Mabthera that were taken or that were seized when I visited his property on April 2nd.

Q. And this is a receipt for the Mabthera that you seized from the Sierra Nevada Cancer Center on that date?
A. That's correct.
MR. ABELL: Thank you. I have no further questions.
THE COURT: Cross-examination.
MR. RESNIK: Yes, your Honor.
Just one second, your Honor, I apologize.
THE COURT: Yes.

CROSS-EXAMINATION
BY MR. RESNIK:
Q. Special Agent Baxter, thank you for bearing with me.
With regards to Government Exhibit 181, that you testified to, I'd like to put that on the screen and if you have a copy, you can put it in front of you.
A. Sir, it's two pages, correct?
Q. Two pages, correct, which I believe you testified to was an Inventory of Evidence taken from Sierra Nevada, correct?
A. That's correct.
Q. Looking at the first page of this document, this would have indicated, based upon your testimony, sir, that you seized five units of the drug Velcade, correct?
A. That's correct.

Q. And eight units or boxes of Altuzan, correct?
A. Correct.
Q. And nine boxes of Aloxi, correct?
A. Yes.
Q. And the date in which this was seized is indicated here over in this column; is that correct?
A. Yes.
Q. And that would be February 28, 2012?
A. That's correct.
Q. And you had testified earlier, sir, that Syria Nevada was purchasing foreign drugs from a company called QSP?
A. That question again? I'm sorry.
Q. You visited Sierra Nevada because you were investigating whether they had purchased drugs from a Canadian supplier called QSP, correct?
A. That's correct, yes.
Q. And you had testified earlier that you would not be able to say with certainty whether these medicines that you seized from Sierra Nevada came from either QSP or from Medical Device King, correct?
A. That's correct.
Q. And you indicated that it would assist you in your testimony if you had invoices from QSP, I believe to identify them?
A. I think the MDK and the QSP invoices, too.

Q. Sure. I'd like to show you what's previously been marked into evidence as Defendant's Exhibit D as in David, U as in umbrella.

These, sir, are the QSP invoices from Sierra Nevada. If you can sort of follow along with them, as I --

A. Okay.

Q. If you look through those exhibits, sir, with regards to Velcade, if you flip through them to the invoice dated February 2nd, 2012.

A. Could you give me a Bates Stamp number?

Q. Sure. Let me come up there, only because it's only the copy that I have. It should be chronological.

On that invoice, sir, does that indicate that Velcade was purchased from QSP by Sierra Nevada Cancer Center on February 2nd, 2012?

A. Yes.

Q. And how many units were purchased?

A. It shows that 12 units were purchased.

THE COURT: How many?

THE WITNESS: 12 units.

Q. 12 units were purchased on February 2nd, and you seized on February 28th, five, correct?

A. That's correct.

Q. Okay. And, you know, it might be easier if I just

put these up on the screen, I apologize.

Now, on the same date, Special Agent, I'm going to show you another document from the QSP invoices which shows that Alimta was also purchased by QSP by Sierra Nevada on that same date.

Can you see -- can you read these two entries, sir?

A. Yes.

Q. So that indicates that Alimta was purchased by Sierra Nevada on that date, correct?

A. Referring to the date of February 7th?

Q. Yes. February 2nd, which is the date up here.

A. I'm sorry, it looks like seven. I apologize.

Q. No problem. I'll zoom in, so it can be clearer.

You agree that's February 2nd, sir?

A. I believe it is, yes.

Q. And the quantity of Alimta that's purchased here in 500 milligrams is six, correct?

A. Yes, it is.

Q. And the 100 milligrams is one, correct?

A. Yes, it is.

Q. And on February 14th, Alimta is purchased again by Sierra Nevada QSP. I'll show you the date, sir -- sorry, February 13th. They purchased Alimta in 100-milligram vials, and they purchased seven of them, and three of the

500 milligrams, correct?

A. Three in the 500 milligrams, and seven in the 100 milligrams, yes.

Q. So if we look back at your inventory, we have a total of eight purchased at the 100 milligrams, which would equal seven that were purchased on February 14th, and the one that was purchased on February 2nd, correct?

A. Yeah, without -- I wasn't calculating in my head while we were doing this. I apologize. I didn't know where we were going with this.

Q. Sure. Would you like to put that back on?

A. Sure, please.

Q. Yes. So we're just going to focus now on the Alimta, 100-milligram purchases.

This one, so you can see, sir, is February 13th, 2012.

A. Yes.

Q. Alimta, 100 milligrams, seven?

A. Seven units, that's correct.

Q. Correct. And Alimta, 100 milligrams, one, and the date here is February 2nd; is that correct, sir?

A. Yes, sir.

Q. So for a total of eight units of Alimta that were purchased between February 2nd and February 13th, 2012, correct?

A. Correct.
Q. And, again, the Alimta that you seized from that office was on February 28th, and there's eight boxes or eight units of Alimta, correct?
A. That's correct.
Q. Similarly, there's -- Government Exhibit 181 indicates that you seized nine units of Aloxi, correct?
A. Yes.
Q. And the date that that Aloxi was seized by you is, again, the same date of February 12th, 2000- -- I'm sorry, February 28, 2012, correct?
A. Yes, sir.
Q. Looking at the same document that we looked at before, Invoice QSP, on February 13th -- I'll just show you the date, again, February 13, 2012, this indicates under the Alimta that we talked about, the purchase of Aloxi, correct --
A. Yes.
Q. -- and in the quantity of 20?
A. That's correct, yes.
Q. And according to your Inventory of Evidence, nine of those were seized two weeks later on February 28th?
A. They were seized, yes, February 28th.
Q. If I can move this along, as best I can, but you also seized 12 boxes of Zometa, correct?

A. According to the evidence, yes.
Q. You have no reason to doubt that this is an accurate testimony as you're testifying?
A. Accurate.
Q. In fact, Zometa was also purchased from QSP by Sierra Nevada Cancer Center, correct?
A. Are you showing me an invoice? Are you asking as I sit here?
Q. Sure. I'm going to ask you first, and then you can look at the invoice.
A. I don't specifically recall, you know, three and a half years later that they bought Zometa from QSP.
Q. Show you another QSP invoice. The date on this, sir, you agree, is January 17th, 2012?
A. Yes.
Q. And amongst the items purchased is Zometa at a quantity of five, correct?
A. Yes.
Q. And in addition on your inventory, sir -- and we went through these already, but seven boxes of Alimta, 500 milligrams, you recall looking at the invoices that there were 500 milligrams purchased as well?
A. Yes. As I said before, as I sit here today, I don't recall the signature here today.
Q. Oh, sure. We just went through the Alimta.

A. Oh, oh, I apologize. Yes, sir. Yes.
Q. So Sierra Nevada did purchase from QSP Alimta, 500-milligram size?
A. Yes.
Q. And Eloxatin, do you recall from your investigation that they purchased Eloxatin as well?
A. I'm sorry. If they have Eloxatin, then they must have purchased it.
Q. Sure, from QSP?
A. Show me an invoice.
Q. I'll show you an invoice from QSP, dated February 13th, 2012. If you can just read that, sir.
A. It says Eloxatin with the active ingredient's name, and also the 100-milligrams.
Q. Quantity purchased, here is six?
A. Yes, sir.
Q. And two weeks later you seized from Sierra Nevada the Eloxatin here, correct?
A. That's correct. The document shows 5 milligrams/milliliters.
Q. You are correct, sir.
And the final drug listed on here is Vidaza; is that correct?
A. That's correct.
Q. And on the -- on January 26th is the date of this

invoice; 12 from QSP. This is a purchase for -- would you read that, sir, to the jury?

A. It says "Vidaza SC."

Q. And the quantity here that's purchased is 20?

A. That's correct. And I believe we have a different milligram strength on that one, too.

We're referring to Line Item Number 7, I assume.

Q. Correct.

A. Yes.

Q. Correct. So, as you testified today, Special Agent, when looking at Government Exhibit 181, as to whether these items were purchased by Sierra Nevada, from MDK or QSP, are you in a position to state authoritatively that these items were purchased from MDK?

A. As I said originally, without seeing both sides of the evidence, I mean, they did purchase from QSP the items that we discussed. Some of them were in different milligrams.

Q. Certainly, but as you testified here in preparation for your testimony today, are you able to sort of state with certainty right now that the items that are listed in Government Exhibit 181 could only have been purchased from MDK?

A. No.

Q. In fact they very well could have come in a forwarded

part from QSP?

A. Going through you showed me documents. Again, I'm a little concerned that some of them have different milligram strengths. That would indicate they're a different product. What I can say -- I can't absolutely say they came from MDK. I can't absolutely say they came from QSP.

THE COURT: How much longer are you going to be?

MR. RESNIK: Not much longer, your Honor. I'm sorry. I got a little bogged down with the invoices. We'll move quicker through the rest of this.

Q. Special Agent Baxter, when you began your investigation of Sierra Nevada Cancer Center, you went there to question Dr. Perez without previous knowledge that he purchased items from MDK, correct?

A. That's correct.

Q. And, in fact, there were nine vials or boxes of Mabthera that you took from Sierra Nevada Cancer Center; isn't that correct?

A. That's correct.

Q. And those nine boxes of Mabthera that you seized from the Sierra Nevada Cancer Center, you believe those nine vials came from Medical Device King or MDK?

A. I believe that's correct.

Q. You actually sent those nine vials of Mabthera,

wherever they came from, out to be tested at an FDA lab, didn't you?

A. That's correct.

Q. And, in fact, they came back to be authentic to the drug Rituxmab, correct?

A. Rituxan is the active ingredient for the drug Rituxan and Rituximab. So it's for the US-approved drug Rituxan and Rituximab -- I apologize. I don't know how to spell it.

Q. So, just to be clear, when you sent it out, the active ingredient Rituximab was active in the vials that you sent out for testing?

A. Yes.

MR. RESNIK: Thank you, nothing further.

THE COURT: Anything else?

MR. ABELL: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ABELL:

Q. Special Agent Baxter, you were asked questions about a lot of the drugs you received that day. You weren't asked about the Altuzan, this inventory seized in evidence, shows that you seized seven boxes of Altuzan, correct?

A. We're referring to Exhibit 182?

Q. Yes.
A. Yes.
Q. Seven boxes of the Altuzan, 400-milligram size?
A. That's correct.
Q. Did you have an opportunity to reconcile the invoices of QSP and MDK with respect to the Altuzan?
A. Yes. Actually, when I reviewed the documents the first -- my first time I went to Sierra Nevada Cancer Center was on the 28th of February 2012.

After taking the products that were taken on that date, I reviewed the inventory, and I specifically recall that the Altuzan -- I had more product in my hands than I had invoices from QSP showing the purchase from Sierra Nevada Cancer Center.

So when I went back to talk to Dr. Perez at the beginning of April, I asked for the additional invoices so that I could marry up the number of products I had compared with the invoices, so I could show at least seven of the greater of the purchase of Altuzan.
Q. So let's be real specific, when you went and seized the product in February, you seized seven boxes, but how many invoices were you provided in QSP?
A. The invoice -- to my recollection, the invoice showed four boxes were purchased from QSP.
Q. In other words, there were three boxes of Altuzan,

400 milligrams, that you couldn't account for based upon the QSP invoices?

A. That's correct.

Q. Did you subsequently get from Sierra Nevada Cancer Center an invoice showing three -- a purchase of three Altuzan, 400 milligrams, from MDK?

A. I recalled that I received three or more. It was enough so that I could marry up the purchase amount, the seven that I had before me.

Q. So once you got them from MDK, were they all a combination of MDK and from QSP?

A. That's correct.

Q. And it was your estimation that these seven boxes were a combination of QSP and MDK product; is that correct?

A. Yes, that's correct.

Q. Counsel asked you if you sent it out for testing.

Did you send the Altuzan out for testing?

A. Yes.

Q. Where it was sent to them?

A. It was sent to the FDA's Forensic Chemistry Center in Cincinnati, Ohio.

Q. What is that Forensic Chemistry Center?

A. It's the lab that conducts tests -- conducts tests for both OCI and other entities within the FDA. But it's

a forensics lab, so it's for criminal investigation.

Q. And you sent the Altuzan that you seized on February 28th, 2012 to the FDA for testing?

A. That's correct.

Q. What were the results of the testing?

A. The testing found that six of the products were genuine products -- it was Altuzan. Still not for the US market. But one of those products had markings on the boxes that were counterfeit and markings on the labels that were counterfeit. The product inside was found to be at least to be consistent with genuine Altuzan, or the active ingredient of Altuzan.

But at the time I spoke to the people, they couldn't tell whether -- I spoke with the chemist, and they couldn't tell if it was the full strength or the presence was there.

Q. So one of the packages you sent to the FTC for testing was determined to have counterfeit packaging; is that accurate?

A. The packaging of Altuzan, correct.

Q. When the product gets sent to the FTC does the FTC also determine whether that product had the markings to enable it to be FDA approved?

A. Yes, it does.

Q. Do you recall if the testing done at the FTC

established that the Mabthera you seized that was purchased from MDK was FDA approved?

A. I don't recall.

MR. ABELL: That's all, your Honor. Thank you.

(Continued on next page.)

Q So the Altuzan that you sent to be tested at the lab, you don't know which ones were from QSP or which ones were from MDK, correct?

A At the time, I think there was not the ability to determine that based on the information I had, both from talking to the people that worked there and the documents that I saw.

Q When you talked about not the ability, you're talking about the boxes, you're not talking about the substance inside, correct?

A Right, that's correct.

MR. ABELL: Nothing else.

THE COURT: Members of the jury, we will take a 15 minutes recess. Keep an open mind. Please recess yourself.

(Whereupon the jurors leave the courtroom.)

THE COURT: 15-minute recess. I will have to speak to one of the jurors. Another juror has raised a problem. I'll let you know about it.

MR. RESNIK: Thank you, Judge.

THE COURT: You are excused.

THE WITNESS: Thank you, sir.

(Time noted: 3:35 p.m.)

(Conference in the hallway.)

THE COURT: Where is the juror who wants to be excused? Who has the temerity to talk to me? Is that you?

(The juror laughs.)

A JUROR: Yes.

THE COURT: What is the scoop?

A JUROR: The situation is my job pays up to two weeks. I am supposed to be here for eight weeks. The court is paying $40 a day. It's significantly less than my mortgage and the need of my kids and myself.

THE COURT: I definitely want to keep you because you have a nice smile.

A JUROR: You're funny. I appreciate that. I need to make sure that my mortgage is covered so I'm not homeless.

THE COURT: Just wait back in the juror room. If we lose you, I'm sorry.

A JUROR: That's okay. Thank you.

(Matter continued on the next page.)

(In Open Court.)

THE COURT: Mr. Kelly, it must be me.

Mr. Kelly?

MR. KELLY: Yes.

THE COURT: I said, Mr. Kelly, it must be me.

MR. KELLY: Why is that?

THE COURT: The jurors want to leave.

MR. KELLY: It could be the defense counsel.

THE COURT: Alternate Juror No. 1 has given me a story. She has children, a mortgage. She can't pay, she'll be in trouble. She'll be in default after the first week the government won't pay her. Her employer, I'm sorry, won't pay her. I'm sorry. The employer will pay her for two weeks, but not six or eight. So I'm going to have to excuse her. I'm sorry about that.

Any objection, Mr. Kelly?

MR. KELLY: No, Your Honor.

THE COURT: Any objection, Mr. Resnik?

MR. RESNIK: No, Your Honor.

THE COURT: We have another couple of issues which my very capable courtroom deputy will tell you about.

THE CLERK: So Juror No. 2, who told me on Thursday, I think we mentioned this, that her employer has a couple of times a week she has to go into the city with her because she will be on television. She said she mentioned this during

jury selection but no one said anything to her about it. She is on this Thursday, the 15th, and Tuesday, the 20th of this month. She has to go into the city which means she probably couldn't get here until about 10 o'clock.

After speaking to Judge Spatt, we'll probably start the trial at 10:30 so that gives her enough time to get here. She doesn't have next month's schedule yet; so she will get it to me as soon as she can.

THE COURT: Well, that is devastating. Starting a trial at 10:30 in the morning, that's not for me. That's for sure. But we're going to have to do it.

Any objection to that, Mr. Kelly?

MR. KELLY: No, Your Honor.

THE COURT: Mr. Resnik?

MR. RESNIK: No, Your Honor. Can I just have the dates again, that we're going to start late?

THE CLERK: Yes. This Thursday, the 15th of October, and next Tuesday, the 20th.

MR. RESNIK: Thank you, very much.

THE COURT: We'll let the jury know about that.

One moment.

THE CLERK: Yes, Your Honor.

(Whereupon the judge speaks to the Deputy Clerk.)

THE COURT: There is another problem also.

THE CLERK: So Juror No. 9 spoke to me before that

her employer, although she works for the state, she's a contractor so technically she doesn't work for the state. She just found out she's only being paid for ten days. She's asked that Judge Spatt contact her employer to see if she can be paid for more than ten days.

Also, she says that she knows we're not sitting on Fridays unless the jury is deliberating, but she has an issue with Friday, November 13th. I told her as we get closer to that date to remind me.

THE COURT: I will call her employer and speak to her employer. I am uniquely unsuccessful in getting money. It probably is a result of my practice of law when I was unsuccessful at getting money as well. So I think it's just a continuation.

Let's bring in the jury.

THE CLERK: Yes, Your Honor.

(Pause in proceeding.)

All rise. Jury entering.

(Whereupon the jury enters at 3:45 p.m.)

THE COURT: Please be seated, members of the jury.

You may proceed, Mr. Kelly.

MR. KELLY: Thank you, Your Honor.

The government calls Charles Burke.

THE CLERK: Please raise your right hand.

(Witness sworn.)

THE WITNESS: I do.

C H A R L E S  B U R K E, I I I

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please state your name, and spell your last name slowly for the record.

THE WITNESS: Charles Henry Burke, B-U-R-K-E, the III.

THE COURT: Okay. Keep your voice up, Mr. Burke.

THE WITNESS: Yes, sir.

THE COURT: Use the microphone.

You may proceed.

MR. KELLY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. KELLY:

Q Good afternoon, Mr. Burke.

A Good afternoon.

Q Please tell the jury where you're employed?

A I'm employed at South Shore Neurologic Associates.

Q Where is that located?

A We have three locations. My location is Islip.

Q How long have you worked there?

A Since May of 2009.

Q What is your position?

A I'm the chief operating officer.

THE COURT: You're what?

THE WITNESS: The chief operating officer.

Q As the chief operating officer of South Shore Neurologic Associates, what are your duties and responsibilities?

A I run all aspects of the company on a day-to-day basis; so I oversee everything that goes on within the company.

Q How many people work at South Shore Neurologic Associates?

A We have 225 employees.

Q How many doctors are on staff?

A 16 physicians.

Q What is the specialty of the 16 physicians?

A It's a neurology group.

Q All of the physicians are neurologists?

A Correct.

Q What other members of the staff are there? What other positions are there within South Shore Neurologic Associates?

A We have 11 nurse practitioners. We have one pain management physician. Physical therapists. Neurodiagnostic technologists. All provide MRI, all provide services.

Q Can you tell the jury a little bit about your educational background?

A I have a master's degree in health care administration. I have been in health care since 1978.

Q Do you play a role in ordering prescription drugs for South Shore Neurologic Associates?
A No, I do not.
Q Prior to 2012 where did South Shore Neurologic Associates get their prescription drugs from?
A We use multiple vendors because we order a varied amount of prescription medication. We use five or six different vendors.
Q What vendors did you use prior to 2012?
A We've used Allergan, we've used Cardinal, we've used Biogen. And a few others that I can't recall.
THE COURT: What was the first one?
THE WITNESS: Allergan.
THE COURT: How do you spell it?
THE WITNESS: I don't want to butcher it. So I'm going to say A-L-A-R-G-A-N.
MR. KELLY: A-L-L, Your Honor.
THE WITNESS: A-L-L.
Q Did there come a time in 2012 when another company came to your attention as a possible source of prescription drugs?
A It was actually 2011, late 2011. We received some faxes from Medical Device King. We contacted them, I believe, in early 2012.
Q Let me show you a document marked as Exhibit 188 for identification, and ask you to take a look at that. Tell me

if you recognize it?

A Yes, I do.

Q What is that?

A It is an e-mail correspondence between myself and Liam Scully.

Q What is it regarding?

A It is basically providing his pricing on several different medications, and I provided him with some of the medications that we currently use within the practice.

Q This included e-mails that you sent?

A Correct.

Q E-mails that Mr. Scully responded to?

A Correct.

MR. KELLY: The government offers Exhibit 188 into evidence, Your Honor.

THE COURT: Any objection?

MR. ROSENSAFT: No objection, Your Honor.

THE COURT: Government Exhibit 188 in evidence.

(So marked as Government Exhibit 188 in evidence.)

Q I'm placing on the screen, and you can look at it on the screen if you wish, the second page of Exhibit 188 in evidence. Do you see that in front of you?

A Yes, I do.

Q Is that an e-mail from you?

A Yes, it is.

Q It's to Liam, correct?
A Correct.
Q Read that e-mail to the jury, please.
A "Liam. I wanted to get back to you regarding" --
THE COURT: Slow down. Read very slowly.
THE WITNESS: Okay. Sorry.
A "Liam, I wanted to get back to you regarding the drugs we use here and to see if you can get better pricing than what we have. As we discussed, I would like to set up a meeting with some of the physicians of my group, but I would like to have your prices on the below items so we can set up an agenda to discuss doing business."
Would you like the list of medication?
Q Yes.
A "Avonex, four injections per box. Gamunex, per gram price. Remicade, 100-milligram vial. Tysabri, cost per vial. Carimune, per gram. Rituxan, 500-milligram.
The above lists are medications we commonly use at our infusion centers. Please get back to me as soon as you can. I would like to set up a meeting prior to the holiday."
Q Turning to the first page of Exhibit 188, did Mr. Scully respond to that?
A Yes, he did.
Q Was that on or about Tuesday, December 20th at 10:30 a.m.?

A Correct.

Q If you could read the response from Mr. Scully to your e-mail?

A Sure. "Hello, Charles. Sorry about the delay. I am still waiting on a few prices, but here are some of the prices. Botox, $375. Dysport, $400. Rituxan, $500 (Mabthera $2,400). Avonex, $2,000. Remicade, 800. I will have other product pricing shortly. Let me know if there's anything else you need in the meantime."

Q After that exchange, in January of 2012 did you have meetings with Mr. Scully?

THE COURT: 2012 or 2011?

MR. KELLY: We've now moved from December 2011 into 2012.

THE COURT: Okay.

Q Did you have meetings with Mr. Scully in 2012?

A Yes, we did.

Q If you could tell the jury what was discussed at those meetings, and what was said by Mr. Scully with regard to the products he was selling?

A The initial meeting was a meet and greet. Since we didn't know of his company, we wanted to meet him face-to-face, get a feel for him. We discussed Botox, that we have a very large Botox program for headaches. That would be something we need to look into to see if he can provide a

reduced price for us. The meeting lasted about 20-minutes or so, and he said that he would be able to provide Botox. And we would set up another meeting, which did occur.

Q Who was present at the first meeting?

A The first meeting, I believe it was myself and Al Roache, R-O-A-C-H-E, who was the CFO.

Q He's the chief financial officer of South Shore Neurologic Associates?

A Correct.

Q Was there a second meeting between Mr. Scully and you?

A Yes, there was. We brought him back because I wanted him to meet the physician who does the Botox, Dr. Xian, X-I-A-N. As long as Dr. Xian would be comfortable after meeting him, we would be able to proceed ahead and purchase product from them, a small amount to try. With that, Liam provided us with four vials, four vials of Botox for Dr. Xian to administer.

Q In terms of the discussion at that meeting, what was said at that meeting?

A The gist of it was basically he's a small company based out of Great Neck. That he can provide product at better pricing because he has less overhead than the larger companies, and it's more of a boutique service than involving large corporations.

Q Did he tell you where he got the Botox from?

A I was told Allergan.

Q Were you told that by Mr. Scully?
A Correct.
Q He told you he bought the Botox directly from the manufacturer?
A Correct.
Q Did you also discuss Rituxan, R-I-T-U-X-A-N, with Mr. Scully?
A Not at that meeting. But at a later date, yes.
Q At a later date, did Mr. Scully tell you where he got Rituxan from?
A From the manufacturer.
Q Prior to these meeting with Mr. Scully, where was South Shore Neurologic Associates getting its Botox and other prescription drugs?
A The Botox, we were receiving directly from the -- from Allergan via the rep who worked for Allergan.
THE COURT: You received the Botox from where?
THE WITNESS: From Allergan via the rep, the sales rep.
THE COURT: How do you spell that?
MR. KELLY: A-L-L-E-R-G-A-N, Allergan.
Q You were getting it directly from a representative of Allergan, correct?
A That's correct.
Q What was the price that you were paying Allergan per box

of Botox?
A I believe at the time it was $525 per vial.
Q How much was Mr. Scully offering it for?
A $375.
Q Did there come a time when you entered into an agreement to purchase product from Mr. Scully?
A Yes, I believe that agreement was signed in January of 2012.
Q Prior to that, did you have any discussions with Mr. Scully other than the ones that you've mentioned here so far?
A No.
MR. KELLY: Your Honor, the government offers Government Exhibit 34 into evidence.
MR. ROSENSAFT: No objection, Your Honor.
THE COURT: What is 34?
MR. KELLY: 34 is a medical device account setup form.
THE COURT: For what?
MR. KELLY: To become a customer. Account setup to become a customer.
THE COURT: Account setup form?
MR. KELLY: Yes, Your Honor.
THE COURT: Received.
(So marked as Government Exhibit 34 in evidence.)

Q I'm placing Exhibit 34 in evidence on the overhead. Do you recognize this document, Mr. Burke?

A Yes, I do.

Q What is it?

A That is the information required to set up an account to do business with Medical Device King.

THE COURT: What do you call that document? Is it a written agreement?

THE WITNESS: It's basically an agreement.

THE COURT: Who was it between?

THE WITNESS: Medical Device King and South Shore Neurologic Associates.

Q After this date, did you begin to make purchases from Medical Device King?

A Yes.

MR. KELLY: The government offers into evidence Exhibit 35.

THE COURT: What is 35?

MR. KELLY: Some invoices from Medical Device King; an invoice dated 5/22/12:

THE COURT: To South Shore?

MR. KELLY: To South Shore, yes.

THE COURT: Your company is South Shore, correct?

THE WITNESS: Correct.

THE COURT: Any objection?

MR. ROSENSAFT: No, Your Honor.

THE COURT: I just note there are checks as well on this exhibit. It's not just invoices. There are Xeroxes of checks. Okay. Invoices and checks as Government Exhibit 35 in evidence.

(So marked as Government Exhibit 35 in evidence.)

Q I'm placing on the screen, Government Exhibit -- the first page of Government Exhibit 35 dated 5/22/2012. Do you see that up there?

A Yes.

Q What is that an order for?

A That is an order for Rituxan, which was delivered as Mabthera.

Q Does that contain your initials on it?

A Yes, that's my initials.

Q Was this order placed after you were told by Mr. Scully that he orders Rituxan directly from the manufacturer?

MR. ROSENSAFT: Objection, leading.

THE COURT: That's a good objection, but I'm going to allow it.

A Can you restate the question, please?

Q Yes. You indicated earlier that Mr. Scully had told you that he got Rituxan directly from the manufacturer.

A Yes.

Q Here is the invoice, the first page of Exhibit 35 in

evidence, for Rituxan. It's listed as Mabthera, correct?
A Yes.
Q Prior to placing this order, had Mr. Scully spoken to you and told you that he bought Rituxan directly from the manufacturer?
A Yes.
Q Did you rely on that in making this purchase?
A Yes.
Q If you knew that was not true, would you have made this purchase?
A No, I would not.
Q Did you believe that the drugs that Mr. Scully was selling was FDA approved?
A Yes, we did.
Q If you knew they were not FDA approved would you have purchased them?
A We would not.

MR. KELLY: The government offers Government Exhibit 38.

THE COURT: One minute now.

(Pause in proceedings.)

THE COURT: What government exhibit now?

MR. KELLY: Exhibit 38 into evidence is the offer of the government. The first page is an invoice dated 8/20/2012 from Medical Device King.

THE COURT: Any objection to Government Exhibit 38?

MR. ROSENSAFT: No objection, Your Honor.

THE COURT: Exhibit 38 in evidence.

(So marked as Government Exhibit 38 in evidence.)

Q I'm placing on the screen the first page of Government Exhibit 38 in evidence. What is that?

A That's an order for Botox.

Q Who is it from?

A It's from Medical Device King.

Q That's where the product is coming from?

A That's what we ordered, that's correct.

Q When you say "we," you mean South Shore Neurologic Associates?

A Yes.

Q Does this reflect an order of South Shore Neurologic Associates from Medical Device King for Botox on August 20, 2012?

A Yes, it does.

Q How much Botox was ordered?

A 50 vials.

Q Did you believe that you were ordering an FDA approved product?

A Yes, we did.

Q Was that based, in part, on the fact that Mr. Scully told you that he bought Botox directly from the manufacturer?

A That's correct.

Q Do you see the amount of this invoice, the $18,780?

A Yes, I do.

Q I'm placing the second page of Exhibit 38 in evidence. Do you see that document?

A Yes, I do.

Q What is that?

A That's a check for payment of the product.

Q It's a check from whom to whom?

A South Shore Neurologic to Medical Device King.

Q Is that check in the amount of the invoice that you just looked at on the first page of Exhibit 38?

A Yes, it is.

MR. KELLY: The government offers Government Exhibit 36 into evidence being Medical Device King invoices and related documents.

THE COURT: Invoices to who?

MR. KELLY: Invoices to South Shore Neurologic Associates.

THE COURT: Any objection?

MR. ROSENSAFT: No objections, Your Honor.

THE COURT: Government Exhibit 36 in evidence.

(So marked as Government Exhibit 36 in evidence.)

Q I'm placing on the screen the first page of Government Exhibit 36 in evidence. Do you recognize that?

A Yes, I do.

Q What is that?

A That is an invoice for four vials of Botox from Medical Device King.

Q That is an order that was made by South Shore Neurologic Associates?

A That's correct.

Q That's an order that you received and paid for?

A We did receive it. I'm not sure about paying it. I believe Mr. Scully offered free products to the physician.

Q The amount of this invoice is $1,500, is that correct?

A That's correct.

Q I'm showing you the third page of Government Exhibit 36 in evidence. Do you recognize that?

A Yes, I do.

Q What is that?

A That is the payment for $1,500 for the product.

Q Does that reflect payment of the invoice dated 2/14/12 for Botox?

A Yes, it does.

Q Did you make other orders for Botox and Mabthera from Medical Device King?

A Yes, we did.

Q Putting on the screen an invoice dated March 22nd, 2012. Is this one of those invoices?

A That's correct.
Q What is the total amount of this invoice?
A $18,750.
Q Did you also place an order on April 13, 2012?
A Yes, we did.
Q That was for what product?
A It's Mabthera, four doses.
Q Prior to that date, had Mr. Scully told you where he got Rituxan from?
A It was from the manufacturer.
Q Had he told you that before you ordered the Rituxan?
A Yes.
Q Did you place other orders for Botox and Mabthera?
A Yes, we did.
Q Did you order Rituxan when you placed an order?
A Yes, we ordered Rituxan.
Q Did you receive Mabthera?
A Yes, we did.
Q Did you take any action when you received Mabthera instead of Rituxan?
A I spoke to Mr. Scully.
Q What did you say to Mr. Scully and what did he say to you about receiving Mabthera after ordering Rituxan?
A When I first questioned it, I spoke to him and he said it was the generic version of Rituxan and it'd be fine.

Q What did you do with that information?
A We basically -- after doing some further investigating, we basically stopped ordering that product from him. I believe we only ordered four doses, four vials.
Q In terms of the Mabthera?
A Correct.
Q You ordered Botox far more times than that?
A Correct. We have a very large Botox program. This is a very small portion of the amount of Botox that we use.
Q You referenced headaches earlier as something that is treated with the Botox in South Shore Neurologic Associates, is that correct?
A That's correct.
Q What kind of headaches were you referencing?
A It's typically migraine headaches, and patients get injected every three months.
Q You said that's an injection?
A Correct.
Q Did there come a time when you surrendered some Botox product purchased from Medical Device King to the FDA?
A Yes, we did. We were notified by Agent Naisatka. We -- I believe there were about 50 vials that we put aside for him to confiscate.
Q What was the cost of those vials?
A To us it was $375 a vial.

Q Were those vials confiscated?
A Yes.
Q Approximately, when was that?
A I believe it was December of 2012.
THE COURT: How many vials were confiscated?
THE WITNESS: I believe 50.
THE COURT: 50?
THE WITNESS: I believe so.
Q Now, was any patient at the practice harmed by these unapproved drugs?
A Not to our knowledge.
Q At all times that you were ordering from MDK, did you believe you were receiving FDA approved products?
A Yes, we did.
Q Is there a medical reason why your practice wants to buy FDA approved drugs?
A Not being a physician but being a manager, I think that the testing that goes on would make sure that that's a pure product, unadulterated.
Q So what risks do you believe are occasioned by administering non-approved FDA drugs?
A One is --
MR. ROSENSAFT: Objection, Your Honor. He just testified he isn't a doctor.
THE COURT: Well, if he knows.

Do you know what risk there was in buying non-approved FDA drugs?

THE WITNESS: I think the risks -- as I said, I'm not a doctor.

THE COURT: So you don't know?

THE WITNESS: I wouldn't know.

THE COURT: Okay.

MR. KELLY: May I have one moment, Your Honor?

THE COURT: Surely.

Q Did there come a time when the FDA asked you to record a meeting with Mr. Scully?

A Yes.

Q Did you do so?

A Yes, I did.

Q Why did you do so?

A I was asked by Agent Naisatka if I was willing to do that. I felt it was my duty and obligation to do that.

MR. KELLY: Nothing further, Your Honor.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. ROSENSAFT:

Q Good afternoon, Dr. Burke.

A I'm not a physician.

Q Excuse me. That's right. Good afternoon, Mr. Burke.

You said you're the chief operating officer of South

Shore Neurologic, correct?

A Yes.

Q You're in charge of all aspects of the company on a day-to-day basis?

A Correct.

Q You have a master's in health care administration?

A Correct.

Q Now, when you first met with Mr. Scully, it was multiple meetings?

A Correct.

Q One of the first things he did was give you a copy of his license, is that right?

A That is correct.

Q In fact, he didn't give you his license. He gave you an updated license to show that it had been renewed by the State of New York.

A At my request, that's correct.

Q I'm going to pass you what's been marked as Defendant's Exhibit C.

THE COURT: What?

MR. ROSENSAFT: C, as in cat.

THE COURT: C for Charlie.

Q I'd ask you to have a chance to look at that, and let me know.

A Okay.

Q Do you recognize Exhibit C?
A Yes, I do.
Q What do you recognize it to be?
A That Mr. Scully's a -- or Pharmalogical is a registered wholesaler of drugs and/or devices by the New York State Board of Pharmacy.
Q So Exhibit C, these are the licenses that you were talking about?
A Correct.

MR. ROSENSAFT: The defense would offer Defendant's Exhibit C into evidence, Your Honor.

THE COURT: Any objection?

MR. KELLY: I need to see it, Your Honor.

(Handing to counsel.)

THE COURT: Any objection?

MR. KELLY: No objection.

THE COURT: Defense Exhibit C, as in Charlie, in evidence.

(So marked as Defendant's Exhibit C in evidence.)

(Matter continued on the next page.)

CROSS-EXAMINATION (Continued).

BY MR. ROSENSAFT:

Q I'm going to put it on the screen. You can continue to look at your copy, Mr. Burke. Let me zoom this out.

So this is the license that Mr. Scully provided you a copy of initially?

A Yes.

Q And it said that he was a licensed wholesaler of pharmaceutical drugs, here the years were 2009 to 2012. Correct?

A Correct.

Q Do you have any reason to believe that this license wasn't valid and accurate?

A No. Not at all.

Q And then upon your request, if you can flip to page 2, he provided you his renewal. Is that correct?

A Correct.

Q And this license date was 2012 to 2015. Correct?

A Correct.

Q And these licenses were in effect during the time you were buying product from Medical Device King?

A Yes.

Q And I didn't ask you about page 3 previously, but if you would, turn to page 3 and tell me if you recognize that.

A Yes, I do.

Q What do you recognize that to be?
A It is a New York State Department of Health controlled-substance license.
Q So, in fact, based on your knowledge, Medical Device King even had a controlled substance license from New York State. Correct?
A Correct.
Q That allowed him to legally sell controlled substances within the State of New York. Correct?
A Correct.
Q And after reviewing the licenses, you also did other checks on Medical Device King to make sure you were buying from a legitimate company. Is that correct?
A Yes, I did.
Q I believe you checked with the Better Business Bureau, for instance.
A Yes.
Q And you didn't find any complaints or any negative feedback at the Better Business Bureau?
A That's correct.
Q And you met with him multiple times, not just one time, so you could make sure to see that he was legitimate. Correct?
A Correct.
Q And in fact, on one of those meetings he brought a sample

of the Botox for you to see. Correct?

A Correct.

Q And the doctor -- I believe it was Dr. John?

A Jen.

Q -- also looked at the Botox to make sure he believed it was legitimate and authentic. Correct?

A Correct.

Q And then after that, just to do another check, you took some sample Botox from Mr. Scully. Correct?

A Four vials, I believe.

Q And the doctor actually used these vials in patients to ensure that they were legitimate and authentic. Correct?

MR. KELLY: Objection.

THE COURT: Overruled.

BY MR. ROSENSAFT:

Q The question is, and the doctor used these vials in patients to ensure they were authentic and legitimate. Correct?

A He used the vials, he used the vials on patients, correct.

Q And there weren't any problems with the vials. Correct?

A None that were reported.

Q And all of the background checks that you had done, none of it raised any red flags. Correct?

A Correct.

Q And then he even provided you a letter from his attorney. Correct?
A Yes. That was dated 2009.
Q Did you ask for that letter?
A I did.
Q And why did you ask for that letter?
A Just, again, just because he, it is a small company, we're just doing any our factfinding, and he offered to provide me with that information, that he had the ability to sell products, that he is not violating any laws.
Q Were you concerned at that point that he might be violating laws?
A Not at the beginning, no.
Q Is it your normal course to ask companies for a letter from their attorney?
A Not from their attorneys, no. But it is our normal course to check out a company's background, yes.
Q Was there something in particular you were worried about?
A Not at the beginning, no.
Q Well, let me pass you what has been previously marked as Defendant's Exhibit K.

Now that you have had a chance to look at that, please tell me if you recognize it.
A Yes, I do.
Q Make sure to look at the second page as well, if you

haven't already.

What do you recognize that to be?

A This the two-page document Mr. Scully provided me from his attorneys, dated May 27th, 2009.

MR. ROSENSAFT: Defense would offer Defendant's Exhibit K into evidence, your Honor.

THE COURT: Any objection?

MR. KELLY: No, your Honor.

THE COURT: Defendant's Exhibit K in evidence.

(Defense Exhibit K in evidence.)

BY MR. ROSENSAFT:

Q Mr. Burke, I'm going to put this up on the screen. But again, you can look at your own version. It will probably be easier for you to see.

A Yes.

Q I see at the top there, it says May 27, 2009. Was that the date you were referring to?

A Yes.

Q And the letter seems to be from Thaler & Gertler, LLP. Do you know who that is?

A I do not.

Q Did Mr. Scully tell you who that was?

A He said it was his attorneys.

Q And the letter seems to concern importation of Botox manufactured by Allergan.

Do you see that?
A Yes, I do.
Q I want to draw your attention to some of the bullet points contained in this letter from Thaler & Gertler.
The first bullet point. Could you read that, please?
A *Pharmalogical, Inc, purchases botulinum toxin Type A Botox from a foreign distributor.*
Q So in that first line from his attorney, which you received, it indicates that Pharmalogical was purchasing Botox from a foreign distributor. Correct?
A Yes.
Q And Allergan had a place out of Ireland.
A It is true.
Q And in fact Allergan makes all their products in Ireland. Correct?
A As far as I know.
Q Pharmalogical, though, is purchasing Botox from a foreign distributor. Correct?
A That is what it says here. Yes.
Q And if you could look at -- let's look at No. 3.
*The Botox which Pharmalogical purchases is labeled that it is manufactured by an Allergan subsidiary.*
Do you see that?
A Yes, I do.

Q Any of the Botox you received, did you ever have any concern that it did not come from Allergan?

A No.

Q And it says here, let's go down to this, the next-to-last bullet point.

*The manufacturing facilities of Allergan's subsidiaries are registered with the FDA.*

Sitting here today, do you have any concerns that the place where Allergan manufactures Botox is not registered with the FDA?

A No.

Q I want to turn to the second page, but before I do.

From the first page, it seems to have established that Pharmalogical is purchasing Botox from a foreign distributor, at least as contained in this letter. Correct?

MR. KELLY: Objection.

THE COURT: On what ground?

MR. KELLY: Because that is what that document says. He hasn't established it. It just says that. It doesn't -- it's not evidence establishing that.

MR. ROSENSAFT: I will phrase it, your Honor, as --

THE COURT: The jury understands that. Overruled.

BY MR. ROSENSAFT:

Q Is that correct, Mr. Burke?

A Yes.

Q Let me go to the second page. You can look at the top bullet point.

Could you read that.

A *Pharmalogical is not aware of the terms by which the distributor purchased the subject Botox from Allergan, Inc's, subsidiary, and Pharmalogical has no reason to believe that the distributor acquired the Botox subject to the limitation that it could not import it into the United States.*

Q So by reading this, Mr. Burke, at the time you understood this letter to be saying that Pharmalogical was purchasing Botox from a foreign distributor, and the Botox initially, though, came from Allergan. Is that correct?

A Correct.

Q So Pharmalogical was not purchasing Botox directly from the manufacturer but was purchasing Botox that originally came from the manufacturer. Correct?

A We were under the impression that it was coming directly from Allergan. So...

I don't know if that answers your question.

Q Not exactly.

A Okay.

Q We understand that the Botox is all manufactured by Allergan. Correct, Mr. Burke?

A As far as I know. Yes.

Q But under this letter, it is also clear that the Botox

Pharmalogical is buying is coming from a foreign distributor who purchases it from Allergan. Correct?

A According to this letter, yes.

Q And that is what Mr. Scully told you. Correct?

A No.

Q Did Mr. Scully not give you this letter, Mr. Burke?

A He did give me this letter. This was after we started doing some business with him. Yes.

Q And so upon reading this letter you are saying there was a contradiction and you immediately discussed it with Mr. Scully.

Is that what you are saying?

A What I'm saying is, we were under the impression that the product was coming from Allergan in Ireland directly.

Q Even though the letter he gave you said something different.

A Yes.

Q And if you look there on the bottom -- I will take you to the last paragraph.

*Pharmalogical has no reason to believe that it is not in full compliance with the FFDCA or any other statute or regulation of the United States of America.*

Do you see that?

A Yes, I do.

Q Did this letter from Thaler & Gertler make you feel

confident that you could purchase Botox from Mr. Scully, among the other things you listed?

A It certainly added more credibility to a young company. Yes.

Q And you purchased Botox the most out of any drug, from Mr. Scully. Correct?

A That is correct.

Q When looking back at the invoices the government showed you, I noticed Botox was often purchased in orders of 50. Is that correct?

A It is correct.

Q And the other drug that was mentioned, Mabthera, was usually like two. Is that correct?

A Correct.

Q Quantity-wise, how many bottles of Botox would you say you purchased from Mr. Scully over the years?

A We typically put an order out -- well, we started putting an order out for 50 vials per purchase. And I'm going to say maybe we have 10 or 12 invoices there. You have it. I don't know off the top of my head.

Q Significantly more than the Mabthera. Correct?

A Yes. Because you use more of the product with Botox than you do with Mabthera. Typically, you use up to three vials per patient.

Q And your purchases from Mr. Scully of Botox seemed to be

going fine until an Allergan rep contacted you. Correct?

A Correct.

Q What was the name of that rep?

A Kristin Haverchek.

Q What was her relationship to Allergan?

A She was a sales rep for Allergan.

Q So she worked directly for Allergan?

A Correct.

Q And her business was hurting because you were purchasing Botox from Mr. Scully. Correct?

A There was a slight down in her volume, yes, that is correct, but it was one-tenth of what we purchased in Botox.

Q In fact she brought that to your attention because she noticed that it went down.

A Yes.

Q Correct?

A Correct.

Q It was hurting her bottom line?

A I would assume if she gets commissions it would, yes.

Q But again, as fair as you knew, you were purchasing Botox from Allergan.

A Correct.

Q From both places. Correct?

A Correct.

Q I'm going to pass you what has been marked as Defense

Exhibit DV.

Do you recognize that?

A I do.

Q What do you recognize that to be?

A This is a note one of my employees left for me that the company was contacted by Agent Naisatka.

Q Please don't read from the note because it is not in evidence.

A Oh.

Q So you did not write that note. Correct?

A I did not. No.

Q Who was the employee?

A Honestly, I don't know. We have 225. It could have been anybody at the front desk.

Q Then I will move on.

Now I want to talk about the invoices that say Mabthera.

A Sure.

Q Now, initially Liam told you that what he could provide is Rituximab. Is that correct?

A Rituxan.

Q Well, there is a big difference there. Correct, Mr. Burke?

A Again, I'm not a physician so I couldn't -- I don't know.

Q So you don't know what the relationship is with Rituxan

and Rituximab.

A I do not.

Q Do you know what the relationship is between Mabthera and Rituximab?

A I do not.

Q Let me pass you -- well, if you could, look at Government Exhibit 188, which is in front of you. And I will publish it on the screen.

Do you recall the prosecutor showed you this when he questioned you?

A Yes.

Q You see there that there is an email from MDK to yourself that lists prices for different drugs. Correct?

A Correct.

Q And with respect to the Rituxan it says *Rituxan (Mabthera)*. Correct?

A Correct.

Q Did you have the knowledge at that time to understand what *Rituxan (Mabthera)* meant?

A No.

Q Did you speak to any of the doctors about that fact?

A No, I did not.

Q But he's clearly saying in that exhibit *Rituxan (Mabthera)*. Correct?

A On this document, yes.

Q I'm going to pass you what has been previously marked as Defense Exhibit DW, and ask you if you recognize that.

Do you recognize that?

A Yes, I do.

Q What do you recognize that to be?

A It is an email from one of my employees, providing me with a list of products that they use. So this is a comparison of costs.

MR. ROSENSAFT: Defense would move Exhibit DW into evidence.

THE COURT: Any objection?

MR. KELLY: May I question, your Honor?

THE COURT: Surely.

VOIR DIRE EXAMINATION

BY MR. KELLY:

Q At the top of this document, Mr. Burke, it says, there is some handwriting at the top.

Do you see that?

A Yes, I do.

Q Whose handwriting is that?

A That is mine.

MR. KELLY: No objection.

THE COURT: Defense DW in evidence.

(Defense Exhibit DW in evidence.)

BY MR. ROSENSAFT:

Q I will place this on the screen as well.

I want to draw your attention to the bottom of that exhibit where again it seems to have an email from Liam to you dated January 30, 2012.

Do you see that?

A Yes, I do.

Q And again, you see that it says Rituxan (Mabthera). Correct?

A Yes.

Q And I see underlining under the milligrams and the price. Do you know who made that writing?

A I do not.

Q Was that your writing?

A I honestly don't know.

Q And that was forwarded to you, if you look at the next message up, though, from Charles Burke to Charles Burke. Is that correct?

A Yes. That is correct.

Q You forwarded it from a personal address to a work address?

A I have several email accounts, and what happens is there are spam filters, and I get a lot of spam. So I find that one of my accounts does not have that problem, so I typically will use that more and more.

Q Do you remember speaking to Mr. Scully about the fact

that sometimes some of his products were in foreign languages?

A I did not see any of his products in foreign languages.

Q That wasn't exactly my question. Do you remember speaking to Mr. Scully about the fact that some of his products were in foreign languages?

A I do not.

Q I'm going to pass you what has been previously marked as Defendant's Exhibit DX.

THE COURT: For identification?

MR. ROSENSAFT: Yes, your Honor.

BY MR. ROSENSAFT:

Q This is a multipage document. Could you take your time please and look at each page.

A Okay.

Q Do you recognize those pages, Mr. Burke?

A I do not recognize the first few pages.

Q Now, on the first page, you see that your name is on that page. Correct?

A I see my name as sender there, yes, but there is also no address on there.

Q And you don't recognize that at all?

A I do not.

Q What kind of a document does it appear to be?

MR. KELLY: Objection, your Honor.

THE COURT: On what ground?

MR. KELLY: He doesn't recognize it. Now we're going to ask him what it appears to be.

MR. ROSENSAFT: I'm only asking him --

THE COURT: Even if he doesn't recognize it, he can say it is what kind of a document. It might be a menu to Peter Luger's Steakhouse. Who knows what it is?

MR. KELLY: Yes, your Honor.

THE COURT: Do you know what that is?

THE WITNESS: It appears to be an email.

THE COURT: An email?

THE WITNESS: Yes, your Honor.

BY MR. ROSENSAFT:

Q What is the date of that email?

A Friday, January 27, 2012.

Q And you said you recognize the third page. Is that correct?

A Yes.

Q What do you recognize that to be?

A It looks like it is an email sent to me on January 30, 2012.

Q And that third page, you see -- what does that third page pertain to?

A It is Mr. Scully getting back to me on some pricing that we had requested from him.

Q When Mr. Scully wrote to you about Mabthera or Rituxan,

do you know of any instance when you wrote when he didn't include Mabthera and Rituxan together?

A I don't remember, to be honest.

Q And now I'm going to pass you what has been previously marked as Defendant's Exhibit DY.

Please take a look at that and tell me if you recognize those documents.

A Yes, I do.

Q What do you recognize those to be?

A These are paid invoices from Medical Device King for Mabthera.

Q Is that all they are? Look at page 2 in particular.

A Page 2 is, at your request we identified, from what we understand, the patient that was given this product.

Q And that page 2, for instance, is that insurance information? Or billing information?

A Yes. We tried to track down, as best we could, who the patient would be that would have gotten this product, given that we used so little of it.

MR. ROSENSAFT: Defense would offer Defense Exhibit DY in evidence.

THE COURT: Any objection?

MR. KELLY: Yes, your Honor.

This document contains a lot of information that should not go into a court exhibit, including the identity of

patients, the date of service, their diagnosis, and a lot of other information that under HIPAA and other statutes should not be placed in a public court exhibit.

THE COURT: Okay. Meanwhile, I'm going to excuse the jury.

Members of the jury, we're going to recess until tomorrow, which is Wednesday, October 14 at 9:30 am. This case, believe it or not, is moving rapidly. You may not think so but it is. And that is because of the very good work and excellent efficiency of the lawyers, who we're very privileged to have. They are moving this case rapidly. So stick with us.

We're going to recess until tomorrow. In the meantime, please don't discuss this case either among yourselves or anyone at home. I'm sure the people at home are barraging you with questions: *Tell me all about this interesting case.* Or maybe they couldn't care less. I don't know. But if they ask you, say: *The judge, he directed me not to talk to you at all.* As I said, blame it on me. Nothing can happen to me.

Keep an open mind. Come to no conclusion. Don't do any research. Don't look in a dictionary. Do they have dictionaries any more? I don't know. I don't think so. Encyclopedias? Do they have those any more? Probably not.

Keep an open mind. Come to no conclusions. Don't

do any research. And we will see you, God willing, tomorrow morning at 9:30.

Have a nice evening.

(The following ensued in the absence of the jury at 4:50 pm.)

THE COURT: You better get through with this case as soon as possible. We're losing jurors. You don't want to try it over again.

All right. What is the story with this exhibit?

MR. KELLY: Your Honor, this exhibit, which is Exhibit DY, the government objects to because the name of patients at the offices of South Shore Neurologic Associates should not be contained in a public exhibit.

The government wants the names, the identities of the patients redacted from the document. Once that is done, the government doesn't believe there is any other personal identifying information. And with that redaction on all the pages where patients are listed, the government would have no objection.

THE COURT: Okay. What about that?

MR. ROSENSAFT: The defense would agree, your Honor.

THE COURT: So redact all the patients and then we will put DY into evidence. Okay?

MR. ROSENSAFT: Thank you, your Honor.

THE COURT: We are going to recess until 9:30

tomorrow morning.

You have to be back at 9:30, Mr. Burke. You have to be back before 9:30.

THE WITNESS: I will be here.

THE COURT: As I said, wait a few minute for the jurors to leave so that you don't get into the same elevator as they.

We will recess until tomorrow morning.

MR. ROSENSAFT: And, your Honor, I just ask that the prosecutors not speak to Mr. Burke since he is still on cross.

THE COURT: Not to talk to who?

MR. ROSENSAFT: Mr. Burke, since he is still on cross-examination.

THE COURT: I never make that instruction. But the first question you can ask on cross is: *Did you speak to the lawyer?* But I don't prevent anybody from talking to anybody.

MR. ROSENSAFT: Very well, your Honor, I will.

THE COURT: They have a right to talk to them. But you have a right to say: *Did you speak to the lawyer during the recess?*

Okay. Tomorrow morning.

(Proceedings adjourned at 4:55 pm.)

CERTIFICATE OF COURT REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dominick M. Tursi, CM, CSR

| | |
|---|---|
| CYNTHIA DEBROSSE | 218 |
| DIRECT EXAMINATION | 218 |
| BY MR. KELLY | |
| CROSS-EXAMINATION | 233 |
| BY MR. ROSENSAFT | |
| JORGE PEREZ, M.D., | 257 |
| DIRECT EXAMINATION | 257 |
| BY MR. KELLY | |
| CROSS EXAMINATION | 279 |
| BY MR. RESNIK | |
| REDIRECT EXAMINATION | 302 |
| BY MR. KELLY | |
| JORGE PEREZ | 307 |
| REDIRECT EXAMINATION | 307 |
| BY MR. KELLY | |
| DOUGLAS LIPTAK | 309 |
| DIRECT EXAMINATION | 309 |
| BY MR. ABELL | |
| CROSS-EXAMINATION | 326 |
| BY MR. RESNIK | |
| CROSS-EXAMINATION | 326 |
| BY MR. RESNIK | |
| REDIRECT EXAMINATION | 335 |
| BY MR. ABELL | |
| RECROSS-EXAMINATION | 337 |
| BY MR. RESNIK | |
| MICHAEL BAXTER | 338 |
| DIRECT EXAMINATION | 338 |
| BY MR. ABELL | |
| VOIR DIRE EXAMINATION | 342 |
| BY MR. RESNIK | |
| DIRECT EXAMINATION (Continued.) | 344 |
| BY MR. ABELL | |
| VOIR DIRE EXAMINATION | 352 |
| BY MR. RESNIK | |
| DIRECT EXAMINATION | 355 |
| CROSS-EXAMINATION | 356 |
| BY MR. RESNIK | |
| REDIRECT EXAMINATION | 366 |
| BY MR. ABELL | |
| CHARLES BURKE, III | 376 |
| DIRECT EXAMINATION | 376 |
| BY MR. KELLY | |
| CROSS EXAMINATION | 394 |
| BY MR. ROSENSAFT | |
| VOIR DIRE EXAMINATION | 410 |
| BY MR. KELLY | |

EXHIBITS:

| Exhibit | Page |
|---|---|
| Government's Exhibit 12 in evidence | 264 |
| Government's Exhibit 184 in evidence | 269 |
| Government Exhibit 183 | 276 |
| Government Exhibit 197 in evidence | 314 |
| Government's Exhibit 177 in evidence | 323 |
| Government's Exhibit 186 in evidence | 323 |
| Government's Exhibit 181 in evidence | 344 |
| Government's Exhibit 182 in evidence | 345 |
| Government's Exhibit 13-A in evidence | 355 |
| Government Exhibit 188 | 379 |
| Government Exhibit 34 | 384 |
| Government Exhibit 35 | 386 |
| Government Exhibit 38 | 388 |
| Government Exhibit 36 | 389 |
| Defendant's Exhibit DU | 290 |
| Defendant's Exhibit C | 396 |
| Defense Exhibit K in evidence | 401 |
| Defense Exhibit DW in evidence | 410 |
| Defendant's Exhibit DH in evidence | 256 |
| Government Exhibit 56 in evidence | 225 |

**$**

**$1,500** [2] - 390:11, 17
**$100,000** [2] - 222:4; 302:3
**$18,750** [1] - 391:3
**$18,780** [1] - 389:2
**$2,000** [1] - 381:7
**$2,550** [1] - 272:19
**$200,000** [1] - 301:9
**$251,525** [1] - 227:2
**$273,000** [3] - 276:5; 277:5; 307:15
**$375** [3] - 381:6; 384:4; 392:25
**$40** [2] - 267:1; 372:9
**$400** [1] - 381:6
**$400,000** [2] - 301:8, 25
**$50** [1] - 327:2
**$500** [1] - 381:6
**$525** [1] - 384:2
**$80,000** [1] - 222:4

**'**

**'10** [1] - 225:19

**0**

**00031** [1] - 322:17

**1**

**1** [4] - 216:11; 226:4; 243:22; 373:9
**1-3-1-6** [1] - 226:11
**10** [5] - 245:20; 259:23; 346:13; 374:4; 406:19
**10/13** [1] - 272:23
**100** [11] - 213:14, 21; 286:5, 19, 24; 293:8; 359:20; 360:2, 5, 18, 20
**100-milligram** [5] - 346:14; 351:20; 359:24; 360:14; 380:16
**100-milligrams** [1] - 363:14
**10022** [1] - 213:18
**10:30** [3] - 374:6, 10; 380:24
**11** [2] - 247:5; 377:19
**11722** [2] - 213:14, 22
**12** [22] - 244:2, 9, 25; 245:1; 264:12, 17-20; 269:20; 285:13; 286:3; 303:3; 349:2; 358:19, 21-22; 361:25; 364:1; 406:19; 419:1
**12:30** [1] - 305:16
**12th** [1] - 361:10
**13** [12] - 213:7; 257:23; 273:2; 287:19; 350:14, 16; 351:17; 352:12, 23; 361:15; 391:4
**13-A** [7] - 355:7, 9-10, 12, 14, 20; 419:5
**1302** [1] - 244:21
**1311** [2] - 245:16; 250:18
**1315** [1] - 250:4
**1316** [8] - 225:8; 226:11, 13, 15; 249:16; 250:5; 251:5
**1317** [1] - 226:6, 8
**13th** [7] - 273:9; 359:24; 360:15, 24; 361:14; 363:12; 375:8
**14** [3] - 290:25; 303:3; 415:7
**14-CR-208** [1] - 213:4
**14th** [2] - 359:22; 360:6
**15** [10] - 226:9; 244:22; 249:17; 250:22; 266:2, 7-8; 310:8; 326:24; 371:14
**15-minute** [1] - 371:17
**150** [3] - 258:5, 8; 351:3
**15th** [3] - 251:6; 374:2, 17
**16** [2] - 377:12
**17** [5] - 287:25; 290:13, 18; 292:19; 293:7
**177** [8] - 322:11, 24; 323:3, 5, 7; 330:21; 331:2; 419:3
**17th** [1] - 362:14
**181** [10] - 340:23; 341:18; 344:1; 346:1; 356:14; 361:6; 364:11, 22; 419:4
**182** [7] - 344:19; 345:16, 22-23; 346:23; 366:25; 419:5
**183** [7] - 275:25; 276:8, 11-12; 299:8; 419:2
**184** [20] - 269:9, 11, 14-16, 22; 270:15; 271:15, 25; 272:22; 274:5; 285:2, 6; 303:16; 419:2
**185** [1] - 347:1
**185158** [1] - 347:2
**186** [7] - 323:10, 13-14, 17, 20, 23; 419:4
**187** [5] - 313:25; 314:1, 10, 13; 315:13
**188** [8] - 378:24; 379:14, 18-19, 21; 380:21; 409:7; 419:6
**197** [2] - 314:14; 419:3
**1978** [1] - 377:25
**1:30** [7] - 304:4, 11, 13; 305:12, 15; 306:3
**1:40** [1] - 307:2
**1st** [1] - 348:15

**2**

**2** [19] - 214:18; 259:23-25; 315:9, 18; 316:22; 317:2; 331:3, 11, 14, 18; 332:2; 335:12; 373:22; 397:15; 414:12, 15
**2,400)** [1] - 381:7
**2-milliliter** [1] - 335:6
**2/14/12** [1] - 390:18
**2/23/12** [1] - 274:2
**2/23/2012** [1] - 274:8
**20** [11] - 219:16; 244:2, 9, 25; 245:19; 250:12; 286:2; 361:19; 364:4;
**20-minutes** [1] - 382:1
**2000** [1] - 361:10
**2002** [1] - 280:9
**2007** [1] - 224:17
**2008** [1] - 313:4
**2009** [10] - 222:3; 261:8; 311:2; 319:10; 320:22; 376:24; 397:9; 400:3; 401:4, 16
**2010** [11] - 221:18; 225:18, 24; 226:1, 9; 247:5; 249:17; 250:22; 251:16; 313:10; 318:8
**2011** [25] - 226:4; 243:18, 22; 244:22; 245:16; 249:7; 251:17; 260:2, 8; 261:15; 272:23; 273:2, 5, 18; 281:13; 285:18; 286:3; 287:20, 25; 290:20; 303:9; 378:21; 381:12
**2012** [57] - 260:2; 275:6; 281:22; 283:11, 17; 285:16, 19; 288:16; 290:13, 18, 25; 292:19; 293:8, 23; 294:6; 295:10; 298:17; 303:3, 11; 339:11; 340:3; 341:3; 346:6; 347:15; 348:16; 349:2, 18; 351:23; 357:8; 358:10, 16; 360:16, 24; 361:11, 15; 362:14; 363:12; 367:9; 369:3; 378:4, 9, 19,

23; 381:10, 12, 14, 16; 384:8; 388:17; 390:24; 391:4; 393:4; 397:9, 18; 411:4; 413:14, 20
**2013** [5] - 235:9; 275:23; 311:2; 319:10; 320:22
**2015** [3] - 213:7; 238:12; 397:18
**20th** [3] - 374:2, 18; 380:24
**218** [2] - 418:1
**22** [4] - 271:14; 272:22; 286:16; 303:17
**225** [3] - 377:10; 408:13; 419:12
**22nd** [1] - 390:24
**23** [1] - 275:6
**233** [1] - 418:2
**24** [3] - 238:12; 242:19; 287:20
**25** [1] - 288:3
**256** [1] - 419:11
**257** [2] - 418:3
**264** [1] - 419:1
**269** [1] - 419:2
**26th** [2] - 286:15; 363:25
**27** [2] - 401:16; 413:14
**27-A** [4] - 346:17; 347:12; 349:1
**270-something** [1] - 301:13
**276** [1] - 419:2
**279** [1] - 418:5
**27th** [1] - 401:4
**28** [5] - 269:17; 273:18; 346:6; 357:8; 361:11
**28th** [8] - 347:10, 15; 358:23; 361:3, 22-23; 367:9;
369:3
**29** [12] - 219:1; 227:7; 233:18; 253:7; 273:9, 12-13; 285:22; 288:8, 12; 341:3
**290** [1] - 419:9
**2nd** [12] - 216:23, 25; 355:25; 358:10, 16, 22; 359:12, 15; 360:7, 21, 24

### 3

**3** [11] - 259:10, 23, 25; 305:1; 306:14, 21; 317:6; 397:23; 402:21
**3/1/12** [1] - 348:10
**30** [5] - 245:19; 249:14; 288:13; 411:4; 413:19
**302** [1] - 418:6
**307** [2] - 418:7
**309** [2] - 418:8
**314** [1] - 419:3
**32** [1] - 258:12
**323** [2] - 419:3
**326** [2] - 418:10
**335** [1] - 418:12
**337** [1] - 418:13
**338** [2] - 418:14
**34** [7] - 332:5; 384:14, 16-17, 25; 385:1; 419:6
**342** [1] - 418:15
**344** [2] - 418:16; 419:4
**345** [1] - 419:5
**35** [7] - 385:17; 386:4, 6, 8, 25; 419:7
**3500** [3] - 236:10; 238:17; 242:14
**351316** [1] - 249:23
**352** [1] - 418:17
**355** [2] - 418:18; 419:5
**356** [1
**36** [6] - 389:15, 22-23, 25; 390:*** 419:8
**366** [1] - 418:20
**376** [2] - 418:21
**379** [1] - 419:6
**38** [9] - 387:19, 23; 388:1, 3-4, 6; 389:4, 12; 419:7
**384** [1] - 419:6
**386** [1] - 419:7
**388** [1] - 419:7
**389** [1] - 419:8
**39** [3] - 274:4; 288:15
**394** [1] - 418:22
**396** [1] - 419:9
**3:35** [1] - 371:23
**3:45** [1] - 375:19

### 4

**4** [2] - 250:11; 317:13
**40** [4] - 269:20; 285:16; 295:5; 327:2
**400** [4] - 286:23; 293:9; 368:1, 6
**400-milligram** [3] - 346:11; 347:6; 367:3
**401** [1] - 419:10
**41** [1] - 297:20
**410** [2] - 418:23; 419:10
**440** [1] - 351:2
**440-milligram** [1] - 346:12
**4:45** [1] - 215:17
**4:50** [1] - 416:5
**4:55** [1] - 417:22

### 5

**5** [12] - 214:4, 8, 24; 215:10, 12, 20, 23; 216:5-7, 18;
**5's** [3] - 216:3; 217:11, 13
**5/22/12** [1] - 385:20
**5/22/2012** [1] - 386:8
**50** [8] - 219:16; 251:13; 388:20; 392:22; 393:6; 406:9, 18
**500** [8] - 272:19; 286:19; 287:21; 359:18; 360:1; 362:20, 22
**500-milligram** [2] - 363:3; 380:17
**56** [13] - 224:22; 225:1, 5-6, 8; 228:17; 240:12, 15, 20; 243:14, 16; 249:16; 419:12
**575** [1] - 213:18

### 6

**6** [5] - 250:11; 285:13, 18; 290:19; 303:8
**6-milligram** [1] - 346:15
**6/3/2011** [2] - 265:16, 19
**6/6/2011** [1] - 270:7
**631** [1] - 213:22
**65** [2] - 225:19; 237:10

### 7

**7** [1] - 364:7
**712-6103** [1] - 213:22
**7th** [1] - 359:11

### 8

**8** [5] - 245:16; 249:7; 285:16, 19; 346:14
**8/20/2012** [1] - 387:24
**80** [12] - 245:10; 249:8;
250:11, 23; 315:9, 18; 317:2; 331:3, 10, 14, 18; 332:2
**80-milligram** [1] - 335:5
**800** [1] - 381:7

### 9

**9** [1] - 374:25
**9/26/2011** [1] - 271:16
**9:25** [2] - 213:8; 214:2
**9:30** [5] - 415:7; 416:2, 25; 417:2
**9:50** [1] - 217:19

### A

**A-L-A-R-G-A-N** [1] - 378:16
**A-L-I-M-T-A** [1] - 293:14
**A-L-L** [1] - 378:18
**A-L-O-X-I** [1] - 293:5
**A-L-T-U-Z-A-N** [1] - 340:18
**A-V-A-S-T-I-N** [1] - 340:20
**ABELL** [55] - 213:15; 256:10; 309:11, 19, 22; 312:18; 314:9, 15; 322:1, 23; 323:9, 15; 325:8; 326:9; 330:6; 332:21; 334:25; 335:3; 336:25; 337:25; 338:3, 14, 17; 341:18; 342:16; 343:13, 21, 24; 344:5; 345:15; 347:11, 14, 19; 348:6, 8, 23; 349:7, 10; 350:16; 352:11; 354:14, 17, 20; 355:6, 18;

356:4; 366:16, 19; 370:4; 371:12; 418:9, 12, 15, 17, 20
**abide** [1] - 337:20
**ability** [3] - 371:4, 8; 400:9
**above-entitled** [1] - 417:24
**abroad** [1] - 220:4
**absence** [4] - 214:1; 215:24; 306:19; 416:4
**absolutely** [15] - 227:1; 229:16; 232:23; 233:1; 237:9; 239:23; 240:18; 241:1; 248:25; 250:19; 254:7, 16; 337:15; 365:5
**accepted** [1] - 300:7
**accepting** [4] - 276:17, 20; 299:24; 300:11
**according** [6] - 272:16, 19; 278:20; 361:21; 362:1; 405:3
**accordingly** [1] - 301:5
**account** [5] - 368:1; 384:17, 20, 22; 385:5
**accounts** [2] - 411:21, 23
**accredited** [1] - 263:2
**accurate** [6] - 327:3; 329:20; 362:2, 4; 369:19; 397:13
**accurately** [1] - 287:16
**acknowledge** [1] - 299:12
**acknowledging** [1] - 300:20
**acquired** [1] - 404:7
**Acting** [1] -
213:13
**active** [6] - 320:10; 363:13; 366:6, 11; 369:12
**activity** [2] - 345:9; 352:5
**acts** [1] - 253:10
**added** [1] - 406:3
**addition** [5] - 278:7; 282:25; 284:4; 353:5; 362:19
**additional** [4] - 259:24; 350:1, 4; 367:16
**address** [6] - 226:15; 304:16; 325:17; 411:19; 412:20
**adenocarcinomas** [1] - 310:24
**adjourned** [1] - 417:22
**administer** [1] - 382:16
**administered** [3] - 233:23; 279:9; 298:9
**administering** [4] - 231:5, 12; 279:3; 393:21
**Administration** [1] - 338:21
**administration** [3] - 278:11; 377:24; 395:6
**administrative** [2] - 265:21; 339:9
**administrator** [1] - 349:24
**admission** [1] - 219:23
**admit** [2] - 302:21; 355:7
**admitted** [4] - 302:24; 313:23; 315:13; 355:20
**ADS** [1] - 213:4
**advanced** [1] - 320:21
**adverse** [4] - 313:1, 6; 318:*** 19
**advertisement** [1] - 234:19
**advises** [1] - 316:17
**affected** [2] - 227:24; 308:20
**afternoon** [11] - 309:23; 326:15; 338:18; 342:5; 376:17; 394:22, 24
**age** [1] - 258:12
**agencies** [1] - 320:11
**agenda** [1] - 380:11
**agent** [11] - 236:21; 242:9; 281:25; 282:5, 19, 25; 283:11; 284:4; 339:14; 340:22; 354:11
**Agent** [23] - 238:12, 22; 239:9; 242:19; 338:4, 18; 342:3; 346:16; 347:24; 349:20; 351:16; 352:21; 353:21; 354:2; 355:19; 356:13; 359:2; 364:10; 365:12; 366:20; 392:21; 394:16; 408:6
**agents** [2] - 339:7, 9
**ago** [6] - 237:15, 18, 23; 238:8; 239:13, 22
**agree** [4] - 229:19; 359:15; 362:14; 416:21
**agreed** [2] - 265:1; 306:24
**agreeing** [1] - 264:25
**Agreement** [1] - 276:13
- 264:24; 275:22; 276:4; 277:3; 298:25; 299:4, 11; 300:2, 10, 14; 301:1, 17; 302:20; 307:15, 19; 308:6; 384:5, 7; 385:8
**ahead** [3] - 260:19; 262:19; 382:14
**airways** [1] - 278:12
**Akron** [4] - 218:14, 20; 219:5, 15
**Al** [1] - 382:5
**alarm** [6] - 247:3, 17; 250:16; 251:9; 252:11
**alarmed** [2] - 254:3, 12
**alarms** [1] - 232:1
**Alimta** [21] - 227:19; 245:20; 293:14; 344:10, 12-13; 359:4, 9, 17, 22, 24; 360:13, 18, 20, 23; 361:2, 4, 16; 362:20, 25; 363:2
**ALIMTA** [2] - 344:10, 13
**ALL** [1] - 378:17
**allegations** [1] - 253:16
**ALLERGAN** [1] - 383:21
**Allergan** [25] - 378:10; 382:25; 383:16, 18, 21, 23, 25; 401:25; 402:13, 15, 23; 403:2, 9; 404:5, 12, 18, 23; 405:2, 14; 407:1, 5-7, 21
**allergan** [1] - 378:13
**n's** [1] -
403:6
**allergic** [1] - 278:10
**allow** [3] - 231:15; 343:25; 386:20
**allowed** [2] - 300:19; 398:8
**allows** [2] - 283:2; 294:11
**Aloxi** [12] - 273:1; 274:12; 275:3; 288:17; 293:5; 344:10; 351:4; 357:3; 361:7, 9, 17
**ALOXI** [1] - 344:11
**alpha** [1] - 318:9
**alphabet** [1] - 247:24
**alternate** [5] - 266:15; 267:4, 6, 8; 373:9
**Alternate** [1] - 216:11
**alternatives** [1] - 281:6
**altuzan** [2] - 287:5; 303:24
**ALTUZAN** [2] - 303:20; 346:11
**Altuzan** [33] - 272:4; 273:21; 284:12; 286:22; 287:3, 25; 288:9; 293:6, 8; 303:20; 340:17; 346:11, 13; 347:6, 19; 357:1; 366:22; 367:3, 6, 12, 19, 25; 368:6, 18; 369:2, 7, 11-12, 20; 371:1
**AMERICA** [1] - 213:3
**America** [3] - 224:6; 299:5; 405:22
**American** [3] - 291:4, 18, 24
**amount** [8] -

368:8; 378:6; 382:15; 389:2, 11; 390:11; 391:2; 392:9
**amounts** [1] - 293:6
**anaphylactic** [2] - 277:24; 278:8
**ANAPHYLACTIC** [1] - 278:9
**Anderson** [1] - 259:3
**anemia** [1] - 219:10
**Angeles** [2] - 338:22, 25
**announcements** [1] - 214:22
**annual** [1] - 327:2
**answered** [2] - 235:23; 237:7
**answers** [3] - 241:25; 242:3; 404:19
**anticounterfeiting** [2] - 310:12, 15
**anxious** [1] - 234:20
**anyplace** [1] - 232:17
**Apex** [2] - 222:17; 237:24
**apologize** [13] - 241:13; 248:10; 262:18; 322:14; 324:19; 348:2; 350:25; 356:8; 359:1, 13; 360:9; 363:1; 366:8
**appear** [4] - 228:24; 261:13; 263:25; 412:23
**appeared** [5] - 224:5, 7; 231:21; 261:16; 263:1
**appearing** [1] - 230:16
**appreciate** [2] - 306:13; 372:13
**approach** [1] -
354:6
**appropriate** [7] - 268:25; 269:1; 276:23; 279:10; 283:9; 293:22; 305:7
**approve** [4] - 280:12, 17; 328:18, 20
**approved** [90] - 223:24; 224:7; 226:24; 228:25; 229:3; 231:1, 22; 232:21, 25; 263:25; 269:7; 271:10; 273:7; 275:7, 17; 276:22; 277:8, 19, 21; 278:2, 15, 19; 279:4; 282:3; 289:2; 293:17; 295:22; 296:1; 297:12, 20, 22; 298:1; 300:8, 18; 302:25; 303:23; 307:25; 308:3; 311:6, 9, 13, 16, 20; 314:4, 24; 315:14; 316:5; 317:2, 11, 14; 319:7; 321:1, 3, 6; 322:2; 323:15, 25; 324:10, 21, 25; 325:3; 328:16; 330:11, 15, 18; 331:16, 22; 333:7, 16, 21; 335:25; 336:23; 339:22; 340:14; 350:10; 366:7; 369:23; 370:2; 387:13, 15; 388:21; 393:13, 16, 21; 394:2
**approximate** [1] - 224:15
**April** [6] - 349:18; 351:23; 355:23, 25; 367:16; 391:4
**area** [
220:4, 5; 222:15; 223:11
**areas** [ ] - 220:14
**arise** [1] - 279:3
**arrived** [1] - 336:22
**arrives** [1] - 336:10
**ARTHUR** [1] - 213:10
**aside** [1] - 392:22
**aspect** [1] - 268:18
**aspects** [2] - 377:6; 395:3
**assign** [1] - 339:6
**assigned** [2] - 318:9; 339:16
**assist** [1] - 357:22
**Assistant** [1] - 213:16
**assistant** [2] - 338:24; 355:23
**assistants** [2] - 259:25; 265:21
**assisting** [1] - 220:11
**associated** [1] - 243:10
**Associates** [15] - 376:20; 377:5, 9, 18; 378:2, 4; 382:8; 383:13; 385:12; 388:13, 16; 389:19; 390:6; 392:11; 416:12
**assume** [7] - 235:11; 236:5, 8; 253:11; 364:7; 407:19
**assumed** [2] - 229:6; 230:3
**assuming** [1] - 224:17
**assured** [2] - 268:19; 275:16
**Atlantic** [1] -
**attention** [17] - 216:13; 236:11; 249:5, 15; 252:3; 266:18; 268:12; 322:16; 330:20; 332:4, 15; 335:8, 17; 378:20; 402:3; 407:13; 411:2
**attorney** [9] - 248:13; 279:18; 295:18, 24; 297:25; 326:17; 400:1, 15; 402:9
**Attorney** [1] - 213:13
**Attorney's** [1] - 298:18
**Auerbach** [1] - 213:21
**August** [3] - 238:12; 242:19; 388:16
**authentic** [4] - 366:4; 399:6, 12, 17
**authoritatively** [1] - 364:13
**authorize** [1] - 271:11
**authorized** [8] - 319:9, 12; 325:20; 334:6, 11, 14-15; 337:7
**authorizing** [2] - 271:12, 24
**automobile** [1] - 351:6
**available** [1] - 352:9
**Avastin** [16] - 227:20; 243:24; 244:1; 245:20; 261:2; 272:6; 273:22; 277:20, 23; 284:15; 303:21, 24; 340:19
**AVASTIN** [1] - 303:21
**Avastins** [1] - 244:9
**Aventis** [1] -
**Avenue** [1] - 213:18
**avenues** [1] - 255:7
**average** [1] - 222:2
**Avonex** [2] - 380:15; 381:7
**aware** [4] - 300:6, 17; 302:24; 404:4
**awful** [1] - 349:13

**B**

**B-A-X-T-E-R** [1] - 338:12
**bachelor's** [2] - 219:24; 220:2
**background** [5] - 219:18; 258:10; 377:23; 399:23; 400:17
**Balman** [1] - 235:15
**barraging** [1] - 415:16
**based** [9] - 291:9; 297:19; 356:23; 368:1; 371:5; 382:19; 388:24; 398:4
**basis** [4] - 259:24; 295:16; 377:6; 395:4
**Bates** [7] - 269:19, 22; 273:13; 274:4; 285:12; 286:2; 358:11
**Baxter** [15] - 255:1; 338:4, 12, 18; 340:22; 342:3; 346:16; 347:24; 351:16; 352:21; 353:21; 355:19; 356:13; 365:12; 366:20
**BAXTER** [2] - 338:6; 418:14
**Baylor** [2] - 259:1
**BDI** [4] - 260:11, 16, 21

**bearing** [1] - 356:13
**became** [5] - 234:10; 254:3; 300:6, 17; 302:24
**become** [2] - 384:20
**becomes** [2] - 316:13; 322:9
**before** [26] - 237:17; 238:10; 239:1; 242:20; 255:11; 264:20; 279:19, 21; 280:3; 281:24; 287:8; 288:25; 303:13; 305:11, 14; 326:19, 21; 335:12; 336:9; 361:14; 362:23; 368:9; 374:25; 391:11; 403:12; 417:3
**begin** [2] - 318:4; 385:13
**beginning** [7] - 216:1; 227:6; 270:4; 276:16; 367:16; 400:13, 19
**behavior** [3] - 276:17, 20; 299:24
**behind** [2] - 328:8; 330:4
**belabor** [1] - 288:8
**belief** [3] - 297:19; 298:1; 329:13
**bell** [1] - 243:1
**belonged** [1] - 244:13
**belongs** [1] - 244:8
**below** [2] - 265:17; 380:11
**bench** [1] - 354:6
**Benvenutos** [1] - 320:24
**best** [4] - 232:15; 277:15; 361:24; 414:17
**Better** [2] - 398:15, 19
**better** [7] - 221:24; 222:10; 267:16; 288:24; 380:8; 382:20; 416:6
**between** [10] - 219:14; 221:1; 224:19; 245:13; 360:24; 379:4; 382:10; 385:10; 409:3
**bevacizumab** [3] - 284:18; 287:5, 12
**beyond** [1] - 216:5
**Bible** [3] - 219:22; 220:3
**big** [5] - 227:13; 252:17; 304:5; 333:18; 408:22
**bill** [1] - 308:12
**billed** [2] - 301:8; 307:24
**billing** [2] - 308:8; 414:16
**billion** [1] - 327:2
**bills** [3] - 214:10; 266:24; 267:2
**Billy** [1] - 242:25
**binding** [1] - 214:6
**biochemistry** [2] - 258:16, 18
**Biogen** [1] - 378:11
**bit** [2] - 260:14; 377:22
**black** [15] - 277:20, 23; 278:3; 312:19, 21, 23, 25; 313:3, 6, 8-10, 12
**blame** [1] - 415:19
**blast** [ 222:5; 234:4, 6; 261:10, 25
**blast** *** _ ] - 261:12
**bleeding** [1] - 278:1
**blood** [6] - 219:10; 227:20; 257:25; 259:19; 278:12
**Board** [1] - 396:5
**body** [1] - 227:25
**bogged** [1] - 365:10
**bones** [1] - 227:23
**boss** [4] - 230:24; 231:23; 247:11, 14
**Botox** [53] - 381:6, 23-24; 382:2, 12, 16, 24; 383:3, 13, 15, 17; 384:1; 388:7, 16, 19, 25; 390:3, 19, 21; 391:13; 392:7-9, 11, 19; 399:1, 5, 9; 401:24; 402:8, 10, 18, 22; 403:1, 9, 14; 404:5, 7, 11, 14-15, 22, 25; 406:1, 5, 9, 15, 22, 25; 407:10, 12, 20
**bottle** [1] - 253:3
**bottles** [2] - 244:18; 406:15
**bottom** [17] - 227:2; 243:16; 244:21; 245:15; 249:22; 269:20; 271:22; 315:25; 316:1, 6, 8; 317:16; 322:17; 332:6; 405:18; 407:18; 411:2
**botulinum** [1] -
**bought** [8] - 301:25; 302:22; 303:1; 362:12; 383:3; 387:4; 388:25
**Boulevard** [1] - 226:18
**boutique** [1] - 382:22
**bowel** [2] - 278:1
**box** [56] - 231:23; 245:9; 247:11, 13, 21; 248:1, 4, 24; 251:18; 271:21; 277:20, 23; 278:3; 281:18; 293:17; 294:15; 312:19, 21, 23, 25; 313:3, 6, 8-10, 12-13; 316:14, 16, 20, 22; 317:1; 324:3, 5, 9, 20; 332:10, 25; 333:10; 334:3; 346:12; 348:9, 15, 24-25; 349:2, 5, 7; 380:15; 383:25
**boxes** [30] - 244:12; 252:5, 8; 282:7, 12; 294:9; 302:8; 333:5; 334:4; 346:10, 12-14; 347:6; 351:19; 357:1, 3; 361:3, 25; 362:20; 365:17, 21; 366:23; 367:3, 21, 24-25; 368:13; 369:9; 371:9
**brackets** [2] - 273:21
**brand** [2] - 284:6, 9
**brands** [1] - 310:5
**break** [2] - 265:23; 303:25
[4] - 227:25; 257:25; 272:7; 310:24
**Bressen** [1] - 215:1
**Brian** [1] - 235:14
**brief** [2] - 339:3; 352:14
**briefly** [4] - 334:25; 337:1; 341:22; 366:16
**bring** [7] - 217:6; 249:15; 252:2; 266:17; 267:13; 306:25; 375:15
**Britain** [1] - 280:6
**brought** [7] - 249:5; 250:16; 268:11; 382:11; 398:25; 407:13
**budget** [1] - 339:10
**building** [1] - 261:5
**bullet** [4] - 402:3, 5; 403:5; 404:2
**Bureau** [2] - 398:15, 19
**Burke** [21] - 375:23; 376:8, 10, 17; 385:2; 394:22, 24; 397:4; 401:12; 403:24; 404:9, 23; 405:6; 408:23; 410:16; 411:16; 412:15; 417:2, 10, 12
**BURKE** [2] - 376:8; 418:21
**business** [15] - 223:19; 310:2; 341:10; 343:20, 22; 345:9; 352:5; 353:11, 14, 16; 380:12; 385:6; 405:8; 407:9
**Business** [2] - 398:15, 19
**butcher** [1] -

378:15
**buy** [8] - 230:25; 232:9; 264:24; 265:1; 278:18; 294:23; 393:15
**buying** [10] - 248:9; 287:2; 294:21; 303:2, 6, 8; 394:1; 397:21; 398:12; 405:1
**buzz** [1] - 215:17
**BY** [64] - 213:15, 19; 218:11; 225:7; 226:12; 233:5, 14; 235:5; 239:7; 240:11, 19; 241:14; 242:8; 257:15; 268:10; 275:2; 279:15; 302:19; 307:13; 308:19; 309:22; 312:18; 314:15; 322:1; 326:14; 335:3; 337:5; 338:17; 342:2; 344:5; 352:20; 355:18; 356:12; 366:19; 376:16; 394:21; 397:2; 399:15; 401:11; 403:23; 410:15, 25; 412:11; 413:12; 418:2-6, 8-13, 15-20, 22
**Byron** [1] - 214:4

C

**C-A-R-D-O-N-A** [1] - 257:10
**calculating** [1] - 360:8
**California** [2] - 338:22; 339:17
**Cambridge** [2] - 258:16, 18
**Canada** [6] - 222:25; 229:7; 234:8; 283:3; 291:10; 294:12
**Canadian** [18] - 234:12, 16, 18, 22; 235:7; 236:3, 25; 238:7; 243:3, 8; 283:18, 22; 284:1; 291:4, 6; 342:11; 357:15
**cancer** [24] - 219:8; 221:13; 227:24; 231:6, 13; 257:25; 258:3; 259:19; 270:13, 23; 272:6; 275:20; 277:14, 18; 279:4; 280:12, 16; 310:24; 311:1; 320:21
**Cancer** [36] - 257:20, 22; 259:1, 3, 17; 265:2; 269:19; 270:2; 274:10; 280:8, 16; 299:6; 339:12, 18, 21, 25; 340:2, 8; 342:9; 344:7; 349:18, 25; 350:1, 22; 353:12, 18; 356:2; 358:15; 362:6; 365:13, 18, 22; 367:8, 14; 368:4
**cancer-related** [1] - 219:8
**cancers** [3] - 257:25; 310:25
**cannot** [2] - 333:16; 343:11
**capable** [1] - 373:21
**carbon** [1] - 346:24
**Cardinal** [2] - 232:18; 378:10
**Cardona** [1] - 257:7
**care** [8] - 216:24; 256:4; 266:6; 267:1; 377:24
415:4
**cargo** [1] - 310:***
**carimune** [1] - 380:17
**Carson** [3] - 257:19; 259:6, 12
**carton** [13] - 314:4; 315:4, 11; 316:2, 6; 317:8; 323:8, 21, 25; 324:11, 17, 21
**cartons** [3] - 311:14; 321:8, 10
**cases** [2] - 339:5; 343:1
**cat** [1] - 395:21
**caution** [1] - 316:16
**CB1** [1] - 236:10
**CD2** [2] - 238:17; 242:14
**cells** [3] - 228:1, 5
**cellular** [2] - 258:16
**center** [4] - 270:24; 279:5; 281:8; 340:4
**Center** [38] - 257:20, 22; 259:1, 3, 17; 265:2; 269:19; 270:3; 274:10; 280:8, 16; 299:6; 339:12, 18, 21; 340:1, 8; 342:9; 344:7; 349:18, 25; 350:1, 22; 353:12, 18; 356:2; 358:16; 362:6; 365:13, 18, 22; 367:9, 14; 368:5, 21, 23
**centers** [1] - 380:19
**Central** [3] -
**certain** [9] - 232:1; 281:5; 295:9, 24; 312:8; 313:1, 4; 322:4; 342:19
**certainly** [4] - 236:5; 297:3; 364:19; 406:3
**certainty** [3] - 336:21; 357:18; 364:21
**Certificate** [3] - 346:8, 20; 348:24
**certificate** [2] - 215:15; 346:22
**CERTIFICATE** [1] - 417:23
**Certified** [5] - 341:1; 344:24; 346:22; 347:4, 15
**certify** [1] - 417:23
**CFO** [1] - 382:6
**chains** [1] - 310:14
**chambers** [1] - 329:7
**chance** [3] - 289:12; 395:23; 400:22
**chances** [1] - 232:13
**change** [1] - 325:3
**changed** [2] - 214:7; 341:15
**channels** [1] - 336:7
**character** [1] - 318:5
**characteristics** [2] - 324:10, 16
**charge** [4] - 233:22; 276:23; 338:24; 395:3
**charged** [8] - 253:9, 13; 301:2, 5, 9, 14, 21; 302:11
**Charles** [5] - 375:23; 376:8; 411:16
**CHARLES** [2] - 213:15; 418:21
**Charlie** [2] - 395:22; 396:17
**cheaper** [4] - 281:7, 10; 329:2, 16
**check** [10] - 222:20; 232:14; 244:6; 249:21; 250:4; 389:8, 11; 399:8; 400:17
**checked** [7] - 244:12; 245:3, 5, 7, 9, 22; 398:15
**checks** [6] - 245:11; 386:2, 4; 398:12; 399:23
**chemical** [1] - 258:15
**chemist** [1] - 369:14
**Chemistry** [2] - 368:21, 23
**chemo** [6] - 227:22; 228:3, 7, 11-12; 246:2
**chemos** [1] - 221:14
**chemotherapy** [16] - 219:2, 9; 220:24; 221:3, 10-12; 227:18; 261:1; 270:12, 22; 272:1; 273:17; 274:7, 9; 275:4
**chief** [6] - 231:10; 377:1, 3-4; 382:7; 394:25
**children** [2] - 266:25; 373:10
**Chou** [1] - 214:4
**chronic** [1] - 228:4
**chronological** [1] - 358:13
**CIE** [5] - 341:1; 344:24; 346:23;

347:1, 8
**Cincinnati** [1] - 368:22
**circumstance** [1] - 300:16
**citizen** [1] - 280:5
**citizens** [2] - 283:3; 294:11
**City** [3] - 257:19; 259:7, 12
**city** [2] - 373:24; 374:3
**claiming** [1] - 301:20
**clarification** [1] - 328:17
**clear** [8] - 230:14; 248:23; 249:1; 250:19; 287:2; 293:7; 366:10; 404:25
**clearer** [1] - 359:14
**clearly** [1] - 409:23
**Clerk** [1] - 374:23
**CLERK** [9] - 266:20; 268:5; 373:22; 374:17, 22, 25; 375:16, 24; 376:6
**clients** [1] - 284:8
**clinic** [1] - 220:12
**close** [7] - 235:4; 258:6; 260:15; 267:18; 282:16; 303:21; 306:12
**closed** [4] - 306:8, 22
**closer** [3] - 218:15, 18; 375:8
**closing** [1] - 278:12
**CM** [1] - 417:25
**Code** [2] - 312:2; 315:7
**college** [1] -
219:23
**College** [1] - 259:1
**Colombia** [3] - 258:11; 279:24; 280:6
**colon** [3] - 270:23; 272:6; 320:21
**column** [1] - 357:6
**combination** [2] - 368:11, 14
**combined** [1] - 258:25
**comfortable** [1] - 382:13
**coming** [7] - 254:8; 325:15; 328:5; 388:10; 404:17; 405:1, 14
**commerce** [2] - 282:11; 299:13
**commissions** [1] - 407:19
**common** [1] - 284:4
**commonly** [2] - 335:24; 380:18
**communication** [1] - 216:17
**community** [1] - 301:16
**companies** [6] - 232:12; 255:10; 260:20, 25; 382:22; 400:14
**company** [56] - 222:7, 16; 223:9, 19; 234:11, 16, 22; 235:7; 236:4, 25; 238:7; 241:6, 11, 16; 242:10, 23; 243:4, 7-8; 261:25; 262:4-6; 263:2; 264:7, 9; 265:1; 268:24; 280:25; 283:22; 284:1; 291:4, 6, 8-9; 310:4; 320:5;
326:25; 339:23; 342:11; 357:11; 377:[illegible] 78:19; 381:22; 382:19; 385:23; 395:3; 398:13; 400:7; 406:3; 408:6
**company's** [1] - 400:17
**compared** [1] - 367:18
**comparison** [1] - 410:8
**competitive** [1] - 224:1
**complaints** [1] - 398:18
**complete** [1] - 307:21
**completed** [3] - 258:17; 259:2; 307:19
**completely** [2] - 229:13; 291:15
**compliance** [2] - 337:20; 405:21
**composite** [1] - 354:23
**compromised** [2] - 279:2; 336:19
**compromising** [1] - 320:12
**computer** [7] - 213:24; 222:14; 223:11, 18; 228:12
**concern** [2] - 401:24; 403:2
**concerned** [11] - 231:23; 232:6; 247:10, 13-14; 248:8; 254:1, 17; 283:6; 365:3; 400:11
**concerns** [1] - 403:8
**conclude** [1] - 324:20
**concluded** [3] - 215:23; 217:7; 264:8
**conclusion** [1] -
**conclusions** [3] - 304:8; 415:25
**conditions** [3] - 310:21; 320:18; 337:8
**conducted** [3] - 298:18; 341:10; 345:9
**conducts** [2] - 368:24
**Conference** [1] - 372:1
**confident** [1] - 406:1
**confine** [1] - 241:25
**confirm** [1] - 285:23
**confiscate** [1] - 392:23
**confiscated** [3] - 298:3; 393:1, 5
**confused** [4] - 222:22; 237:17, 22; 238:4
**confusion** [1] - 250:20
**connected** [1] - 234:10
**consideration** [1] - 333:1
**considered** [1] - 300:1
**consumers** [1] - 325:17
**contact** [5] - 222:11; 223:3, 5; 295:18; 375:4
**contacted** [4] - 222:24; 378:22; 407:1; 408:6
**contain** [4] - 265:3; 277:20; 279:9; 386:14
**contained** [4] - 348:13; 402:4; 403:15; 416:13
**contains** [3] - 272:16; 354:1; 414:24
**contents** [1] - 349:5
[1] -
340:11
**continuation** [1] - 375:14
**continue** [4] - 214:10; 268:25; 269:3; 397:3
**Continued** [2] - 344:4; 418:16
**continued** [11] - 246:10; 274:13; 286:14; 287:19; 303:11; 305:18; 307:6; 321:13; 370:5; 372:18; 396:20
**CONTINUED** [1] - 275:1
**Continued)** [1] - 397:1
**contract** [1] - 264:10
**contractor** [1] - 375:2
**contradiction** [1] - 405:10
**controlled** [3] - 398:3, 5, 8
**controlled-substance** [1] - 398:3
**controls** [2] - 329:18, 21
**conversation** [7] - 216:4; 237:13, 15; 239:13, 22; 240:3; 294:2
**conversations** [1] - 294:1
**convince** [1] - 297:25
**copies** [1] - 346:24
**copy** [12] - 264:20; 265:6; 299:2; 322:14; 323:2; 330:22; 353:12; 356:16; 358:13; 395:11; 397:4, 6
**corner** [3] - 226:2; 240:22; 332:6
**corporations** [1] - 382:23

**correspondence** [1] - 379:4
**cost** [2] - 380:16; 392:24
**costs** [3] - 245:20; 298:6; 410:8
**counter** [1] - 282:20
**counterfeit** [5] - 310:13; 339:23; 369:9, 18
**countries** [1] - 329:18
**country** [8] - 223:1; 282:10; 317:10; 320:6; 325:16, 18; 336:10, 22
**country's** [1] - 247:16
**counts** [1] - 228:3
**couple** [3] - 335:4; 373:20, 23
**courses** [2] - 220:1; 260:18
**court** [4] - 215:24; 372:8; 414:25; 415:3
**Court** [4] - 213:21; 297:4; 354:10; 373:1
**Courthouse** [1] - 213:6
**courtroom** [8] - 214:25; 266:11; 268:6; 304:12; 306:6, 18; 371:16; 373:21
**COURTROOM** [2] - 215:14; 217:5
**covered** [1] - 372:14
**covers** [2] - 214:21; 346:25
**create** [8] - 341:6, 12; 345:5, 11; 346:3; 351:21; 352:1, 8
**created** [13] - 313:12; 341:2; 345:2, 13; 350:20; 351:18; 353:6, 9-10; 354:22, 25; 355:1
**credibility** [1] - 406:3
**credible** [3] - 261:14, 16, 19
**crime** [2] - 301:21; 302:11
**criminal** [2] - 253:10; 369:1
**Criminal** [2] - 338:22; 340:25
**cross** [11] - 233:11; 241:21; 279:12; 303:2; 307:14; 326:10; 356:6; 394:19; 417:10, 13, 15
**CROSS** [12] - 233:13; 279:14; 326:13; 356:11; 394:20; 397:1; 418:2, 5, 10-11, 19, 22
**cross-examination** [8] - 233:11; 241:21; 279:12; 303:2; 307:14; 326:10; 356:6; 417:13
**CROSS-EXAMINATION** [8] - 233:13; 326:13; 356:11; 397:1; 418:2, 10-11, 19
**CSR** [1] - 417:25
**Cure** [2] - 221:21; 232:18
**current** [1] - 259:14
**CURRIE** [1] - 213:13
**customer** [2] - 384:20
**customers** [1] - 325:17
**cut** [1] - 286:24
**Cynthi**[illegible] - 218:[illegible]2
**CYNTHIA** [2] - 218:[illegible] 18:1

**D**

**D-A-G-E-N-H-A-M** [1] - 327:20
**Dagenham** [8] - 311:4; 318:3; 320:24; 327:19; 328:15, 21; 329:25
**damaged** [2] - 231:18; 254:18
**damages** [1] - 254:11
**danger** [1] - 318:19
**dates** [1] - 374:16
**David** [9] - 215:1; 255:24; 256:11, 13-14; 289:9, 22; 296:7; 358:2
**Davidson** [2] - 265:18, 20
**day-to-day** [6] - 220:19; 310:9, 11; 339:4; 377:6; 395:4
**days** [3] - 215:15; 375:3, 5
**DD** [1] - 249:23
**deal** [2] - 220:24; 245:7
**dealing** [1] - 220:25
**dealt** [1] - 242:23
**death** [2] - 278:13; 313:11
**Debrosse** [15] - 218:1; 233:15; 240:4, 12, 14; 241:21; 243:12; 245:21; 246:1; 247:20; 248:22; 249:25; 251:4, 10; 252:12
**DEBROSSE** [2] - 218:3; 418:1
**December** [11] - 5-6; 249:17; 250:22; 251:5, 16; 380:24; 381:13; 393:4
**decided** [4] - 235:6; 264:10; 268:24; 269:1
**decision** [1] - 264:3
**default** [1] - 373:11
**defense** [11] - 214:14; 246:6; 255:20; 267:11; 289:21; 296:21; 373:8; 396:10; 401:5; 410:9; 416:21
**Defense** [12] - 296:5, 22; 396:17; 401:10; 407:25; 410:2, 23-24; 414:20; 419:10
**definitely** [2] - 224:1; 372:11
**degree** [5] - 219:25; 220:1-3; 377:24
**delay** [1] - 381:4
**deliberating** [2] - 304:9; 375:7
**deliver** [1] - 288:24
**delivered** [1] - 386:12
**delivery** [1] - 270:2
**Department** [2] - 276:4; 398:2
**deputy** [1] - 373:21
**DEPUTY** [2] - 215:14; 217:5
**Deputy** [1] - 374:23
**describe** [2] - 310:21; 320:18
**description** [1] - 323:18
**designated** [1] - 324:12
[illegible] 2] - 271:20; 408:14
**despite** [1] - 353:14
**destined** [2] - 311:24; 318:13
**destroy** [1] - 228:5
**destroys** [1] - 227:20
**detail** [1] - 281:23
**details** [1] - 254:1
**deterioration** [1] - 278:23
**determination** [1] - 259:20
**determine** [3] - 311:16; 369:22; 371:5
**determined** [1] - 369:18
**devastating** [1] - 374:9
**deviate** [1] - 217:14
**Device** [35] - 222:8; 223:6, 21; 241:3; 252:12; 264:5; 268:14; 269:3, 18; 274:9; 275:7; 319:15; 320:5; 334:10; 337:16; 357:20; 365:23; 378:22; 385:6, 11, 14, 19; 387:25; 388:9, 16; 389:10, 15; 390:4, 22; 392:20; 397:21; 398:4, 12; 414:10
**device** [1] - 384:17
**devices** [1] - 396:5
**DH** [13] - 246:7; 255:21, 24; 256:3, 10-11, 18; 313:22; 314:16, 23; 317:6, 13;

419:11
**diagnosis** [2] - 259:20; 415:1
**dictionaries** [1] - 415:23
**dictionary** [1] - 415:22
**difference** [3] - 333:18, 24; 408:22
**differences** [1] - 311:15
**different** [27] - 227:21; 230:16; 234:1; 242:10; 252:5; 254:9; 275:15; 288:9; 293:8; 311:19, 23; 317:4; 320:14; 322:2; 334:4; 336:3; 344:12; 354:5; 364:5, 17; 365:3, 5; 378:7; 379:8; 405:16; 409:13
**differently** [1] - 227:19
**digit** [3] - 318:5, 9
**digits** [1] - 318:11
**dilute** [1] - 316:17
**diploma** [2] - 219:20, 23
**dire** [2] - 341:21; 352:14
**DIRE** [6] - 342:1; 352:19; 410:14; 418:15, 17, 23
**DIRECT** [15] - 218:10; 257:14; 275:1; 309:21; 338:16; 344:4; 355:17; 376:15; 418:1, 4, 9, 14, 16, 18, 21
**direct** [6] - 236:11; 285:9; 291:11; 322:16; 327:15; 330:25
**directed** [2] - 335:17; 415:18
**directing** [1] - 335:8
**directions** [1] - 316:3
**directly** [16] - 221:22; 222:11; 255:1; 261:13; 343:16; 383:3, 15, 22; 386:17, 23; 387:4; 388:25; 404:14, 17; 405:14; 407:7
**disagreed** [1] - 295:21
**discharging** [1] - 267:8
**discount** [1] - 298:13
**discuss** [7] - 216:9; 266:7; 268:18; 304:6; 380:12; 383:6; 415:14
**discussed** [8] - 217:12; 275:14, 17; 364:17; 380:9; 381:18, 23; 405:10
**discussion** [1] - 382:17
**Discussion** [1] - 215:23
**discussions** [3] - 275:16; 300:16; 384:9
**disease** [1] - 277:14
**diseases** [2] - 219:7; 257:24
**dishonest** [1] - 248:10
**disorders** [2] - 257:25; 259:19
**dispense** [1] - 221:15
**displayed** [1] - 248:1
**disregard** [1] - 255:16
**distributed** [1] - 339:23
**distrib**... - 278:24; 291:6; 311:17; 317:25; 333:*** 336:6
**distributor** [11] - 319:12; 334:15; 337:8; 402:8, 11, 19; 403:15; 404:5, 7, 11; 405:1
**distributors** [7] - 319:9; 325:20; 334:7, 11, 16
**DISTRICT** [3] - 213:1, 11
**Diversion** [1] - 276:14
**diversion** [7] - 277:3; 298:25; 299:5, 11; 300:20; 301:1; 302:20
**diverted** [1] - 310:13
**doctor's** [2] - 249:5; 252:3
**doctors** [3] - 219:1; 377:11; 409:21
**Document** [3] - 340:21; 350:12; 354:10
**document** [77] - 225:9; 241:12; 256:8; 264:21; 265:3, 5, 14; 269:23; 270:24; 271:18, 22; 272:9; 274:6; 276:7, 13; 286:8; 296:18; 297:10, 15-16, 19; 298:24; 299:5, 7, 20, 23; 300:5, 24; 332:12; 341:3, 6, 22; 342:7, 14; 343:6, 10, 19, 23; 344:8, 25; 345:5, 19; 350:17; 351:18, 21; 352:1, 14, 24; 353:5, 10-11, 13, 17; ...; 355:23;
356:22; 359:3; 361:13; 363:19; 378:24; 385:2, 7; 389:5; 401:3; 403:18; 409:25; 410:16; 412:12, 23; 413:5; 414:24; 416:15
**documentation** [1] - 295:25
**documents** [14] - 272:16; 289:14, 19; 346:5; 353:6, 8, 16; 354:22; 365:2; 367:7; 371:6; 389:16; 414:7
**DOD105** [1] - 317:19
**dog** [2] - 256:17; 290:7
**dollars** [1] - 301:13
**Dominick** [1] - 417:25
**don'** [1] - 342:18
**done** [14] - 236:13, 18; 238:20; 242:16; 246:8; 294:1; 305:5; 318:12; 320:12; 339:7; 346:18; 369:25; 399:23; 416:15
**dosage** [3] - 315:8, 10, 17
**doses** [2] - 391:7; 392:4
**doubt** [2] - 240:2; 362:2
**Douglas** [1] - 309:11
**DOUGLAS** [2] - 309:14; 418:8
**Dr** [21] - 233:16, 19; 253:7; 256:23; 267:14; 269:21; 289:8, 15; 290:10; 297:10; 299:6; 304:14;
365:14; 367:15; 382:12, 16; 394:22; 399:3
**drafted** [1] - 299:20
**draw** [2] - 402:3; 411:2
**Drs** [1] - 218:19
**drug** [28] - 222:2; 229:2; 231:19; 254:22, 24; 255:5; 270:10, 12, 14; 272:8; 284:9, 17, 24; 293:12; 295:15; 326:25; 329:24; 331:3; 333:22; 340:18; 356:24; 363:22; 366:5-7; 406:5, 12
**Drug** [3] - 312:2; 315:6; 338:21
**druggist** [1] - 271:8
**drugs** [167] - 219:3; 221:5-7, 10-12, 16, 19, 23; 223:22; 224:2, 7; 225:22; 226:22, 25; 227:11, 15, 17; 228:15, 24; 230:19, 21; 231:1, 5, 12; 232:9, 22, 25; 233:23; 234:1; 246:2; 247:15; 253:13, 22; 254:2, 15, 18; 255:3, 8; 260:3, 9, 24; 261:1; 263:11, 14; 268:13, 18; 269:7; 270:22; 272:1; 273:6, 17, 20; 274:7, 9; 275:7, 11, 15, 17; 276:6, 21-24; 277:7, 11, 21; 278:15, 19; 280:12, 16-17, 25;

281:8, 10, 17; 282:3, 6, 9, 20; 283:1, 3, 6, 17-18; 284:1, 5; 285:18; 288:24; 289:2; 292:3; 293:16; 294:12, 14, 19, 23; 295:1, 9, 12; 298:3, 8-9, 13; 299:12; 300:6, 8, 12-13, 18; 301:19; 302:22; 303:23; 308:8, 14, 21, 24; 328:20; 329:19; 330:18; 337:21; 340:14-16; 342:11, 14, 19, 21, 23-24; 343:1, 3, 11; 346:4, 7; 350:11; 351:1, 7, 10, 12, 14-15; 357:11, 14; 366:21; 378:1, 5, 20; 380:7; 383:14; 387:12; 393:10, 16, 21; 394:2; 396:5; 397:9; 409:13

**DT** [2] - 296:5, 22

**DU** [4] - 290:7, 9, 11; 419:9

**due** [2] - 228:3; 300:16

**duly** [6] - 218:4; 257:3; 307:6; 309:15; 338:8; 376:4

**duties** [12] - 220:9, 19; 259:16; 260:3; 339:9; 341:7; 345:6; 349:20; 352:2; 377:5

**duty** [2] - 339:14; 394:17

**DV** [1] - 408:1

**DW** [5] - 410:2, 9, 23-24; 419:10

**DX** [1] - 412:8

**DY** [4] - 414:5, 21; 416:11, 23

**dysport** [1] - 381:6

**E**

**E-L-O-X-A-T-I-N** [2] - 270:16; 327:14

**e-mail** [4] - 379:4, 24; 380:3; 381:3

**e-mails** [2] - 379:10, 12

**E-N-V-O** [1] - 304:23

**early** [1] - 378:23

**easier** [2] - 358:25; 401:14

**easy** [1] - 256:6

**educational** [3] - 219:18; 258:9; 377:22

**effect** [2] - 217:11; 397:20

**effects** [1] - 220:25

**efficacy** [2] - 312:12, 15

**efficiency** [1] - 415:10

**efforts** [2] - 320:12; 325:10

**EH** [1] - 256:6

**eight** [7] - 357:1; 360:5, 23; 361:3; 372:8; 373:14

**either** [11] - 228:24; 229:6; 230:24; 293:24; 315:11; 339:5; 342:22; 343:5; 344:24; 357:19; 415:14

**elevator** [1] - 417:6

**Elizabeth** [5] - 260:4, 6; 261:23; 340:4, 6

**ELMO** [1] - 244:22

**Elmo** [

250:4-5

**ELOXATIN** [2] - 293:*** 344:14

**Eloxatin** [41] - 227:23; 243:24; 244:2; 245:1; 270:15, 19-20; 293:14; 320:16, 19-20, 22-23; 321:1, 3, 6; 322:2-4, 22; 323:8, 16, 22, 25; 325:9, 21, 25; 327:8, 12; 332:7, 10; 333:6, 19; 334:1; 335:18; 344:13; 363:5-7, 13, 18

**Eloxatins** [1] - 244:9

**email** [8] - 409:12; 410:6; 411:3, 21; 413:9, 13, 19

**emphatically** [1] - 229:24

**employed** [4] - 218:13; 338:20; 376:19

**employee** [5] - 217:15; 328:7; 340:4; 408:12

**employees** [3] - 377:10; 408:5; 410:6

**employer** [14] - 214:4; 216:4, 17; 217:11, 13; 266:20, 22; 373:12, 23; 375:1, 4, 10

**enable** [1] - 369:23

**encounter** [2] - 313:2; 318:19

**Encyclopedias** [1] - 415:24

**end** [11] - 215:13, 16; 216:9; 225:13, 24; 227:6, 8-9; 254:14; 275:23

[1] - 227:9

**England** [1] - 258:12

**English** [16] - 224:5; 229:12-14; 231:25; 246:4; 247:18; 252:22; 263:23; 291:21; 312:3; 313:19; 315:2; 325:1

**ensued** [8] - 214:1, 24; 215:24; 217:18; 306:5, 18; 307:1; 416:4

**ensure** [2] - 399:12, 17

**enter** [2] - 277:2; 300:19

**entered** [4] - 268:6; 275:22; 301:1; 384:5

**entering** [2] - 268:5; 375:18

**enters** [1] - 375:19

**entities** [2] - 325:19; 368:25

**entitled** [3] - 276:13; 299:5; 417:24

**entries** [1] - 359:6

**envelope** [4] - 346:21; 347:3, 17, 22

**Envo** [1] - 304:20

**envo** [1] - 304:23

**EOM** [1] - 335:18

**equal** [1] - 360:6

**equivalent** [2] - 332:20; 340:18

**esophogeal** [1] - 310:25

**ESQ** [2] - 213:19

**essentially** [2] - 308:10; 336:4

...h [1] -

343:15

**established** [5] - 303:2; 349:1; 370:1; 403:13, 19

**establishing** [1] - 403:20

**estimation** [1] - 368:13

**Europe** [4] - 329:2, 14, 17; 330:1

**European** [4] - 287:5, 9; 329:18; 332:19

**evaluate** [1] - 262:4

**evening** [1] - 416:3

**event** [2] - 318:21; 325:9

**events** [2] - 313:1; 318:20

**eventually** [3] - 224:10; 246:3; 247:1

**exact** [6] - 240:2-4; 284:17; 337:8; 351:22

**exactly** [8] - 232:5; 239:21; 247:4, 7, 11; 254:4; 404:20; 412:3

**examination** [13] - 233:11; 241:21; 279:12; 285:10; 291:11; 303:2; 307:14; 326:10; 327:16; 330:25; 356:6; 394:19; 417:13

**EXAMINATION** [43] - 218:10; 233:13; 257:14; 275:1; 279:14; 302:18; 307:12; 309:21; 326:13; 335:2; 337:4; 338:16; 342:1; 344:4; 352:19; 355:17; 356:11; 366:18; 376:15; 394:20; 397:1;

410:14; 418:1, 4-7, 9
**examined** [5] - 218:5; 257:3; 309:16; 338:8; 376:4
**examining** [1] - 220:12
**example** [5] - 284:12; 288:15; 294:20; 311:19; 318:22
**examples** [1] - 288:7
**excellent** [1] - 415:10
**exchange** [1] - 381:10
**exclusively** [2] - 311:4; 354:15
**excuse** [9] - 214:8; 216:6; 239:8; 258:6; 267:4; 297:22; 373:14; 394:24; 415:4
**excused** [4] - 215:7; 309:9; 371:21; 372:3
**exhibits** [3] - 266:6; 358:8; 419:1
**expand** [1] - 261:4
**expected** [1] - 231:20
**expensive** [1] - 228:8
**experience** [4] - 255:9, 11; 282:9
**experienced** [1] - 318:16
**expiration** [2] - 316:1; 317:15
**explain** [6] - 221:12; 310:9; 312:23; 316:14; 317:22; 355:21
**explains** [1] - 216:19
**explanation** [1] - 248:17
**explore** [1] - 237:10
**explored** [1] - 237:5
**exposed** [2] - 316:12; 336:16
**exterior** [4] - 256:9; 311:14; 323:8, 21
**external** [1] - 220:1
**eyes** [7] - 306:8, 11-12, 21, 23

**F**

**face** [2] - 381:23
**face-to-face** [1] - 381:23
**facilities** [3] - 328:19; 403:6
**facility** [2] - 327:25; 328:22
**factfinding** [1] - 400:8
**factory** [3] - 328:5, 15; 333:22
**fair** [5] - 238:3; 281:3; 286:12; 343:5; 407:20
**fairly** [1] - 281:2
**Fallon** [1] - 259:14
**FALLON** [1] - 259:15
**familiar** [5] - 239:17; 312:19; 320:16; 329:4; 332:16
**family** [1] - 229:2
**far** [6] - 221:3; 329:2; 384:11; 392:7; 402:17; 404:24
**fast** [1] - 225:19
**favorite** [1] - 261:12
**fax** [9] - 222:13, 15; 234:4, 11-12; 261:11
265:12
**faxes** [4] - 222:9; 232:11; 261:10; 378:21
**FDA** [129] - 223:25; 224:7; 226:24; 228:24; 230:21; 231:1, 5, 12, 22; 232:21, 25; 235:10, 14; 236:4; 242:9; 247:15; 263:25; 269:7; 273:6; 275:7, 17; 277:8, 21; 278:2, 15, 18; 279:4; 281:22, 25; 282:5, 19, 25; 283:11, 17; 284:4; 289:2; 293:17, 23; 294:3, 25; 295:9, 15, 18, 21-22, 25; 296:1, 19; 297:12, 21, 25; 300:17; 302:24; 303:23; 311:7, 10, 13, 16, 20; 312:25; 313:16; 314:4, 23; 315:14; 316:5; 317:2, 11, 14; 320:7, 9-10, 13; 321:1, 3, 6; 322:2; 323:15, 25; 324:10, 21, 25; 325:4; 326:4, 8; 328:16, 18, 21; 330:11, 15, 18; 331:22; 333:6, 9, 14, 16; 335:22, 25; 336:23; 338:23; 339:15; 341:7, 12, 16; 345:6, 11, 14; 349:21; 352:2, 7; 366:1; 368:25; 369:3, 23; 370:2; 387:13, 15; 393:13, 16, 21; 394:2, 10; 403:7, 10
**FDA's** [3] - 341:9; 345:8; 368:21
**FDA-approved** [22] - 224:7; 226:24; 231:1; 232:21; 311:16, 20; 314:4; 315:14; 316:5; 317:2, 11, 14; 322:2; 323:15, 25; 324:10, 21; 330:11, 15, 18; 335:25; 336:23
**FDA-required** [1] - 313:16
**fear** [1] - 320:12
**featured** [1] - 313:13
**February** [42] - 245:16; 249:7; 251:17; 275:6; 280:9; 288:16; 290:25; 303:3; 339:11; 340:3; 341:3; 346:6; 347:10, 15; 357:8; 358:10, 16, 22-23; 359:11, 15, 22, 24; 360:6, 15, 21, 24; 361:3, 10-11, 14-15, 22-23; 363:12; 367:9, 21; 369:3
**federal** [1] - 275:23
**Federal** [2] - 213:14, 21
**FedEx** [1] - 228:16
**fee** [2] - 308:10
**feedback** [1] - 398:19
**feeding** [1] - 227:21
**fellowship** [2] - 258:24; 259:2
**felony** [3] - 9, 14
**felt** [3] - 289:3; 295:21; 394:17
**few** [12] - 221:18, 23; 238:8; 239:22; 240:2; 288:7; 329:8; 342:7; 378:11; 381:5; 412:16; 417:5
**FFDCA** [1] - 405:21
**Fiat** [1] - 351:6
**field** [1] - 338:25
**fighting** [1] - 227:25
**filters** [1] - 411:22
**final** [4] - 251:2; 285:15; 290:25; 363:22
**finances** [1] - 308:9
**financial** [3] - 214:11; 339:10; 382:7
**financially** [1] - 308:20
**fine** [3] - 282:6; 391:25; 407:1
**finger** [1] - 265:12
**finish** [1] - 234:20
**finished** [2] - 219:24; 276:25
**firm** [1] - 215:3
**firm's** [1] - 217:14
**five** [11] - 224:19; 252:15; 266:16; 267:5, 7; 322:15; 356:24; 358:23; 362:17; 378:7
**fixed** [2] - 308:10
**flag** [3] - 230:10; 231:18; 247:9
**flags** [1] - 399:24
**flip** [4] -

292:25; 293:1; 358:9; 397:15
**Florida** [1] - 221:20
**fluid** [1] - 313:11
**focus** [2] - 342:10; 360:13
**follow** [2] - 335:4; 358:5
**follow-up** [1] - 335:4
**following** [11] - 214:1, 24; 215:24; 217:18; 246:10; 288:12; 306:5, 18; 307:1; 321:13; 416:4
**follows** [6] - 218:6; 257:4; 307:6; 309:17; 338:9; 376:5
**Food** [1] - 338:21
**foregoing** [1] - 417:23
**foreign** [47] - 244:17; 250:14; 251:1, 24; 252:2; 253:1, 18; 268:12, 19; 275:11; 281:18; 282:6, 12, 21; 283:1, 6; 292:1; 293:17, 25; 294:5, 9, 15, 19, 22-23; 295:1; 302:8; 311:20; 318:21; 319:2; 320:6; 325:9, 15; 339:22; 340:13, 18; 350:10; 357:11; 402:8, 11, 18; 403:14; 404:11; 405:1; 412:1, 5
**foreign-market** [2] - 318:21; 325:9
**foreign-source** [1] - 319:2
**foremost** [2] - 315:2; 321:7
**Forensic** [2] - 368:21, 23
**forensics** [1] - 369:1
**form** [5] - 233:3; 341:13; 352:8; 384:18, 22
**formulation** [1] - 331:3
**forth** [1] - 245:13
**forwarded** [3] - 364:25; 411:15, 19
**foundation** [1] - 343:10
**France** [3] - 320:25; 328:4, 12
**free** [1] - 390:10
**French** [1] - 326:25
**frequently** [2] - 261:11; 294:14
**Friday** [2] - 375:8; 413:14
**Fridays** [1] - 375:7
**front** [40] - 226:14; 240:13; 241:12; 243:14; 265:6; 270:17; 271:20; 275:25; 285:2, 4, 6; 292:16; 304:24; 313:22, 25; 315:3, 11, 22; 316:19; 317:1; 322:11, 22; 323:8; 324:3, 9, 17; 330:22; 331:23; 340:22; 342:25; 344:18; 347:3, 18; 350:14; 351:22; 353:15; 356:16; 379:22; 408:14; 409:7
**FTC** [4] - 369:17, 21, 25
**full** [4 338:4, 5; 369:15; 405:21
**fully** [2] - 263:2, 10
**funny** [1] - 372:13

**G**

**G-E-M-Z-A-R** [1] - 270:10
**gamunex** [1] - 380:15
**Garnerville** [1] - 259:15
**gastric** [2] - 310:24
**Gemzar** [3] - 270:10
**general** [1] - 297:17
**generally** [1] - 296:14
**generic** [2] - 229:2; 391:25
**gentlemen** [2] - 241:17; 242:23
**genuine** [2] - 369:7, 11
**Germany** [2] - 328:4, 12
**Gertler** [3] - 401:19; 402:4; 405:25
**gist** [1] - 382:19
**given** [11] - 219:16; 221:13; 228:2; 278:21; 328:24; 350:19; 355:23; 373:9; 414:14, 18
**God** [1] - 416:1
**Government** [72] - 213:13; 218:4; 225:5; 240:12, 20; 242:13; 243:16; 249:16; 264:17; 269:14, 21; 271:15; 275:25; 276:11; 296:4; 299:8; 307:5; 309:15; 313:25; 314:10, 13-14; 315:13; 323:3, 10, 13; 330:20; 331:1; 340:23; 344:1, 19; 346:1, 17; 350:14; 351:17; 352:11, 23; 355:12; 356:14; 361:6; 364:11, 22; 379:19; 384:14, 25; 386:4, 6-8; 387:18; 388:1, 4-5; 389:14, 22-24; 390:13; 409:6; 419:2, 6-8, 12
**government** [35] - 218:1; 224:22; 255:20; 256:23; 264:12; 269:9; 275:23; 276:8; 285:2; 288:8; 298:24; 300:1, 19; 301:20; 309:11; 314:9; 334:9; 338:3; 345:15; 347:11; 373:12; 375:23; 379:14, 18; 384:13; 385:16; 387:18, 22, 24; 389:14; 406:8; 416:11, 14, 16, 18
**Government's** [14] - 264:18; 269:15; 323:5, 17; 344:2; 345:23; 355:14; 419:1
**government's** [1] - 217:23
**graduated** [3] - 219:20; 258:11; 279:23
**gram** [2] - 380:15, 17
**Great** [3] - 226:18; 280:6; 382:20
**great** [1] - 324:19
**greater** [1] -
**greet** [1] - 381:21
**ground** [2] - 403:17; 412:25
**Group** [1] - 319:23
**group** [2] - 377:14; 380:10
**groups** [1] - 313:5
**guarantee** [2] - 237:6; 278:20
**guess** [1] - 300:24
**gun** [1] - 351:6

**H**

**H-E-R-C-E-P-T-I-N** [1] - 293:15
**half** [4] - 220:8; 229:5; 362:12
**hallway** [2] - 215:18; 372:1
**hand** [4] - 226:2; 285:5; 332:6; 375:24
**handed** [3] - 340:21; 350:12; 354:10
**handing** [2] - 264:21; 297:4
**Handing** [3] - 289:13; 322:14; 396:14
**handled** [1] - 326:8
**handling** [1] - 321:11
**hands** [2] - 337:11; 367:12
**handwriting** [11] - 270:25; 353:1, 3, 15, 19, 23; 354:1, 3, 11; 410:17, 20
**handwritten** [1] - 352:24
**hardship** [1] - 214:9
**harmed** [2] - 277:11; 393:9
**harmful** [1] - 279:8

**Harry** [2] - 255:24; 256:17
**Haverchek** [1] - 407:4
**head** [3] - 310:25; 360:8; 406:20
**headaches** [4] - 381:24; 392:10, 14
**headed** [1] - 336:7
**headquarters** [2] - 339:6, 20
**health** [3] - 377:24; 395:6
**Health** [2] - 317:10; 398:2
**heard** [4] - 222:16; 239:1, 17, 19
**hearing** [7] - 258:7; 260:12; 267:14, 23-24; 325:6
**hearsay** [2] - 350:8; 354:1
**held** [2] - 310:7; 339:1
**hello** [2] - 338:19; 381:4
**help** [2] - 232:16; 267:1
**helpful** [1] - 236:1
**helping** [1] - 220:23
**hematology** [2] - 218:24; 258:24
**hematoma** [1] - 219:9
**Henry** [1] - 376:8
**Herceptin** [11] - 227:24; 244:25; 261:3; 263:17; 273:22; 274:11; 288:17; 292:10; 293:15; 346:12; 351:3
**Herceptin,H** [1] - 351:2
**Herceptin,H-E-R-C-E-P-T-I-N** [1]
- 351:2
**hiding** [2] - 236:6, 9
**high** [1] - 281:2
**higher** [1] - 281:4
**hills** [2] - 220:13, 15
**HIPAA** [1] - 415:2
**hire** [1] - 330:1
**hmm** [7] - 236:2; 240:24; 242:21; 249:18; 250:13; 251:12; 285:24
**hold** [1] - 329:5
**holiday** [1] - 380:20
**home** [3] - 223:12; 415:15
**homeless** [1] - 372:14
**honest** [1] - 414:3
**honestly** [4] - 235:23; 237:7; 408:13; 411:14
**HONORABLE** [1] - 213:10
**hospital** [2] - 219:21; 220:10
**hours** [1] - 301:16
**Houston** [3] - 258:21; 259:3, 5
**Howard** [2] - 256:11, 13
**hundreds** [1] - 219:14
**hurt** [1] - 233:8
**hurting** [2] - 407:9, 18
**hypersensitivities** [1] - 313:11

**I**

**ID** [1] - 215:19
**idea** [1] - 247:22
**identification** [4] - 276:1; 312:5; 378:25; 412:9
**identif**
340:4; 355:3; 414:13
**ident***** [1] - 317:24
**identify** [2] - 311:15; 357:24
**identifying** [1] - 416:17
**identities** [1] - 416:14
**identity** [1] - 414:25
**III** [2] - 376:9; 418:21
**illegal** [1] - 248:8
**Illusion** [1] - 221:20
**imagine** [1] - 215:21
**immediately** [3] - 229:17; 258:19; 405:10
**immune** [2] - 228:5; 278:7
**impact** [1] - 308:23
**import** [1] - 404:8
**importance** [1] - 284:8
**important** [2] - 240:4; 294:8
**importation** [1] - 401:24
**imported** [2] - 282:10; 294:14
**impose** [1] - 329:18
**impression** [2] - 404:17; 405:13
**Inc** [2] - 319:12; 402:7
**Inc's** [1] - 404:5
**incidentally** [1] - 217:10
**include** [4] - 258:1; 264:10; 310:11; 414:2
**included** [3] - 261:2; 283:24; 379:10
221:5; 273:21; 274:11
**including** [5] - 257:25; 298:9; 339:10; 351:1; 414:25
**incoming** [1] - 339:5
**increase** [2] - 227:12; 281:11
**Indiana** [1] - 259:1
**indicate** [5] - 306:20; 315:4; 331:14; 358:14; 365:4
**indicated** [20] - 241:11; 279:23; 282:25; 291:11; 313:4, 10; 315:11; 317:1; 327:15; 330:9; 332:12; 333:5; 334:9; 347:15; 349:2; 356:23; 357:5, 22; 386:22
**indicates** [12] - 315:9; 316:16; 317:8, 25; 318:6, 13; 324:12; 359:9; 361:7, 15; 402:10
**indicating** [1] - 288:21
**indicating)** [1] - 287:21
**indication** [2] - 312:25; 315:8
**indicator** [3] - 321:10; 324:22
**industry** [1] - 335:25
**inform** [2] - 298:12, 15
**infusion** [1] - 380:19
**ingredient** [4] - 284:6; 366:6, 11; 369:12
**ingredient's** [1] - 363:13
3] -
281:16; 342:9; 381:21
**initialed** [4] - 280:22; 286:8; 287:23; 288:20
**initialing** [1] - 271:5
**initials** [9] - 271:2, 12, 18, 23-24; 289:17; 348:9; 386:14
**initiate** [1] - 319:3
**injected** [1] - 392:16
**injecting** [1] - 312:13
**injection** [3] - 221:17; 228:3; 392:17
**injections** [1] - 380:15
**inquire** [3] - 234:16; 281:5; 302:14
**insert** [11] - 229:11; 231:24; 244:6; 247:4, 13; 248:3; 251:21; 313:14; 324:15
**inserts** [2] - 229:4; 232:10
**inside** [5] - 316:18; 334:3; 348:13; 369:10; 371:10
**inspect** [2] - 328:19, 21
**inspected** [2] - 328:18, 21
**instance** [5] - 313:3; 318:2; 398:16; 414:1, 15
**instead** [1] - 391:20
**instructed** [1] - 255:16
**instruction** [1] - 417:14
**instructions** [1] - 268:21
**insurance** [1] -

414:15
**insured** [3] - 263:10; 291:13; 292:6
**intended** [4] - 311:20; 318:1; 320:6; 341:16
**intentionally** [1] - 299:19
**interested** [1] - 223:1
**interesting** [3] - 283:10; 289:4; 415:17
**internal** [5] - 258:13, 20; 324:24; 348:3
**internally** [1] - 318:12
**internet** [3] - 237:5, 10
**interrupt** [1] - 262:17
**interrupted** [1] - 240:8
**interstate** [1] - 299:13
**interview** [1] - 235:17
**interviewed** [3] - 235:9; 238:11; 283:10
**introduction** [2] - 343:10; 354:23
**inventory** [6] - 318:10; 348:10; 360:4; 362:19; 366:22; 367:11
**Inventory** [7] - 341:1; 344:24; 346:23; 347:5, 16; 356:19; 361:21
**investigated** [2] - 283:16, 20
**investigating** [2] - 357:14; 392:2
**investigation** [9] - 264:7; 282:2; 298:18; 320:11; 326:8; 342:8; 363:5; 365:13; 369:1
**Investigation's** [1] - 340:25
**Investigations** [1] - 338:22
**investigations** [1] - 310:6
**Invoice** [1] - 361:14
**invoice** [55] - 227:16; 245:15; 249:16, 20, 23; 270:1, 7, 9; 271:11, 15; 272:19, 23; 273:1, 17; 274:1, 7; 285:12; 286:3, 5, 11, 22; 287:16; 288:17, 20; 292:18; 293:7; 350:18, 25; 351:13-15; 358:9, 14; 362:7, 10, 13; 363:10; 364:1; 367:23; 368:5; 385:20; 386:25; 387:24; 389:2, 11; 390:3, 11, 18, 24; 391:2
**invoices** [35] - 269:17; 280:21; 285:3, 7, 9, 21; 289:20, 25; 292:16; 342:25; 353:16; 357:23, 25; 358:4; 359:3; 362:21; 365:10; 367:5, 13, 16, 18, 22; 368:2; 385:19; 386:3; 389:15, 17-18; 390:25; 406:8, 19; 408:16; 414:10
**involved** [1] - 298:17
**involvement** [2] - 280:11, 15
**involving** [1] - 382:22
**Ireland** [3] - 402:13, 15; 405:14
**Islip** [
213:6, 14, 22; 376:22
**issue** [***] - 375:7
**issued** [3] - 313:3, 9; 318:17
**issues** [6] - 253:22; 254:19; 310:14; 312:6; 331:1; 373:20
**it'd** [1] - 391:25
**Item** [1] - 364:7
**items** [11] - 244:4; 245:21; 294:5; 317:2; 362:16; 364:12, 14, 16, 21; 365:15; 380:11
**itself** [3] - 300:24; 349:8, 11
**IV** [5] - 221:6, 8, 14

**J**

**January** [14] - 227:10; 290:13, 18; 292:19; 293:7; 303:3, 7; 362:14; 363:25; 381:10; 384:7; 411:4; 413:14, 19
**Jen** [1] - 399:4
**jeopardize** [1] - 230:24
**job** [7] - 310:10; 311:12; 314:7; 341:6; 345:6; 352:1; 372:7
**John** [1] - 399:3
**Jorge** [3] - 256:23; 257:7; 299:6
**JORGE** [6] - 256:24; 257:1, 9; 307:4; 418:3, 7
**JP** [2] - 271:3
**JUDGE** [1] - 213:11
**June** [8] -
22; 281:13; 285:13, 18; 290:19; 303:8
**JUROR** [8] - 215:10, 12, 20; 306:14; 372:5, 7, 13, 17

**K**

**KATTEN** [1] - 213:17
**keep** [13] - 240:16; 241:18; 266:8; 304:7, 10; 306:11, 24; 325:7; 371:14; 372:11; 376:10; 415:21, 25
**keeping** [1] - 332:4
**Kelley** [1] - 237:22
**Kelly** [20] - 217:8, 24; 218:7; 231:9; 238:8, 11; 242:19; 255:23; 256:19; 265:24; 267:22; 268:8; 304:1; 307:9; 373:2, 5, 16; 374:12; 375:21
**KELLY** [121] - 213:13, 15; 214:16, 20; 217:9, 25; 218:8, 11; 224:22, 25; 225:2, 7; 226:2, 5, 11-12; 231:10; 233:5, 10; 237:1; 238:25; 239:24; 240:6; 241:10; 250:6; 253:19, 24; 255:13, 20, 24; 256:4, 8, 12, 15, 20, 23; 257:12, 15; 264:12; 265:25; 266:4; 267:10; 268:9; 269:9, 12, 17; 272:11; 274:4;
275:2; 276:8; 279:11; 283:13; 290:6; 294:17; 296:24; 297:1, 13; 299:14; 300:3, 22; 301:22; 302:14, 17, 19; 304:2; 305:10; 307:10, 13; 308:19; 309:3; 347:22; 355:9, 11, 15; 373:4, 6, 8, 17; 374:13; 375:22; 376:14, 16; 378:17; 379:14; 381:13; 383:21; 384:13, 17, 20, 23; 385:16, 19, 22; 387:18, 23; 389:14, 18; 394:8, 18; 396:13, 16; 399:13; 401:8; 403:16, 18; 410:12, 15, 22; 412:24; 413:1, 7; 414:23; 416:10; 418:2, 4, 6, 8, 22, 24
**KENNETH** [1] - 213:15
**kept** [7] - 278:22; 288:23; 312:8; 322:4; 341:9; 345:8; 352:4
**kids** [1] - 372:10
**kind** [6] - 214:9; 232:9; 251:23; 392:14; 412:23; 413:5
**King** [35] - 222:8; 223:6, 21; 241:3; 252:13; 264:5; 268:14; 269:4, 18; 274:10; 275:8; 319:15; 320:5; 334:10; 337:16; 357:20; 365:23; 378:22; 385:6, 11, 14,

19; 387:25; 388:9, 16; 389:10, 15; 390:4, 22; 392:20; 397:21; 398:4, 12; 414:10
**Kingdom** [9] - 258:12; 280:1; 311:5; 320:24; 327:17, 20; 328:1, 15; 329:25
**knowing** [8] - 277:17; 302:8; 335:11, 14; 336:9, 12, 15, 18
**knowingly** [4] - 299:12, 18; 300:12; 302:22
**knowledge** [7] - 233:25; 292:6; 299:25; 365:14; 393:11; 398:4; 409:18
**known** [4] - 257:21; 310:19; 320:16; 335:24
**knows** [4] - 318:14; 375:6; 393:25; 413:6
**Kristin** [1] - 407:4

**L**

**lab** [5] - 348:14; 366:1; 368:24; 369:1; 371:1
**label** [5] - 263:21; 295:2; 315:14; 323:16; 333:10
**labeled** [4] - 311:25; 346:13; 350:10; 402:22
**labeling** [5] - 224:4; 315:3; 333:24; 336:3
**labels** [9] - 263:14; 268:12; 281:19; 283:7; 311:19, 23; 321:12; 322:2; 369:9
**Laboratory** [1] - 320:25
**lack** [1] - 343:10
**lacked** [1] - 333:7
**Lake** [1] - 259:15
**language** [27] - 224:4; 229:5; 247:12, 16, 18, 25; 251:24; 252:2; 253:1, 18; 263:14, 21; 268:12, 19, 21; 275:11; 281:18; 293:25; 294:5, 9, 19, 22, 24; 295:1; 302:8; 316:24; 321:8
**languages** [12] - 249:6; 252:22; 275:15; 282:7, 12, 21; 283:6; 293:17; 294:15; 412:1, 5
**large** [5] - 225:14; 227:4; 381:24; 382:23; 392:8
**larger** [1] - 382:21
**last** [21] - 228:23; 232:10; 242:14; 251:3, 5-8; 252:11, 21, 25; 254:1; 304:19; 305:4; 318:11; 322:11, 15; 338:11; 376:7; 403:4; 405:19
**lasted** [1] - 382:1
**lastly** [1] - 336:2
**late** [3] - 340:3; 374:16; 378:21
**laughs** [1] - 372:4
**law** [2] - 319:1; 375:12
**laws** [2] - 400:10, 12
**lawy**[4] - 296:19; 298:21; 417:16, 19
**lawyers** [4] - 266:19; 267:21; 297:10; 415:10
**leading** [1] - 386:18
**leads** [1] - 324:20
**leaflet** [1] - 324:24
**learn** [1] - 222:19
**learned** [3] - 222:7; 320:4; 325:23
**least** [4] - 229:5; 367:18; 369:11; 403:15
**leave** [7] - 215:17; 216:8; 305:14; 371:16; 373:7; 417:6
**leaves** [2] - 304:12; 337:11
**led** [1] - 291:7
**left** [3] - 214:12; 240:22; 408:5
**legal** [1] - 230:7
**legally** [1] - 398:8
**legit** [1] - 230:7
**legitimate** [13] - 223:15, 24; 230:14; 262:7; 263:1; 264:9; 268:24; 398:13, 22; 399:6, 12, 17
**less** [3] - 372:9; 382:21; 415:17
**letters** [2] - 252:10; 255:23
**leukemia** [1] - 228:5
**level** [1] - 217:16
**Liam** [6] - 382:15; 408:19; 411:3
**liam** [1] - 380:7
**license** [12] - 291:18, 21, 24; 292:1; 395:12, 14-15; 397:5, 12, 18; 398:3, 5
**licensed** [7] - 263:7, 10; 291:13; 292:5; 334:16; 397:8
**licenses** [3] - 396:7; 397:20; 398:11
**lie** [3] - 237:6; 238:3; 239:14
**life** [2] - 277:25; 278:6
**light** [3] - 316:10, 12; 336:16
**limitation** [1] - 404:7
**Line** [1] - 364:7
**line** [3] - 255:10; 402:9; 407:18
**linked** [1] - 343:14
**Liptak** [20] - 309:11, 23, 25; 310:18, 21; 311:6; 312:7; 313:21, 24; 317:22; 319:9; 320:4, 15; 323:6; 324:2; 326:15; 327:15; 329:12; 335:4; 337:6
**LIPTAK** [2] - 309:14; 418:8
**list** [7] - 265:9; 285:3; 319:9; 325:19; 346:5; 380:13; 410:7
**listed** [12] - 227:15; 272:8, 12; 315:7; 342:14; 343:3; 344:8; 363:22; 364:21; 387:1; 416:18
**listen** [1] - 248:11
**listing** [1] - 351:1
**lists** [2] - 380:18; 409:13
**Liz** [7] - 261:24; 262:9; 264:3, 7; 268:17; 275:10, 14
**LLP** [2] - 213:17; 401:19
**located** [2] - 219:4; 376:21
**location** [3] - 327:16, 19; 376:22
**locations** [2] - 320:23; 376:22
**looking** [25] - 222:10; 224:24; 240:21; 265:6; 281:7, 10; 285:21; 286:2; 290:16; 293:7; 310:12; 311:14; 318:22; 321:9; 324:15, 24; 325:11, 14; 333:6; 354:7; 356:22; 361:13; 362:21; 364:11; 406:8
**looks** [8] - 217:2; 251:18, 21; 253:4; 306:23; 348:13; 359:13; 413:19
**Los** [2] - 338:22, 24
**lose** [3] - 217:2; 312:12; 372:16
**losing** [1] - 416:7
**loud** [2] - 218:16; 236:15
**loudly** [1] - 257:6
**low** [2] - 227:10; 228:3
**lower** [1] - 329:13

**lowering** [1] - 278:12
**Luger's** [1] - 413:6
**lunch** [3] - 302:16; 304:4, 11
**luncheon** [1] - 305:16
**lung** [1] - 272:6
**Lupron** [1] - 221:22
**lymph** [1] - 275:20
**lymphoma** [1] - 275:20
**lymphomas** [1] - 228:4

**M**

**M-A-B-T-H-E-R-A** [1] - 272:11
**M.D** [2] - 257:1; 418:3
**MABTHERA** [1] - 351:2
**Mabthera** [52] - 272:8, 14-15, 18, 20; 273:1; 274:11; 284:22; 286:5, 12, 14, 18; 287:14, 20; 288:13, 17; 295:13, 15, 19, 22; 296:1, 15; 297:11, 20; 298:1; 351:1, 20; 355:24; 356:1; 365:18, 21, 25; 370:1; 381:6; 386:13; 387:1; 390:21; 391:7, 13, 17, 19, 23; 392:5; 406:12, 21, 23; 408:17; 409:3, 19; 413:25; 414:2, 11
**Mabthera)** [3] - 409:16, 24; 411:7
**machine** [2] - 226:3; 351:6
**Madison** [1] - 213:18
**magnesium** [1] - 255:5
**mail** [4] - 379:4, 24; 380:3; 381:3
**mails** [2] - 379:10, 12
**main** [6] - 255:10; 259:10-12; 260:10; 270:21
**mainstream** [1] - 232:18
**maintain** [1] - 337:8
**maintained** [3] - 312:10; 322:7; 336:13
**maintenance** [1] - 312:7
**majority** [1] - 220:22
**male** [2] - 229:25; 230:2
**man** [1] - 230:1
**management** [1] - 377:20
**manager** [2] - 310:5; 393:17
**manila** [1] - 346:21
**manner** [1] - 278:22
**manufacture** [5] - 255:6; 311:3; 320:22; 328:16; 330:18
**manufactured** [10] - 310:18; 311:4; 317:25; 318:3, 7-8; 320:23; 401:25; 402:23; 404:22
**manufacturer** [16] - 221:23; 254:25; 255:3, 10; 278:22; 310:3; 383:4, 11; 386:17, 23; 387:5; 388:25; 391:10; 404:15
**manufacturers** [2] - 313:4
**manufactures** [1] *** 3:9
**manufacturing** [2] - 328:19; 403:6
**March** [7] - 244:22; 285:16, 19; 303:11; 348:15; 349:2; 390:24
**mark** [1] - 355:6
**marked** [27] - 236:10; 238:17; 246:6; 276:12; 285:1; 289:8; 290:9; 296:3; 313:22; 332:5; 340:23; 346:17; 350:14; 358:2; 378:24; 379:19; 384:25; 386:6; 388:4; 389:23; 395:18; 396:19; 400:20; 407:25; 410:1; 412:7; 414:5
**market** [7] - 314:22; 318:18, 21; 319:2; 325:9; 336:8; 369:8
**marketplace** [1] - 319:2
**markets** [6] - 311:17, 21, 24; 318:1; 319:1; 320:6
**markings** [3] - 369:8, 22
**marks** [1] - 290:14
**Marquinez** [1] - 218:19
**marry** [2] - 367:17; 368:8
**master's** [2] - 377:24; 395:6
**material** [1] - 242:4
**matter** [10] - 230:17; 232:8; 304:16; 305:18; 328:9; 372:18; 396:20; 417:24
**matters** [1] - 217:17
**McCutchen** [1] - 260:22
**MD** [1] - 259:3
**MDK** [65] - 261:25; 262:9, 20, 22; 264:4, 24-25; 265:1; 268:17; 270:2; 272:17; 275:16; 276:6, 21, 25; 277:8; 278:15; 281:4, 13, 17; 283:8, 12, 17; 285:18; 286:14; 287:17, 19, 25; 288:23; 289:1, 5; 290:19, 22; 291:12; 293:19, 24; 294:1; 298:10; 301:20, 25; 302:22; 303:6, 8; 307:25; 342:22; 343:5, 12, 16; 357:25; 364:12, 14, 23; 365:6, 15, 23; 367:6; 368:6, 10-11, 14; 370:2; 371:3; 393:12; 409:12
**MDK's** [1] - 291:12
**MDs** [1] - 334:10
**mean** [9] - 224:14; 232:4; 234:19; 273:13; 299:21; 312:13, 15; 364:16; 388:12
**meaning** [2] - 337:10
**means** [5] - 299:18, 20; 318:15; 332:16; 374:3
**meant** [1] -
**meantime** [3] - 304:6; 381:9; 415:14
**meanwhile** [1] - 415:4
**mechanical** [1] - 213:24
**media** [2] - 296:13, 16
**medical** [20] - 218:21; 220:21; 230:25; 231:11; 258:11, 23; 259:24; 278:6, 18; 279:5, 23; 284:5; 297:19; 298:6; 310:21; 319:15; 320:18; 384:17; 385:11; 393:15
**Medical** [36] - 222:8; 223:5, 21; 241:3; 252:12; 264:4; 268:13; 269:3, 18; 274:9; 275:7; 319:17, 23; 320:5; 334:10; 337:16; 357:20; 365:23; 378:22; 385:6, 14, 19; 387:25; 388:9, 16; 389:10, 15; 390:3, 22; 392:20; 397:21; 398:4, 12; 414:10
**Medicare** [20] - 276:4-6, 23; 277:5; 298:6, 8, 12; 301:8, 12, 14; 307:15, 17, 24; 308:2, 5, 10-11; 319:21
**medication** [17] - 260:11; 271:7; 272:5, 15; 275:4; 277:18; 278:11, 20-21, 24; 310:23; 320:20; 322:9; 334:20; 378:7; 380:13

**Medication** [1] - 332:19
**medications** [11] - 221:7; 261:2, 12; 264:24; 265:1; 271:9; 302:25; 379:8; 380:18
**medicine** [8] - 245:2; 252:16, 18, 20; 258:13, 20; 349:9
**Medicine** [1] - 259:1
**medicines** [1] - 357:18
**meet** [4] - 339:25; 381:21; 382:12
**meeting** [18] - 242:18, 20, 22; 282:5; 380:9, 20; 381:21; 382:1, 3-5, 10, 13, 17-18; 383:8, 12; 394:11
**meetings** [5] - 381:11, 16, 19; 395:9; 398:25
**members** [10] - 217:20; 256:16; 266:1; 268:7; 304:3; 307:8; 371:13; 375:20; 377:17; 415:6
**memorizing** [1] - 241:19
**memory** [2] - 248:5; 253:23
**mention** [4] - 231:4; 293:24; 294:6, 19
**mentioned** [13] - 222:11; 238:23; 239:9, 15-16; 263:2; 294:10; 315:21; 316:3; 373:23, 25; 384:10; 406:12
**menu** [1] - 413:5
**Mercedes** [2] - 265:18, 20
**merely** [1] - 297:6
**message** [1] - 411:16
**met** [7] - 279:19; 326:19; 340:3, 5-6; 395:8; 398:21
**Mets** [1] - 351:8
**mic** [1] - 235:4
**Michael** [2] - 338:4, 12
**MICHAEL** [3] - 213:19; 338:6; 418:14
**microphone** [6] - 218:16; 240:17; 257:5; 258:7; 267:19; 376:12
**middle** [4] - 316:14, 16; 351:24; 354:4
**might** [6] - 221:22; 232:6; 305:7; 358:25; 400:11; 413:5
**migraine** [1] - 392:15
**milligram** [11] - 272:19; 286:6, 19-20, 23-24; 287:21; 315:9; 344:12; 364:6; 365:4
**milligrams** [26] - 245:19; 250:12; 293:8; 315:18; 317:2; 331:3, 10, 14; 332:2; 351:3; 359:18, 20; 360:1-3, 5, 18, 20; 362:21; 364:18; 368:1, 6; 411:10
**milligrams/ milliliters** [1] - 363:20
**milliliter** [1] - 315:9
**milliliters** [10] - 315:19; 331:4, 11, 14, 18, 25; 332:2; 335:***
**mind** [7] - 266:8; 297:7; 304:7, 10; 371:14; 415:21, 25
**mine** [1] - 410:21
**Ministry** [1] - 317:9
**minute** [6] - 237:25; 266:2, 7; 329:5; 387:20; 417:5
**minutes** [3] - 266:8; 329:8; 371:14
**misbranded** [5] - 299:12; 300:12; 301:20; 302:22
**misdemeanor** [1] - 301:5
**misled** [1] - 232:24
**Miss** [6] - 240:4, 12-13; 243:12; 245:21; 246:1
**miss** [1] - 241:21
**missing** [1] - 324:22
**mission** [2] - 220:7, 10
**missionary** [2] - 220:6
**mistaken** [3] - 294:20; 295:3
**moment** [6] - 264:15; 285:23; 296:8, 24; 374:21; 394:8
**money** [7] - 301:11; 307:17, 23; 308:13, 15; 375:11, 13
**monitor** [1] - 278:23
**monitoring** [1] - 310:16
266:21; 374:3
**month's** [1] - 374:7
**months** [2] - 290:22; 392:16
**morning** [15] - 215:3; 216:7; 217:20; 218:12; 233:15; 257:16; 267:7; 279:16; 374:10; 416:2; 417:1, 8, 21
**mortgage** [4] - 266:25; 372:9, 14; 373:10
**most** [5] - 221:4; 261:12; 263:18; 302:7; 406:5
**mostly** [2] - 220:11; 227:24
**mountains** [2] - 220:13, 15
**move** [10] - 289:21; 314:9; 322:23; 323:9; 341:18; 352:11; 361:24; 365:11; 408:15; 410:9
**moved** [2] - 261:4; 381:13
**moves** [2] - 345:15; 347:11
**moving** [3] - 280:3; 415:8, 11
**Mr** [107] - 217:8, 24; 218:7; 231:9; 237:22; 238:8, 11; 242:19; 253:10; 255:23; 256:19; 265:24; 267:22; 268:8; 279:19; 304:1, 20, 23; 307:9; 309:4, 8, 23, 25; 310:18, 21; 311:6; 312:7; 313:21, 24; 317:22; 319:9; 320:4, 15; 323:6; 324:2; 326:15, 18; 329:12; 335:4; 337:6; 373:2, 5, 16, 18; 374:12, 14; 375:21; 376:10, 17; 379:12; 380:21; 381:2, 11, 16, 19; 382:10; 383:1, 7, 9, 12; 384:3, 6, 10; 385:2; 386:16, 22; 387:3, 12; 388:24; 390:10; 391:8, 21-22; 394:11, 24; 395:8; 396:4; 397:4; 399:9; 401:3, 12, 22; 403:24; 404:9, 23; 405:4, 6, 11; 406:1, 6, 16, 25; 407:10; 408:23; 410:16; 411:25; 412:4, 15; 413:23, 25; 417:2, 10, 12
**MRI** [1] - 377:21
**Ms** [9] - 233:15; 247:20; 248:22; 249:25; 251:4, 10; 252:12; 281:5; 295:1
**Mubashir** [4] - 218:19; 233:16, 19; 253:7
**MUCHIN** [1] - 213:17
**multipage** [1] - 412:12
**multiple** [4] - 258:1; 378:6; 395:8; 398:21
**must** [3] - 363:7; 373:2, 5
**myeloma** [1] - 258:1

**N**

**N-E-U-L-A-S-T-I-N** [1] - 292:15
**N-E-U-P-O-G-E-N** [1] - 293:15

**Naisatka** [5] - 238:12; 242:19; 392:21; 394:16; 408:6
**name** [35] - 214:4; 239:15; 241:8, 19; 242:25; 257:6, 19; 270:20; 272:5, 15; 279:18; 284:9, 13, 15, 19-20, 22; 287:5, 8-9, 11, 14; 326:17; 338:10; 342:3; 345:3; 363:13; 376:6; 407:3; 412:17, 19; 416:11
**named** [2] - 222:8; 235:14
**names** [12] - 222:22; 223:23; 230:2; 237:17, 19, 23; 243:1; 263:4; 284:6; 293:12; 416:14
**National** [2] - 312:2; 315:6
**natural** [1] - 277:17
**nausea** [1] - 275:4
**NDC** [8] - 312:1; 315:6; 321:10; 324:14, 23; 333:7, 10, 17
**near** [1] - 271:19
**Neck** [2] - 226:19; 382:20
**neck** [1] - 310:25
**need** [9] - 218:18; 221:25; 238:5; 348:7; 372:10, 13; 381:9, 25; 396:13
**needed** [2] - 221:4; 288:24
**needs** [1] - 221:3
**negative** [1] - 398:18
**negotiated** [1] - 298:21
**nervous** [1] - 237:24
**Neulasta** [1] - 346:15
**Neulastin** [1] - 292:13
**Neupogen** [6] - 228:2; 243:24; 244:2, 25; 293:15; 346:13
**Neupogens** [1] - 244:10
**neurodiagnostic** [1] - 377:20
**Neurologic** [17] - 376:20; 377:4, 8, 18; 378:2, 4; 382:8; 383:13; 385:12; 388:12, 15; 389:10, 18; 390:5; 392:11; 395:1; 416:12
**neurologists** [1] - 377:15
**neurology** [1] - 377:14
**Nevada** [52] - 257:19, 22; 259:6, 12, 15, 17; 265:2; 269:18; 270:2; 274:10; 280:8, 16; 283:2; 294:11; 298:19; 299:6; 339:12, 17, 21; 340:8; 342:9, 15; 344:7; 347:10; 349:17, 25; 350:22; 353:12, 18; 356:2, 19; 357:10, 13, 19; 358:5, 15; 359:5, 10, 23; 362:6; 363:2, 17; 364:12; 365:13, 18, 22; 367:8, 14; 368:4
**never** [8] - 236:16
241:4, 5; 267:22; 291:18, 24; 332:1; 417:14
**NEW** [1] - 213:1
**new** [1] - 261:5
**New** [15] - 213:6, 14, 18, 22; 219:25; 220:2; 223:8; 226:19; 351:8; 395:16; 396:5; 398:2, 5, 9
**next-to-last** [1] - 403:4
**nice** [3] - 304:11; 372:12; 416:3
**nine** [9] - 351:19; 355:24; 357:3; 361:7, 21; 365:17, 21-22, 25
**NO** [4] - 215:10, 12, 20; 306:14
**No.3** [1] - 306:5
**nobody** [1] - 266:21
**nodes** [1] - 275:21
**non** [8] - 279:4; 282:3; 293:17; 300:8; 331:16; 333:21; 393:21; 394:2
**non-approved** [7] - 279:4; 282:3; 300:8; 331:16; 333:21; 393:21; 394:2
**non-FDA** [1] - 293:17
**nonapproved** [3] - 230:21; 231:5, 12
**None** [1] - 399:22
**none** [3] - 254:19; 267:11; 399:23
**normal** [4] - 244:5; 336:6; 400:14, 16
226:18
**notation** [4] - 332:15; 335:6, 17, 22
**note** [4] - 386:2; 408:5, 7, 10
**noted** [2] - 263:2; 371:23
**notes** [3] - 236:21; 238:14, 16
**nothing** [11] - 279:11; 295:2; 309:3, 5; 334:23; 337:23; 343:18; 366:14; 371:12; 394:18; 415:20
**notice** [1] - 343:17
**noticed** [5] - 246:3; 281:17; 304:19; 406:9; 407:14
**notified** [4] - 320:7, 10; 392:21
**November** [9] - 214:18; 216:23, 25; 227:6; 273:18; 288:12; 313:4; 375:8
**nowadays** [1] - 223:17
**number** [40] - 228:18; 243:11; 253:10; 265:9; 266:5, 15-16; 267:4-7, 9; 269:22; 273:13; 274:4; 280:20; 286:2; 298:5; 315:6, 24; 316:1; 317:9, 14-16, 20-21, 24; 318:3; 321:10; 324:14, 23; 333:7, 10, 17; 347:1; 358:11; 367:17
**Number** [3] - 332:5; 347:1;
**numbering** [2] - 318:1; 319:1
**numbers** [5] - 269:20; 312:1, 5; 317:22; 318:4
**numeric** [3] - 318:6, 11
**nurse** [12] - 219:2, 20; 220:6, 20; 221:1; 228:11; 231:11, 20; 233:19; 245:23; 259:25; 377:19
**nursers** [1] - 245:12
**nurses** [2] - 259:23
**Nursing** [1] - 219:21
**nursing** [1] - 220:7

### O

**o'clock** [1] - 374:4
**O-X-A-L-I-P-L-A-T-I-N** [1] - 261:3
**Oakland** [1] - 339:17
**object** [3] - 323:18; 343:9; 353:25
**objections** [1] - 389:21
**objects** [1] - 416:11
**obligation** [1] - 394:17
**observe** [1] - 223:20
**observed** [1] - 229:10
**obviously** [1] - 229:14
**occasion** [4] - 221:21; 314:6; 339:11; 349:17
**occasioned** [3] - 231:5, 12; 393:20
**occur** [1] - 382:3

**occurred** [1] - 228:21
**occurs** [1] - 278:10
**OCI** [1] - 368:25
**October** [7] - 213:7; 273:2, 5; 287:19, 25; 374:18; 415:7
**OF** [4] - 213:1, 3, 10; 417:23
**offer** [7] - 296:22; 349:4; 387:23; 396:10; 401:5; 414:20
**offered** [3] - 268:20; 390:10; 400:8
**offering** [5] - 225:1; 261:11; 297:6; 348:4; 384:3
**offers** [10] - 224:22; 255:20; 264:12; 269:9; 276:8; 379:14; 384:13; 385:16; 387:18; 389:14
**Office** [3] - 298:18; 338:21; 340:25
**office** [36] - 218:21, 23; 219:4, 7, 15, 17; 220:21; 221:2; 222:14; 223:11; 228:13; 232:15; 235:18; 245:6, 8, 12-13; 257:19, 24; 259:10-12; 260:1; 261:9; 271:7; 272:18; 281:25; 338:25; 339:6-8, 17, 21; 361:3
**office's** [1] - 222:1
**officer** [5] - 377:1, 3-4; 382:7; 394:25
**offices** [9] - 219:12, 14, 17; 245:6; 259:9, 13-14; 416:12
**often** [1] - 406:9
**oftentimes** [1] - 282:9
**Ohio** [7] - 218:14, 20; 219:5, 21; 220:18; 368:22
**once** [6] - 271:7, 10; 337:7, 11; 368:10; 416:15
**oncologists** [1] - 259:18
**oncology** [16] - 218:24; 219:2, 9; 220:20; 221:20; 228:11; 231:10; 232:18; 258:22; 280:24; 281:17; 310:23; 320:20; 334:19; 340:14
**Oncology** [5] - 260:10, 20; 280:25; 281:2, 6
**one-tenth** [1] - 407:12
**ones** [8] - 222:10; 254:2; 261:18; 263:17; 371:2; 384:10
**online** [1] - 310:16
**Open** [1] - 373:1
**open** [10] - 266:8; 304:7, 10; 306:11, 24; 348:2; 371:14; 415:21, 25
**opened** [3] - 229:5; 259:7
**operating** [4] - 377:1, 3-4; 394:25
**opinion** [1] - 325:3
**opportunity** [1] - 367:5
**oral** [1] - 221:14
**order** 221:25; 223:14; 224:16; 225:13; 226:1*** 25; 227:2, 4; 228:13, 23; 230:6; 232:12, 14, 17; 233:8; 234:8; 235:6; 241:3; 243:25; 244:1, 21; 250:8, 10-11, 14, 16-17; 251:6, 13, 16; 252:1, 11, 25; 254:1; 264:4; 269:3; 270:14; 272:1; 273:20; 281:10; 283:3; 286:14; 287:19; 288:12; 290:12, 19; 293:8; 378:6; 386:11, 16; 387:3; 388:7, 15; 390:5, 8; 391:4, 15; 406:17
**ordered** [30] - 224:20; 228:17; 229:22; 233:6; 234:3; 240:25; 241:2, 5; 243:19; 244:7, 24; 245:4; 247:15; 251:5, 8; 252:12, 16; 270:9; 288:16; 289:1, 3; 291:3; 293:4; 388:11, 19; 391:11, 16; 392:4, 7
**ordering** [39] - 219:3; 221:2; 223:1, 23; 225:22; 228:13, 22; 229:9, 15, 17-18, 24; 230:8, 14, 17-18; 232:20; 233:22; 241:19; 242:11; 252:13; 254:3; 260:3, 24; 262:22; 270:5; 276:25; 286:23; 288:23; 289:4; 292:8; 378:1; 388:21; 391:23; 392:3; 393:12
**orders** [14] - 222:2; 224:10, 13, 19; 225:12; 228:10; 243:11; 251:11; 252:21; 285:22; 386:17; 390:21; 391:13; 406:9
**original** [5] - 226:14; 346:24; 348:9, 19
**originally** [3] - 340:2; 364:15; 404:15
**otherwise** [2] - 215:6; 289:3
**outside** [5] - 214:24; 306:5; 311:17; 325:18; 336:6
**ovarian** [1] - 272:7
**over-the-counter** [1] - 282:20
**overhead** [7] - 249:24; 264:19; 269:22; 274:1; 303:17; 382:21; 385:1
**overlap** [1] - 303:7
**overruled** [23] - 231:15; 237:2; 239:2, 4, 25; 253:25; 283:14; 294:18; 297:14; 299:15; 300:4, 23; 301:23; 308:17; 309:2; 330:7; 332:22; 342:17; 343:25; 345:21; 350:9; 399:14; 403:22
**overseas** [1] - 310:13
**oversee** [1] - 377:7
**oversight** [1] -
**overview** [1] - 339:3
**own** [2] - 257:21; 401:13
**owned** [1] - 243:8
**Oxaliplatin** [2] - 261:3; 270:21
**OXALIPLATIN** [1] - 270:21
**Ozay** [1] - 319:25

**P**

**P-E-R-E-Z** [1] - 256:24
**p.m** [3] - 305:17; 371:23; 375:19
**pack** [1] - 331:19
**package** [15] - 231:18; 244:6; 247:9, 13; 248:2; 251:23; 311:13; 313:14; 315:22, 25; 317:17; 321:6; 324:15; 335:18; 346:18
**packages** [6] - 249:2; 252:19; 312:4; 333:12; 369:17
**packaging** [11] - 311:15; 314:22; 315:9; 316:5; 322:22; 324:13; 331:4, 13; 369:18, 20
**packet** [1] - 332:5
**paid** [10] - 216:13; 266:18, 23; 298:6; 307:17; 308:2; 375:3, 5; 390:8; 414:10
**pain** [2] - 221:7; 377:19
**pair** [1] - 348:1
**pancreatic** [1] - 270:13
**panel** [1] -

332:10
**paper** [3] - 249:10; 271:12; 350:24
**paperwork** [1] - 339:7
**paragraph** [5] - 236:11; 238:18; 276:16; 405:19
**parameters** [5] - 312:8, 10; 322:5, 8; 336:13
**parens** [2] - 303:21
**parenthesis** [1] - 273:23
**part** [13] - 237:6; 258:23; 259:24; 260:3; 299:11; 304:21; 339:14; 341:6; 345:5; 349:20; 352:1; 365:1; 388:24
**part-time** [1] - 259:24
**particular** [7] - 311:13; 321:6; 322:15; 343:6; 400:18; 414:12
**particularly** [1] - 322:11
**partly** [1] - 227:9
**pass** [11] - 215:12; 236:10; 238:17; 246:6; 395:18; 400:20; 407:25; 409:6; 410:1; 412:7; 414:4
**passed** [1] - 261:20
**past** [1] - 215:4
**pathology** [1] - 258:15
**patient** [13] - 231:19; 233:9; 277:11; 279:1, 10; 312:13; 313:2, 4; 316:17; 393:9; 406:24; 414:14, 18
**patients** [38] - 219:12, 17; 220:13, 23; 221:13; 230:24; 231:3, 6, 13; 232:16; 233:23; 254:6; 258:3, 5, 8; 259:19; 277:15; 279:4; 295:7; 298:5; 302:6; 308:13, 20; 310:24; 318:16, 19; 320:21; 392:15; 399:11, 17, 19; 415:1; 416:12, 15, 18, 22
**patients'** [1] - 308:9
**Pause** [1] - 329:9
**pause** [4] - 214:23; 228:22; 375:17; 387:21
**paying** [5] - 272:18; 307:23; 372:9; 383:25; 390:9
**payment** [11] - 266:24; 270:1; 271:12, 24; 276:6; 280:12; 308:8; 389:8; 390:17
**payments** [1] - 280:17
**pays** [1] - 372:7
**pen** [1] - 324:3
**Pennsylvania** [1] - 258:20
**per** [17] - 222:2; 258:5, 8; 272:19; 315:9, 18; 331:3, 14; 332:2; 380:15-17; 383:25; 384:2; 406:18, 24
**Perez** [14] - 256:24; 257:7; 267:14; 269:21; 289:8, 15; 290:10; 297:10; 299:6; 309:8; 349:24; 365:14; 367:15
**PERE***_5]** - 257:1, 9; 307:4; 418:3, 7
**Perez's** [1] - 355:23
**perfectly** [1] - 282:6
**perforation** [1] - 278:1
**performance** [1] - 307:19
**perhaps** [1] - 305:4
**period** [6] - 224:15; 229:22; 252:14; 266:21; 303:7; 311:2
**Perry** [1] - 213:21
**personnel** [1] - 260:1
**persuade** [1] - 215:5
**pertain** [2] - 319:1; 413:22
**Peter** [3] - 290:3; 413:6
**Ph.D** [2] - 258:15, 17
**Pharma** [2] - 260:21
**pharmaceutical** [2] - 310:3; 397:9
**Pharmaceuticals** [2] - 319:19, 25
**pharmacies** [1] - 310:16
**Pharmacy** [1] - 396:6
**pharmacy** [7] - 221:15; 259:25; 260:4; 261:20; 271:8; 293:21; 294:2
**Pharmalogical** [35] - 223:5, 21; 224:10; 226:18; 228:18; 229:21; 230:4, 20-21; 232:21; 237:25; 240:23, 25; 241:3; 252:13; 319:12; 320:5; 325:24; 334:10; 337:16; 396:4; 402:7, 10, 18, 22; 403:14; 404:4, 6, 10, 14; 405:1, 20
**Philippines** [3] - 220:5, 16
**phone** [9] - 216:3; 221:4; 230:5, 12; 234:25; 235:17, 19; 241:6, 20
**photos** [1] - 256:9
**phrase** [1] - 403:21
**physical** [1] - 377:20
**Physician** [1] - 332:19
**physician** [6] - 377:20; 382:12; 390:10; 393:17; 394:23; 408:24
**physicians** [4] - 377:12, 15; 380:10
**pick** [1] - 266:2
**picture** [3] - 263:19; 323:15; 324:19
**pictured** [1] - 224:8
**pictures** [4] - 224:2; 263:3, 11, 16
**place** [18] - 224:10; 227:11; 228:10; 232:15; 234:8; 247:16; 251:17; 263:1; 266:17; 269:21; 272:22; 310:15; 345:25; 391:4, 13; 402:13; 403:9; 411:1
**placed** [12] - 224:12, 15; 245:23; 250:8; 251:16; 252:1; 313:7; 340:22; 386:16; 391:15; 415:3
**places** [3] - 282:10; 294:20; 407:23
**placing** [13] - 264:19; 271:14; 273:9; 274:1; 275:25; 379:20; 385:1; 386:7; 387:3; 388:5; 389:4, 24
**plant** [1] - 329:25
**play** [1] - 378:1
**Plaza** [2] - 213:14, 21
**plus** [1] - 227:11
**PM** [1] - 306:3
**pm** [3] - 307:2; 416:5; 417:22
**point** [14] - 255:4, 6; 265:22; 266:12; 268:11; 275:6; 286:18; 288:8; 330:12; 342:18; 400:11; 402:5; 403:5; 404:2
**pointing** [2] - 331:17; 332:15
**points** [1] - 402:4
**policy** [4] - 214:5, 7; 215:3; 217:15
**POM** [2] - 332:16; 333:1
**popular** [1] - 326:25
**portion** [1] - 392:9
**position** [11] - 218:25; 220:20; 297:11; 310:4, 7; 321:5; 337:12, 19; 339:1; 364:13; 376:25
**positions** [1] - 377:18

**positive** [1] - 228:1
**possible** [2] - 378:20; 416:7
**possibly** [1] - 278:13
**potency** [1] - 312:15
**potential** [1] - 216:16
**potentially** [1] - 313:5
**practice** [25] - 231:1, 11; 232:9; 233:9; 252:20; 257:21; 259:6, 18; 278:19; 280:8; 281:11; 283:2; 284:5; 295:4, 9, 12; 341:12; 345:11, 13; 352:7; 375:12; 379:9; 393:9, 15
**practices** [1] - 259:9
**practitioner** [2] - 259:8, 25
**practitioners** [1] - 377:19
**preparation** [1] - 364:19
**prescribed** [2] - 310:22; 320:19
**prescription** [19] - 221:5, 7, 9, 19; 222:2; 260:3, 9, 24; 278:14; 308:8; 315:5; 321:9; 324:22; 329:18; 378:1, 5, 7, 20; 383:14
**prescription-only** [1] - 321:9
**presence** [3] - 217:18; 307:1; 369:16
**present** [2] - 254:20; 382:4
**pressure** [1] - 278:12
**presumably** [2] - 233:25; 235:21
**Pretrial** [1] - 276:13
**pretrial** [7] - 277:3; 298:25; 299:4, 11; 300:19; 301:1; 302:20
**pretty** [1] - 302:16
**prevent** [2] - 275:4; 417:16
**previous** [2] - 217:7; 365:14
**previously** [9] - 297:15; 307:5; 339:23; 358:1; 397:23; 400:20; 410:1; 412:7; 414:4
**price** [11] - 221:24; 227:11; 288:25; 329:14, 18, 21; 330:1; 380:16; 382:1; 383:25; 411:10
**prices** [11] - 222:10, 12, 25; 234:17, 23; 263:5; 281:2; 380:11; 381:5; 409:13
**pricing** [9] - 222:20; 223:25; 232:14; 329:4; 379:7; 380:8; 381:8; 382:21; 413:23
**primarily** [2] - 311:24; 340:14
**primary** [1] - 342:9
**print** [1] - 312:3
**printed** [2] - 331:18, 23
**printout** [1] - 286:25
**private** [2] - 259:6
**privileged** [1] - 415:10
**problem** [18] - 216:10, 14, 16, 23; 238:2, 6; 239:18; 253:2; 266:14; 268:20; 307:21; 359:*** 371:18; 374:24; 411:23
**problems** [9] - 219:10; 244:15; 252:22; 253:23; 254:6, 8, 14; 330:17; 399:21
**procedure** [2] - 261:9; 271:5
**proceed** [10] - 217:23; 218:7; 257:11; 307:9; 309:18; 329:10; 338:13; 375:21; 376:13; 382:14
**proceeding** [1] - 375:17
**proceedings** [4] - 214:23; 329:9; 387:21; 417:24
**Proceedings** [2] - 213:24; 417:22
**process** [2] - 318:10
**processed** [1] - 339:9
**produce** [2] - 328:24; 344:12
**produced** [2] - 213:24; 329:25
**product** [113] - 229:10; 278:23, 25; 279:10; 282:19; 294:21; 311:14, 16, 24; 312:6, 10, 12, 14; 313:2, 6-7, 17; 314:23; 315:4, 7; 316:10, 18; 317:11, 14, 24; 318:6, 13, 17-18, 23; 319:5; 320:14, 16; 322:7; 324:12, 25; 325:11, 15; 328:8, 25; 330:3; 332:7, 13; 333:11, 22, 24-25; 334:3, 9, 12, 15, 18, 21, 23; 337:7, 17; 339:22, 24; 340:17; 344:9-11, 13; 346:10, 14; 347:3, 7, 14, 17, 19; 348:4, 15, 18, 22; 350:11, 21, 23; 351:3; 352:8; 365:5; 367:12, 21; 368:14; 369:10, 21-22; 381:8; 382:14, 20; 384:6; 388:10, 22; 389:8; 390:17; 391:6; 392:3, 20; 393:19; 397:21; 405:14; 406:22; 414:14, 18
**Products** [2] - 283:22; 292:22
**products** [56] - 263:3, 16; 264:10; 268:25; 270:2; 279:4, 8; 283:21, 24; 293:4; 301:25; 302:3, 6; 307:24; 308:3, 11; 310:13, 16-18; 317:4; 330:15; 334:7, 11, 17; 335:25; 336:3; 340:9, 12-13; 343:15, 17; 346:5; 350:1, 4, 6, 10; 351:15; 367:10, 17; 369:6-8; 381:20; 390:10; 393:13; 400:10; 402:15; 410:7; 412:1, 5
**profession** [1] - 284:5
**profitability** [1] - 281:11
**program** [3] - 300:20; 381:24;
**programs** [1] - 317:10
**progression** [1] - 277:17
**prominently** [2] - 248:1; 313:13
**pronunciation** [1] - 327:21
**proof** [1] - 266:23
**proper** [1] - 278:22
**properly** [2] - 231:17; 232:3
**property** [4] - 350:20; 351:19; 355:22, 25
**prosecutor** [6] - 238:22; 239:8; 241:2; 253:9; 280:20; 409:9
**prosecutors** [1] - 417:10
**prostate** [1] - 311:1
**protection** [2] - 310:5, 12
**provide** [8] - 266:23; 377:21; 381:25; 382:2, 20; 400:9; 408:19
**provided** [14] - 291:18, 21, 24; 292:1; 295:24; 297:24; 301:11; 367:22; 379:8; 382:15; 397:5, 16; 400:1; 401:3
**providing** [2] - 379:7; 410:6
**public** [2] - 415:3; 416:13
**publish** [4] - 249:23; 256:2, 5; 409:7
**purchase** [29] - 227:8, 13; 251:7; 264:11; 280:24; 281:13; 290:14, 22, 25; 294:12; 303:11; 308:13, 21; 361:16; 363:2;

364:1, 16; 367:13, 19; 368:5, 8; 382:14; 384:6; 387:7, 10; 406:1, 18
**purchased** [57] - 230:22; 250:22; 251:6; 260:11; 276:6, 21; 277:8; 285:18; 292:10, 13; 298:10; 301:19; 302:3; 303:13; 342:15, 19, 22-24; 343:1, 16; 357:14; 358:15, 18-19, 22; 359:4, 9, 17, 22, 24-25; 360:5-7, 24; 362:5, 16, 22; 363:6, 8, 15; 364:4, 12, 14, 22; 365:15; 367:24; 370:2; 387:16; 392:20; 404:5; 406:5, 9, 16; 407:12
**purchases** [8] - 281:17; 289:20; 360:14; 385:13; 402:7, 22; 405:2; 406:25
**purchasing** [33] - 226:21, 24; 227:9; 230:19; 232:25; 262:7; 268:13; 277:7; 278:15; 282:3; 283:1, 6, 17-18, 21; 284:1; 286:5, 19; 292:3; 293:16; 299:22; 303:13; 342:10; 357:11; 402:10, 18; 403:14; 404:10, 14-15; 407:9, 20
**pure** [1] - 393:18
**purporting** [1] - 297:8
**purpose** [2] - 339:19; 349:23
**put** [25] - 216:18; 231:16; 244:7, 12, 22; 245:4; 250:18; 285:6; 290:10; 297:16; 299:3; 315:12; 317:9; 331:2; 333:12; 348:21; 356:15; 359:1; 360:11; 392:22; 397:3; 401:12; 406:17; 416:23
**putting** [6] - 226:3; 303:17; 348:23; 355:19; 390:24; 406:17

**Q**

**QSP** [61] - 283:19; 284:1; 289:5, 20, 25; 290:2, 4, 14, 25; 291:3, 9, 18; 292:10, 20; 293:20, 24; 294:1; 298:10; 301:20; 302:4; 303:3, 14; 342:11, 13, 15, 20, 24; 343:5; 357:11, 15, 19, 23, 25; 358:4, 15; 359:3, 23; 361:14; 362:5, 12-13; 363:2, 9, 11; 364:1, 13, 16; 365:1, 7; 367:6, 13, 22, 24; 368:2, 11, 14; 371:2
**quality** [2] - 328:8; 330:4
**Quality** [2] - 283:22; 292:21
**quantities** [6] - 225:14; 227:4; 249:8; 250:22
**quantity** [9] - 244:2; 249:13; 252:18; 359:17; 361:19; 363:4, 5; 364:4; 406:15
**quan*** **-** **wise** [1] - 406:15
**Quantum** [7] - 222:16, 21; 238:8, 23; 239:9, 17; 320:2
**Queen** [1] - 290:4
**questioned** [6] - 253:15; 266:16; 281:21; 282:18; 391:24; 409:10
**questions** [15] - 235:23; 237:7; 241:22; 255:17; 283:21, 25; 302:13; 326:9; 335:4; 336:2, 25; 342:7; 356:5; 366:20; 415:16
**quicker** [1] - 365:11
**quickly** [2] - 236:12; 304:17
**quite** [2] - 229:8; 230:13
**quote** [2] - 237:8

**R**

**raise** [1] - 375:24
**raised** [2] - 371:18; 399:24
**range** [1] - 316:8
**rapidly** [2] - 415:8, 11
**rather** [1] - 284:6
**rating** [1] - 328:24
**Ravenna** [2] - 219:5, 15
**reach** [2] - 255:7, 12
**reached** [1] - 271:7
**reaction** [3] - 277:24; 278:10;
**reactions** [4] - 277:25; 278:6; 313:6
**reading** [5] - 236:18, 25; 296:14; 404:9; 405:9
**reads** [1] - 249:23
**ready** [2] - 217:5, 21
**real** [2] - 214:11; 367:20
**reality** [1] - 283:16
**realize** [1] - 300:14
**reason** [16] - 230:25; 278:18; 279:7; 281:5; 288:23; 289:1; 291:15; 297:24; 329:16; 337:15; 353:21; 362:2; 393:15; 397:12; 404:6; 405:20
**reasons** [3] - 214:9; 253:17; 331:15
**reassurance** [1] - 268:23
**rebate** [1] - 317:10
**recalled** [3] - 330:12, 15; 368:7
**receipt** [6] - 350:19; 351:18; 352:9; 355:22; 356:1
**receives** [1] - 271:20
**receiving** [13] - 269:7; 273:5; 275:7; 279:1, 6-7; 286:12; 287:2; 288:25; 383:15; 391:23; 393:13
**recess** [15] - 266:2, 7, 9, 13; 304:3, 11; 305:16; 371:14, 5:6, 13;
416:25; 417:8, 20
**Recess** [1] - 266:12
**recesses** [1] - 215:16
**recognition** [1] - 276:24
**recognize** [49] - 225:9; 264:21; 269:23; 270:25; 271:23; 276:1, 21; 289:15, 17; 296:10, 16, 18; 299:7; 314:1, 19; 316:24; 331:8, 24; 332:1; 340:24; 344:21; 350:17; 353:19, 23; 379:1; 385:2; 389:25; 390:14; 396:1, 3; 397:24; 398:1; 400:23; 401:2; 408:2, 4; 410:2, 5; 412:15, 21; 413:1, 4, 15, 18; 414:7, 9
**recollection** [3] - 248:23; 249:1; 367:23
**reconcile** [1] - 367:5
**record** [12] - 216:18; 241:10; 256:10; 306:20; 338:11; 341:9; 345:8; 352:4; 353:14; 376:7; 394:10; 417:24
**recorded** [1] - 213:24
**RECROSS** [2] - 337:4; 418:13
**RECROSS-EXAMINATION** [2] - 337:4; 418:13
**red** [5] - 230:10; 231:18; 247:9; 316:16; 399:24
**redact** [1] -

416:22
**redacted** [1] - 416:15
**redaction** [1] - 416:17
**REDIRECT** [8] - 302:18; 307:12; 335:2; 366:18; 418:6, 12, 20
**reduced** [1] - 382:1
**refer** [6] - 240:12; 242:13; 284:5, 17, 19, 24
**reference** [4] - 242:18; 263:6, 9; 276:19
**referenced** [1] - 392:10
**referencing** [1] - 392:14
**referred** [2] - 273:21; 335:20
**referring** [4] - 359:11; 364:7; 366:25; 401:17
**reflect** [2] - 388:15; 390:18
**reflected** [5] - 314:23; 315:18, 21; 323:6, 23
**reflects** [1] - 287:16
**refrigerated** [2] - 231:17; 254:19
**refrigeration** [1] - 232:2
**refrigerator** [2] - 244:8; 245:25
**refused** [1] - 234:8
**regard** [2] - 261:9; 381:19
**regarding** [3] - 379:6; 380:4, 7
**regardless** [2] - 284:9; 308:12
**regards** [4] - 280:15; 334:6; 356:14; 358:8
**Regents** [1] - 219:25
**registered** [5] - 259:23; 396:4; 403:7, 9
**regular** [6] - 273:25; 343:20; 345:11, 13; 352:4, 7
**regularly** [4] - 314:6; 341:10, 12; 345:8
**regulation** [1] - 405:22
**Rehman** [1] - 218:19
**reimbursement** [2] - 227:10; 298:8
**relate** [1] - 343:11
**related** [4] - 219:8, 11; 310:14; 389:16
**relationship** [3] - 407:5; 408:25; 409:3
**release** [2] - 296:13, 16
**rely** [1] - 387:7
**remember** [36] - 215:5; 224:17, 20-21; 230:1; 236:3; 238:11, 14; 239:21; 240:1; 241:8; 242:9, 12, 22, 25; 248:22; 249:4, 10; 251:18, 21, 23; 252:8; 253:4; 254:6, 8, 14; 263:18; 281:22-24; 296:4; 335:6; 411:25; 412:3; 414:3
**remembered** [1] - 248:3
**Remicade** [2] - 380:16; 381:7
**remind** [1] - 375:9
**reminder** [1] - 305:4
**removed** [1] - 265:8
**renew** [1] - 345:18
**rene**[illegible] [1] - 397:16
**renewed** [1] - 395:15
**rep** [6] - 383:16, 18-19; 407:1, 3, 6
**repay** [2] - 277:5; 307:15
**repeat** [2] - 293:12; 297:23
**rephrase** [1] - 297:24
**replace** [2] - 267:5
**report** [2] - 345:12; 352:8
**reported** [1] - 399:22
**Reporter** [1] - 213:21
**REPORTER** [1] - 417:23
**reports** [1] - 346:3
**represent** [1] - 285:21
**representative** [1] - 383:22
**represented** [1] - 241:6
**representing** [1] - 300:9
**request** [3] - 395:17; 397:15; 414:13
**requested** [1] - 413:24
**require** [1] - 333:10
**required** [6] - 270:1; 313:16; 333:12, 14; 335:22; 385:5
**requirement** [1] - 298:14
**requires** [2] - 313:1; 315:4
**research** [3] - 261:25; 415:22; 416:1
214:14; 233:2; 308:16; 309:1, 5; 312:17
**Resnick** [1] - 309:4
**resnik** [1] - 373:18
**Resnik** [4] - 279:18; 326:17; 342:4; 374:14
**RESNIK** [72] - 213:19; 262:12, 16, 18; 264:15; 267:11; 269:13; 275:12; 276:10; 279:13, 15; 289:21, 25; 290:2, 4, 18; 292:15, 21, 25; 296:7, 21; 297:3, 6; 299:2, 9; 302:13; 314:12; 323:1, 4, 12, 18; 326:11, 14; 327:12, 14; 329:6, 11; 334:23; 337:1, 5, 23; 341:21; 342:2; 343:9; 345:18; 349:12, 16; 350:7; 352:14, 17, 20; 353:25; 354:5, 8, 21; 355:1, 4; 356:7, 12; 365:9; 366:14; 371:20; 373:19; 374:15, 19; 418:5, 10-11, 13, 16, 18
**resolution** [1] - 298:21
**respect** [9] - 314:1, 16; 315:17, 24; 324:9; 325:10, 19; 367:6; 409:15
**respective** [1] - 326:6
**respond** [1] - 380:22
**[illegible]ded** [2] -
329:12; 379:12
**responding** [1] - 234:4
**response** [1] - 381:2
**responsibilities** [9] - 220:9, 19-20; 259:16; 310:10; 314:7; 339:4; 377:5
**responsibility** [4] - 276:17, 20; 299:24; 300:11
**responsible** [1] - 337:13
**rest** [2] - 216:8; 365:11
**restate** [1] - 386:21
**rested** [2] - 217:21
**result** [5] - 232:8; 278:13; 279:1; 283:5; 375:12
**results** [2] - 278:11; 369:5
**retention** [1] - 313:12
**retired** [1] - 266:10
**retracting** [1] - 299:25
**retrospect** [2] - 300:7, 9
**return** [2] - 301:11; 349:17
**returning** [1] - 220:18
**review** [2] - 339:6, 8
**reviewed** [4] - 264:2; 280:20; 367:7, 11
**reviewing** [1] - 398:11
**reviews** [1] - 289:14
**right-hand** [2] - 226:2; 332:6
**rights** [1] - 291:6
**ring** [1] - 243:1

**rise** [1] - 375:18
**risk** [6] - 231:3; 277:24; 278:1; 394:1
**risks** [8] - 231:4, 11; 279:3; 312:11; 316:12; 322:8; 393:20; 394:3
**Rituxama** [2] - 263:17, 22
**Rituxan** [40] - 228:4, 25; 229:1; 244:25; 245:1; 261:2; 263:19, 21-22; 275:19; 278:2; 284:20; 366:6; 380:17; 381:6; 383:6, 10; 386:12, 17, 23; 387:1, 4; 391:9, 11, 15-16, 20, 23, 25; 408:21, 25; 409:15, 19, 23; 411:7; 413:25; 414:2
**RITUXAN** [1] - 383:6
**Rituximab** [8] - 229:1; 284:24; 366:7, 11; 408:20; 409:1, 4
**Rituxmab** [1] - 366:5
**Riverside** [1] - 219:21
**RN** [1] - 231:18
**Roache** [1] - 382:5
**ROACHE** [1] - 382:6
**role** [1] - 378:1
**room** [2] - 304:9; 372:15
**ROSENMAN** [1] - 213:17
**ROSENSAFT** [56] - 213:19; 225:4; 231:7, 14; 233:14; 235:5; 239:4, 7; 240:11, 18-19; 241:14; 242:8; 249:22; 250:2, 5; 255:17, 22; 256:1; 304:16, 19, 23; 305:1, 3, 7, 13; 379:17; 384:15; 386:1, 18; 388:2; 389:21; 393:23; 394:21; 395:21; 396:10; 397:2; 399:15; 401:5, 11; 403:21, 23; 410:9, 25; 412:10; 413:3, 12; 414:20; 416:21, 24; 417:9, 12, 17; 418:3, 23
**row** [1] - 304:24
**RS** [1] - 324:12
**run** [1] - 377:6
**running** [1] - 353:15
**RX** [8] - 311:25; 315:3, 21; 321:9; 332:13, 20, 25; 335:22

**S**

**safe** [3] - 231:2, 19; 254:18
**safety** [1] - 325:10
**SAIC** [1] - 344:16
**sale** [2] - 297:21; 298:1
**sales** [3] - 327:2; 383:18; 407:6
**salesperson** [5] - 223:4; 230:2; 241:6, 20
**Salt** [1] - 259:15
**sample** [2] - 398:25; 399:9
**Sanofi** [39] - 310:1-3, 18; 311:2, 316:4; 318:12, 22; 320:4, 14, 22; *** 5; 325:10, 14, 16, 23; 326:2, 5, 23, 25; 327:5; 328:7, 11; 329:2, 13, 24; 330:4; 334:7, 15; 336:8, 12, 15, 18, 21; 337:7
**Sanofi's** [2] - 337:11
**Sanofi-Aventis** [1] - 316:7
**satellite** [4] - 259:9, 13
**satisfactory** [1] - 328:24
**save** [2] - 308:13
**saw** [9] - 229:6; 236:21; 247:12; 250:25; 252:1; 261:15; 262:24; 318:2; 371:7
**SC** [1] - 364:3
**scenario** [1] - 334:19
**schedule** [1] - 374:7
**scheme** [1] - 252:17
**School** [1] - 219:21
**school** [2] - 258:11; 279:23
**scissors** [1] - 348:1
**scoop** [1] - 372:6
**SCOTT** [1] - 213:19
**Scott** [3] - 279:18; 326:17; 342:4
**screen** [21] - 270:25; 271:14; 272:22; 273:9; 290:10; 299:3; 302:21; 331:2; 359:1; 379:20; 386:7; 388:5; 389:24; 390:24; 397:3; 401:12; 409:8; 411:1
**Script** [2] - 221:21; 232:18
**Scully** [44] - 253:10; 326:18; 379:5, 12; 380:21; 381:2, 11, 16, 19; 382:10; 383:1, 7, 9, 12; 384:3, 6, 10; 386:16, 22; 387:3, 12; 388:24; 390:10; 391:8, 21-22; 394:11; 395:8; 397:5; 399:9; 401:3, 22; 405:4, 6, 11; 406:1, 6, 16, 25; 407:10; 411:25; 412:4; 413:23, 25
**scully** [1] - 279:19
**SCULLY** [1] - 213:7
**Scully's** [1] - 396:4
**seat** [1] - 217:21
**seated** [3] - 268:7; 307:8; 375:20
**second** [25] - 236:11, 17; 276:16; 313:9, 12; 318:5; 331:7; 349:23; 351:16; 353:5, 10; 354:18, 22, 24; 355:5; 356:8; 379:21; 382:10; 389:4; 400:25; 403:12; 404:1
**secondary** [1] - 219:5
**section** [1] - 344:16
[1] -
310:14
**seeing** [3] - 294:9, 22; 364:15
**seem** [3] - 249:12; 286:24; 323:2
**seize** [1] - 340:15
**seized** [29] - 343:4, 17; 344:6; 345:24; 346:8; 347:4, 14; 348:15; 349:2; 355:25; 356:2, 24; 357:5, 19; 358:23; 361:2, 7, 9, 22-23, 25; 363:17; 365:21; 366:22; 367:20; 369:2; 370:1
**seizure** [4] - 343:16; 345:25; 346:3
**selection** [5] - 215:15; 216:2, 12; 266:17; 374:1
**sell** [7] - 261:12; 263:3; 310:16; 334:14, 16; 398:8; 400:10
**selling** [9] - 253:13; 263:4; 264:9; 294:4; 320:6; 325:24; 328:11; 381:20; 387:13
**sells** [6] - 328:9; 329:2, 13, 16, 24
**send** [2] - 230:10; 368:18
**sender** [1] - 412:19
**senior** [3] - 221:1; 233:19; 310:5
**sensitive** [2] - 217:17; 316:10
**sent** [14] - 339:5; 349:10;

365:25; 366:10, 12; 368:17, 20-21; 369:2, 17, 21; 371:1; 379:10; 413:19
**sentences** [1] - 242:14
**separate** [3] - 285:22; 323:2; 353:8
**separately** [1] - 355:3
**September** [2] - 286:3, 15
**sequencing** [1] - 318:12
**serial** [1] - 346:25
**serialization** [1] - 317:9
**series** [1] - 269:17
**service** [5] - 230:15; 273:25; 301:16; 382:22; 415:1
**services** [1] - 377:21
**set** [8] - 217:4; 251:8; 331:18; 380:9, 11, 20; 382:3; 385:5
**setup** [3] - 384:17, 20, 22
**seven** [17] - 217:15; 251:13; 266:5; 346:10; 359:13, 25; 360:2, 6, 18-19; 362:20; 366:23; 367:3, 18, 21; 368:9, 13
**several** [3] - 312:4; 379:7; 411:21
**severe** [4] - 277:25; 278:6, 10
**share** [1] - 297:10
**sharp** [1] - 304:4
**shelf** [3] - 244:7; 245:4, 23
**shifting** [1] - 332:7
**shipment** [3] - 271:7, 10, 21
**shipped** [6] - 229:7; 252:19; 273:24; 274:10; 287:17; 318:13
**shipping** [1] - 337:10
**shippings** [1] - 245:20
**shock** [1] - 278:8
**Shore** [20] - 376:20; 377:4, 8, 18; 378:2, 4; 382:7; 383:13; 385:11, 21-23; 388:12, 15; 389:10, 18; 390:5; 392:11; 395:1; 416:12
**short** [3] - 220:5; 302:15; 339:2
**shortage** [3] - 221:25; 254:24; 255:1
**shortages** [1] - 254:22
**shortly** [1] - 381:8
**shots** [1] - 220:12
**show** [15] - 241:10; 285:1; 295:25; 296:3; 354:19; 358:1; 359:3, 23; 361:14; 362:13; 363:10; 367:18; 378:24; 395:15
**showed** [7] - 248:8; 288:9; 298:24; 365:2; 367:23; 406:8; 409:9
**showing** [8] - 289:8; 292:18; 303:16; 350:21; 362:7; 367:13; 368:5; 390:13
**shows**
228:18; 348:24; 351:19; 358:19; 359:*** 63:19; 366:23
**side** [5] - 220:25; 250:19; 296:4; 316:6
**side-by-side** [1] - 250:19
**sidebar** [2] - 349:13
**sides** [2] - 324:7; 364:15
**Sierra** [42] - 257:20, 22; 259:17; 269:18; 270:2; 274:10; 280:8, 16; 299:6; 339:12, 17, 21; 340:8; 342:9, 15; 344:6; 347:10; 349:17, 25; 350:21; 353:12, 17; 356:2, 19; 357:13, 19; 358:4, 15; 359:4, 9, 23; 362:5; 363:2, 17; 364:12; 365:13, 18, 22; 367:8, 14; 368:4
**signature** [11] - 265:3, 5, 10, 17; 286:9; 341:4; 344:15, 17, 25; 351:24; 362:24
**signed** [7] - 288:5; 299:23; 300:2, 5, 10, 14; 384:7
**significantly** [2] - 372:9; 406:21
**similar** [7] - 216:11; 266:15; 293:21; 350:18; 353:11, 17, 22
**similarly** [2] - 284:20; 361:6
**simple** [1] - 251:10
**simply** [1] -
**single** [3] - 302:11; 324:13
**sit** [5] - 215:6; 329:8; 343:8; 362:8, 23
**site** [1] - 223:24
**sites** [2] - 245:12, 14
**sitting** [5] - 248:5, 23; 251:17; 375:6; 403:8
**situation** [2] - 267:3; 372:7
**six** [13] - 224:19; 244:20; 245:19; 250:23; 252:15; 286:5; 290:22; 293:6; 359:18; 363:15; 369:6; 373:14; 378:7
**size** [7] - 286:6, 20, 23-24; 287:21; 363:3; 367:3
**sizes** [2] - 288:9; 293:8
**skip** [1] - 293:13
**skipping** [1] - 288:15
**SKU** [1] - 317:11
**sleeping** [7] - 304:20; 305:2; 306:9, 12, 22
**slight** [1] - 407:11
**slow** [3] - 267:16; 325:7; 380:5
**slowly** [3] - 338:11; 376:7; 380:5
**small** [4] - 382:15, 19; 392:9; 400:7
**smarter** [1] - 223:17
**smile** [1] - 372:12
**so..** [2] - 254:4;
**sold** [12] - 270:20; 278:21; 282:11, 20; 294:15; 328:3; 330:3, 5; 333:11; 336:8; 337:7
**sole** [1] - 259:7
**Solutions** [3] - 222:16; 319:21; 320:2
**someone** [2] - 229:20; 235:14
**sometimes** [10] - 221:24; 222:9; 237:18, 22; 282:11; 295:1; 306:7, 9; 330:17; 412:1
**somewhere** [2] - 228:12; 327:2
**soon** [5] - 224:25; 302:16; 374:8; 380:19; 416:7
**sorry** [23] - 235:3; 237:20; 239:3; 250:7; 296:4; 330:10; 333:20; 344:20; 347:1; 357:12; 359:13, 23; 361:10; 363:7; 365:10; 372:16; 373:12, 15; 380:6; 381:4
**sort** [4] - 294:22; 331:24; 358:5; 364:20
**sorts** [1] - 255:12
**sound** [3] - 235:15; 260:17; 285:25
**sounds** [1] - 235:13
**source** [6] - 281:7, 10; 283:18; 319:2; 325:15; 378:20
**South** [20] - 376:20; 377:4, 8, 18; 378:2, 4; 382:7; 383:12;

385:11, 21-23; 388:12, 15; 389:10, 18; 390:5; 392:11; 394:25; 416:12
**spam** [2] - 411:22
**spans** [1] - 224:21
**SPATT** [1] - 213:10
**Spatt** [3] - 215:16; 374:5; 375:4
**speaking** [10] - 220:7; 236:22; 237:21; 264:3; 296:14; 297:17; 317:22; 374:5; 411:25; 412:4
**speaks** [3] - 267:22; 300:24; 374:23
**Special** [19] - 238:22; 239:8; 242:19; 338:4, 18; 342:3; 346:16; 347:24; 349:20; 351:16; 352:21; 353:21; 354:2; 355:19; 356:13; 359:2; 364:10; 365:12; 366:20
**special** [1] - 339:14
**specialist** [1] - 338:24
**specialize** [1] - 218:23
**specialty** [1] - 377:13
**Specialty** [2] - 283:22; 292:22
**specific** [3] - 248:5; 254:5; 367:20
**specifically** [2] - 362:11; 367:11
**speculation** [1] - 350:8
**spell** [9] - 257:8; 272:10; 292:14; 327:13; 338:11; 366:8; 376:6; 378:14; 383:20
**spelled** [2] - 340:7, 17
**spoken** [3] - 279:21; 326:21; 387:3
**stack** [1] - 285:6
**staff** [6] - 259:22; 281:17; 283:5, 8; 377:11, 17
**Stamp** [1] - 358:11
**stand** [6] - 292:20; 304:14; 309:12; 328:8; 330:4; 338:4
**stands** [3] - 292:21; 312:1; 332:18
**start** [4] - 304:5; 305:11; 374:5, 16
**started** [4] - 289:5; 292:3; 405:7; 406:17
**starting** [1] - 374:9
**starts** [1] - 322:17
**State** [7] - 219:25; 220:2; 395:15; 396:5; 398:2, 5, 9
**state** [13] - 283:1; 294:11; 296:12; 297:7; 317:6, 14; 338:10; 364:13, 20; 375:1; 376:6
**STATES** [3] - 213:1, 3, 11
**States** [44] - 213:6, 13, 16; 223:2, 25; 228:25; 229:13; 230:15; 234:10; 258:19; 280:3, 6; 282:11; 291:7, 13; 292:5; 297:4, 21; 298:2; 299:5; 311:*** 314:5; 319:4, 10; 325:17, 21, 25; 328:3; 329:3, 14, 17, 22; 330:1, 13; 333:11, 13; 336:8; 340:19; 404:8; 405:22
**stating** [1] - 335:18
**statute** [1] - 405:21
**statutes** [1] - 415:2
**stay** [5] - 216:8; 222:10; 260:15; 292:25; 293:1
**stayed** [1] - 259:5
**staying** [1] - 235:4
**Steakhouse** [1] - 413:6
**stenography** [1] - 213:24
**step** [3] - 256:21; 309:8; 338:1
**steps** [4] - 320:8, 11; 326:6
**stick** [1] - 415:11
**still** [13] - 229:1, 17; 230:22; 232:14; 236:24; 240:13; 243:15; 277:8; 330:22; 369:7; 381:5; 417:10, 12
**stop** [2] - 229:15; 292:8
**stopped** [6] - 229:17; 241:19; 248:9; 254:3; 289:4; 392:3
**storage** [7] - 312:6; 316:3, 8; 321:11; 337:10,
**stored** [1] - 337:16
**story** [2] - 373:10; 416:9
**straight** [1] - 247:14
**strength** [10] - 315:10, 17; 344:12; 346:11, 13-15; 351:20; 364:6; 369:15
**strengthen** [1] - 227:23
**strengths** [1] - 365:4
**strictly** [1] - 342:19
**strike** [6] - 233:3; 253:21; 255:15; 326:2; 330:10; 348:2
**strong** [1] - 218:17
**structures** [1] - 329:4
**studies** [1] - 220:4
**subject** [4] - 281:21; 319:7; 404:5, 7
**submitted** [1] - 298:8
**subpotent** [2] - 316:13; 322:9
**subsequently** [5] - 229:20; 298:17; 341:14; 348:25; 368:4
**subsidiaries** [1] - 403:7
**subsidiary** [5] - 223:2; 234:9; 243:4; 402:23; 404:6
**substance** [3] - 371:9; 398:3, 5
**substances** [1] - 398:8
**substandard** [1] - 328:12
**suffer** [2] - 313:5; 318:19
**Sugar** [2] -
**suggesting** [1] - 331:24
**sum** [1] - 276:5
**supervise** [1] - 259:21
**supplier** [3] - 221:22; 260:10; 357:15
**suppliers** [5] - 221:19; 232:18; 260:8; 281:7; 343:2
**supplies** [2] - 219:3; 221:3
**Supplies** [2] - 260:10, 20
**supply** [1] - 310:13
**Supply** [4] - 221:20; 280:25; 281:2, 6
**support** [1] - 261:1
**supported** [1] - 297:11
**supposed** [2] - 336:22; 372:8
**suppression** [1] - 278:7
**surely** [4] - 296:25; 341:23; 394:9; 410:13
**surgery** [1] - 220:11
**surrender** [3] - 340:8; 350:1, 4
**surrendered** [1] - 392:19
**surrendering** [1] - 340:11
**sustain** [1] - 349:15
**sustained** [8] - 233:3; 253:21; 255:15; 262:13; 275:13; 297:5, 9; 354:13
**switch** [1] - 320:14
**sworn** [4] - 257:3; 338:8; 375:25; 376:4
**sworn/affirmed** [3] - 218:5;

307:6; 309:16
**Syria** [2] - 265:2; 357:10
**system** [2] - 228:6; 318:1

**T**

**T-A-L-L-E-N-T** [1] - 340:7
**Tallent** [14] - 260:5; 261:23; 262:9; 264:3, 8; 268:17; 275:10, 14; 281:5; 295:1; 340:4, 6
**Taranis** [1] - 319:17
**Tarn** [1] - 242:25
**TAXOTERE** [1] - 256:9
**Taxotere** [68] - 228:7; 245:19; 246:1, 3; 247:1, 20; 249:8, 13; 250:11, 15, 23; 251:11, 13-14; 252:1, 6, 25; 256:9; 310:19, 22-23; 311:3, 6, 9, 13, 20; 312:7, 21; 313:4, 8; 314:4, 22; 317:8; 318:2, 21; 319:7, 10, 13; 320:6; 327:5-7, 16, 22-25; 328:3, 12, 16, 25; 329:2, 13, 16; 330:11; 333:6, 19-21; 335:10
**teaching** [1] - 220:23
**tech** [1] - 293:21
**technically** [1] - 375:2
**technician** [4] - 260:4, 17; 261:20; 294:2
**technologies** [1] - 310:15
**technologists** [1] - 377:21
**techs** [1] - 259:25
**telephone** [3] - 214:3; 216:4; 228:14
**television** [1] - 373:25
**temerity** [1] - 372:3
**temperature** [6] - 254:9; 312:8; 316:8; 322:5; 336:13; 337:20
**temperatures** [1] - 312:6
**ten** [3] - 301:16; 375:3, 5
**tenth** [1] - 407:12
**term** [3] - 312:19; 318:15; 335:24
**terms** [15] - 225:21; 227:15; 263:11; 270:9; 271:18; 272:18; 274:6; 276:7; 277:2; 303:16; 307:23; 312:7; 382:17; 392:5; 404:4
**terrible** [1] - 277:14
**tested** [4] - 220:1; 348:25; 366:1; 371:1
**testified** [29] - 218:5; 243:3; 254:17; 257:3; 280:11, 17, 24; 284:12; 285:9; 287:8; 292:19; 309:16; 327:5; 330:11, 25; 331:5, 13; 333:19, 23; 334:6; 338:8; 356:15, 18; 357:10, 17; 364:10, 19; 376:4; 393:24
**testify**
343:4, 14
**testifying** [5] - 307:6; 332:24; 333:23, 25; 362:3
**testing** [10] - 349:10; 366:12; 368:17; 369:3, 5-6, 18, 25; 393:18
**tests** [2] - 368:24
**Texas** [1] - 259:3
**Thaler** [3] - 401:19; 402:4; 405:25
**THE** [343] - 213:10; 214:3, 17, 21; 215:1, 11, 14; 216:1; 217:5, 10, 20; 218:7, 15, 17; 225:1, 3, 5; 226:1, 4, 8, 10; 231:8, 15; 233:3, 11; 235:2; 237:2; 239:2, 6, 25; 240:8, 16; 241:13, 21, 24-25; 242:2, 5-7; 244:1; 248:11-13, 16-17, 20-21; 249:20; 250:4, 7; 253:21, 25; 255:15, 19, 23, 25; 256:3, 6, 14, 16, 19, 21; 257:5, 7-9, 11; 258:6; 260:12, 17; 262:13, 17, 19; 264:14, 17; 265:14, 23; 266:1, 5, 14, 20; 267:3, 12, 17-18, 20-21, 25; 268:1, 3-5, 7; 269:11, 14, 16; 272:10; 273:11; 274:3; 275:13; 276:9, 283:14; 289:24; 290:1, 3, 5, 7, 17; 292:14, 20; 293:3; 294:18; 296:6, 23, 25; 297:2, 5, 9, 14; 299:8, 15; 300:4, 23; 301:23; 302:15; 303:25; 304:3, 13, 15, 18, 22, 25; 305:2, 6, 9, 11, 14; 306:7, 15, 20; 307:8; 308:17; 309:2, 4, 7, 10, 18; 314:11, 13; 322:25; 323:3, 11, 13; 325:6; 326:10; 327:11, 13; 329:5, 7, 10; 330:7; 332:22; 334:24; 337:2, 24; 338:1, 10, 12-13; 340:5; 341:20, 23; 342:17; 343:19, 22, 25; 345:17, 21; 347:13, 17, 21, 23; 348:4, 7, 18-19, 21; 349:4, 9, 14; 350:9, 15, 23, 25; 351:5, 7-8, 10-14; 352:13, 16; 354:3, 7, 9, 11-13, 16, 19, 25; 355:2, 8, 10, 12; 356:6, 9; 358:20; 365:8; 366:15; 371:13, 17, 21-22; 372:2, 6, 11, 15; 373:2, 5, 7, 9, 18, 20, 22; 374:9, 14, 17, 20, 22, 24-25; 375:10, 16, 20, 24; 376:1, 6, 8, 10-12; 377:2; 378:12-15, 18, 18; 380:5; 381:12, 15; 383:17, 20; 384:16, 19, 22, 24; 385:7, 9-11, 18, 21, 23-25; 386:2, 19; 387:20, 22; 388:1, 3; 389:17, 20, 22; 393:5-8, 25; 394:3, 5-7, 9, 19; 395:20, 22; 396:12, 15, 17; 399:14; 401:7, 9; 403:17, 22; 410:11, 13, 23; 412:9, 25; 413:4, 8-11; 414:22; 415:4; 416:6, 20, 22, 25; 417:4, 11, 14, 18
**theft** [1] - 310:14
**themselves** [3] - 229:12; 232:19; 312:13
**therapists** [1] - 377:20
**thereabouts** [2] - 238:12; 303:7
**therefore** [3] - 276:22; 329:24; 354:23
**third** [7] - 238:18; 259:9; 318:9; 390:13; 413:15, 21
**Thomas** [1] - 296:7
**thousand** [1] - 301:13
**thousands** [2] - 295:7
**threatening** [2] - 277:25; 278:6
**three-year** [3] - 219:20, 22; 220:3
**throughout** [1] - 282:11
**Thursday** [3] - 373:22; 374:2, 17

**ticket** [1] - 351:8
**tight** [1] - 329:8
**title** [1] - 338:23
**today** [15] - 214:8; 215:7; 216:15; 217:3; 248:6, 23; 251:18; 334:12; 343:8; 362:23; 364:10, 20; 403:8
**together** [6] - 353:6, 9; 354:23, 25; 355:1; 414:2
**token** [1] - 342:21
**Toledo** [1] - 219:21
**tomorrow** [7] - 267:7; 415:7, 13; 416:1; 417:1, 8, 21
**took** [8] - 245:2; 295:9, 15; 332:25; 345:25; 350:21; 365:18; 399:8
**top** [16] - 225:15; 226:16; 240:22; 243:22; 265:15; 271:19; 292:18; 317:8; 324:23; 331:10; 354:4; 401:16; 404:1; 406:20; 410:16
**total** [4] - 276:5; 360:4, 23; 391:2
**totaled** [1] - 227:2
**towards** [4] - 225:13; 227:8; 290:16; 316:5
**toxic** [1] - 313:11
**toxin** [1] - 402:7
**track** [2] - 241:18; 414:17
**trade** [13] - 270:20; 272:5, 15; 284:12, 15, 20, 22; 287:5, 8-9, 11, 14
**trained** [1] - 280:1
**training** [7] - 219:19; 258:10, 13, 20-21, 23, 25
**transcript** [3] - 213:10, 24; 417:23
**translate** [1] - 268:21
**translation** [1] - 283:12
**translations** [1] - 268:20
**transported** [1] - 232:3
**trash** [1] - 261:13
**traveled** [1] - 220:6
**treat** [5] - 219:7; 257:24; 275:19; 310:23; 320:21
**treated** [2] - 219:8; 392:11
**treating** [1] - 295:7
**treatment** [11] - 259:20; 270:13, 22; 272:6; 277:15; 279:1, 7
**treatments** [2] - 220:23; 259:21
**trial** [4] - 216:22, 24; 374:6, 10
**tribal** [2] - 220:14
**tried** [2] - 255:7; 414:17
**trouble** [10] - 214:11; 255:2; 258:7; 260:12; 267:14, 23-24; 325:6; 373:11
**true** [9] - 238:9; 239:20; 253:11 283:15; 291:3, 16; 387:9; 402:***
**trusted** [1] - 268:23
**truth** [7] - 236:20; 237:3; 238:3; 239:14; 247:3; 297:7
**truthful** [1] - 235:24
**try** [9] - 232:15; 241:25; 255:8, 12; 295:18; 297:25; 382:15; 416:7
**trying** [3] - 236:1; 239:12; 255:5
**Tuesday** [3] - 374:2, 18; 380:24
**tumor** [1] - 227:21
**Turkey** [3] - 318:22; 328:4, 12
**Turkish** [9] - 247:20, 22; 314:22; 316:24; 317:9, 18; 319:5; 336:7
**turn** [9] - 226:6; 244:20; 245:15; 249:19; 250:18; 330:20; 332:5; 397:24; 403:12
**turning** [3] - 225:8; 302:20; 380:21
**Tursi** [1] - 417:25
**two-month** [1] - 266:21
**two-page** [1] - 401:3
**Type** [1] - 402:7
**types** [3] - 220:25; 232:3; 260:24
**typical** [1] - 294:22 10; 315:25; 392:15; 406:17; 411:23
**Typically** [1] - 406:23
**Tysabri** [1] - 380:16

**U**

**U.S** [1] - 298:18
**Um-hmm** [3] - 249:18; 250:13; 251:12
**um-hmm** [3] - 236:2; 240:24; 242:21
**Um-um** [1] - 249:3
**umbrella** [3] - 289:9, 22; 358:3
**unadulterated** [1] - 393:19
**unapproved** [13] - 253:13, 17; 276:24; 277:11; 300:6; 308:14, 21, 24; 316:19; 317:4; 324:17; 325:24; 393:10
**Uncle** [1] - 290:3
**uncle** [1] - 290:7
**under** [11] - 273:20; 277:5; 282:2; 301:16; 308:5; 361:16; 404:17, 25; 405:13; 411:10; 415:2
**underlining** [1] - 411:10
**understood** [4] - 223:8; 255:11; 278:14; 404:9
**undertake** [3] - 326:2, 5
**undertook** [1] - 326:6
**Unfortunately** [1] - 217:14
**unhappy** [1] - 230:18
**unique** [3] - 324:10
**uniquely** [1] - 375:11
**unit** [2] - 228:11; 270:21
**UNITED** [3] - 213:1, 3, 11
**United** [52] - 213:6, 13, 16; 223:2, 25; 229:13; 230:15; 234:9; 258:12, 19; 280:1, 3, 6; 282:11; 291:7, 13; 292:5; 294:15; 297:12, 21; 298:2; 299:5; 311:5, 16-17; 314:5; 319:3, 5, 10; 320:24; 325:17, 21, 25; 327:17, 20; 328:1, 3, 15; 329:3, 14, 17, 22, 25; 330:1, 13; 333:11, 13; 336:8; 340:19; 404:8; 405:22
**units** [10] - 356:24; 357:1; 358:18, 21-22; 360:19, 23; 361:4, 7
**University** [1] - 219:25
**unless** [1] - 375:7
**unlike** [1] - 260:14
**unpacked** [2] - 244:9; 247:2
**unsuccessful** [2] - 375:11, 13
**untreated** [1] - 278:13
**unusual** [1] - 227:14
**updated** [1] - 395:15
**upper** [1] - 226:2
**UPS** [2] - 228:16; 273:25

**upset** [2] - 229:8; 230:13
**US** [8] - 243:4, 8; 311:24; 315:8; 319:1; 366:7; 369:7
**US-approved** [1] - 366:7
**USA0-22** [2] - 271:14, 25
**USAO-12** [2] - 269:19, 22
**USAO-39** [1] - 274:1
**USAO-40** [1] - 269:19
**USP** [1] - 290:3

**V**

**V-I-D-A-Z-A** [2] - 293:11; 344:14
**valid** [1] - 397:13
**varied** [1] - 378:6
**variety** [2] - 272:1; 340:16
**various** [1] - 351:1
**Velcade** [5] - 293:5; 344:9; 356:24; 358:9, 15
**VELCADE** [2] - 293:6; 344:9
**vendors** [4] - 261:11; 378:6, 8
**verifies** [1] - 271:9
**version** [5] - 277:20; 278:2; 316:19; 391:25; 401:13
**versions** [1] - 277:19
**versus** [2] - 237:24; 299:6
**vessels** [1] - 227:20
**via** [4] - 273:24; 383:16, 18
**vial** [9] - 324:14; 348:12, 19-20; 349:11; 380:16; 384:2; 392:25
**vials** [23] - 355:24; 359:25; 365:17, 23, 25; 366:11; 382:16; 388:20; 390:3; 392:4, 22, 24; 393:1, 5; 399:10, 16, 19, 21; 406:18, 23
**Vidaza** [4] - 293:11; 344:14; 363:22; 364:3
**view** [5] - 231:10; 294:14; 328:7, 11; 332:12
**viewed** [1] - 331:15
**violating** [2] - 400:10, 12
**visit** [4] - 302:24; 339:12, 19; 349:23
**visited** [6] - 281:24; 339:17, 25; 340:2; 355:25; 357:13
**voice** [4] - 218:17; 240:16; 325:7; 376:10
**voir** [2] - 341:21; 352:14
**VOIR** [6] - 342:1; 352:19; 410:14; 418:15, 17, 23
**volume** [1] - 407:11
**vomiting** [1] - 275:5

**W**

**wait** [4] - 236:17; 305:14; 372:15; 417:5
**waiting** [1] - 381:5
**walk** [2] - 345:24; 346:7
**Walmart** [5] - 282:19
19, 23
**wants** [3] - 372:*** 93:15; 416:14
**warning** [17] - 277:20, 22-23; 278:3, 5; 312:19, 21, 23, 25; 313:3, 7-10, 12, 16
**warnings** [2] - 313:13, 19
**website** [14] - 223:13, 20; 224:4, 8; 262:20, 25; 263:1, 12, 15; 264:2, 8; 291:12
**Wednesday** [1] - 415:7
**week** [16] - 214:6; 216:6, 20; 219:13; 222:2, 5-6; 258:4, 8; 304:19; 305:4; 373:11, 24
**weeks** [11] - 215:5; 238:8; 239:22; 266:23; 286:15; 361:22; 363:17; 372:8; 373:13
**whatsoever** [1] - 244:15
**whichever** [1] - 255:5
**white** [1] - 228:2
**whole** [3] - 238:19; 250:10; 353:15
**wholesaler** [2] - 396:5; 397:8
**WILLIAM** [1] - 213:7
**willing** [2] - 394:16; 416:1
**wise** [1] - 406:15
**wish** [1] - 379:21
**WITNESS** [49] -
235:3; 239:3; 241:13, 24; 242:2, 5, 7; 248:12, 16, 20; 257:7, 9; 267:17, 20, 25; 268:3; 304:15; 338:12; 340:6; 348:19; 350:25; 351:7, 10, 12, 14; 354:12; 358:21; 371:22; 376:1, 8, 11; 377:3; 378:13, 15, 18; 380:6; 383:18; 385:9, 11, 24; 393:6, 8; 394:3, 6; 413:9, 11; 417:4
**wonder** [2] - 216:1; 232:2
**word** [5] - 239:1, 15, 17, 19; 283:11
**words** [8] - 240:2-4; 300:9; 336:7; 346:3; 352:24; 367:25
**works** [4] - 227:21, 25; 228:4; 375:1
**world** [2] - 328:9; 330:5
**World** [1] - 319:23
**worried** [1] - 400:18
**worry** [1] - 295:2
**worth** [2] - 301:25; 302:3
**worthwhile** [1] - 294:5
**write** [1] - 408:10
**writing** [6] - 250:14; 251:1; 312:3; 321:7; 411:11, 13
**writings** [1] - 244:18
**written** [7] - 217:15; 229:14; 252:10;
315:2; 321:8; 385:8
**wrote** [2] - 413:25; 414:1

**X**

**X-I-A-N** [1] - 382:12
**Xeroxes** [1] - 386:3
**Xian** [3] - 382:12, 16

**Y**

**year** [13] - 219:20, 22; 220:3, 7; 225:13; 227:8, 12, 14; 259:5; 318:6
**years** [18] - 217:15; 219:1; 221:18; 227:7; 233:18; 239:13; 253:7; 257:23; 258:21; 259:8; 295:5; 297:20; 310:8; 326:24; 339:2; 362:12; 397:9; 406:16
**yes-or-no** [1] - 241:23
**yesterday** [1] - 215:2
**YORK** [1] - 213:1
**York** [15] - 213:6, 14, 18, 22; 219:25; 220:2; 223:8; 226:19; 351:8; 395:16; 396:5; 398:2, 5, 9
**young** [1] - 406:3
**yourself** [3] - 282:2; 371:15; 409:12
**yourselves** [3] - 266:9; 304:7; 415:15

**Z**

**Z-O-M-E-T-A** [1]

- 293:5
**zero** [1] - 318:7
**Zometa** [7] - 227:23; 293:5; 344:11; 361:25; 362:5, 12, 16
**ZOMETA** [1] - 344:11
**zoom** [3] - 250:21; 359:14; 397:4

* * *